ORIGINAL

IN THE UNITED COURT OF FEDERAL CLAIMS

FILED
APR 21 2005
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL W. STOVALL | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 05-400C |
| | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA | ) | |

**AMENDED COMPLAINT**

Plaintiff MICHAEL W. STOVALL, Individually, complains of THE UNITED STATES OF AMERICA, by and through its agent, the Secretary of Agriculture (AGRI), and alleges as follows:

## I. JURISDICTION AND VENUE

1. Jurisdiction and venue lies in the Court of Federal claims pursuant to the Tucker Act, 28 U.S.C. § 1346(a)(2) and the Contract Disputes Act of 1978, 41 U.S.C. §§ 607 - 609.

## II. PARTIES

2. Plaintiff MICHAEL W. STOVALL ("STOVALL") is a resident of Town Creek, Morgan County, Alabama.

3. Defendant THE UNITED STATES OF AMERICA is the sovereign served with process by the Clerk of this Court by delivery of the Complaint to the United States Attorney General.

III.

**PROCEDURAL BACKGROUND**

4. The United States District Court of the District of Columbia, DC Circuit, in an order, dated January 24, 2005, transferred the instant matter to the Court of Federal Claims because the contract breach complained exceeded $10,000, and this Court has exclusive jurisdiction hereof.

IV.

**FACTUAL BACKGROUND**

5. Plaintiff STOVALL was raised in Courtland, Lawrence County, Alabama, where his family had farmed for more than sixty years. Even as a small child, Plaintiff STOVALL helped his father farm their land, a family farm. In 1993, while farming his father's land, Plaintiff STOVALL attempted to obtain a loan application from the Lawrence County FSA Supervisor to secure a $200,000 farm ownership loan under the Socially Disadvantaged Farm Program. Plaintiff STOVALL was refused an application and told that the FSA had no money to lend to farmers and therefore, it was not necessary to provide STOVALL with an application.

12. In 1994, Plaintiff STOVALL was finally provided with an application for a farm ownership loan. Without any counseling or technical assistance from the FSA, Plaintiff STOVALL completed the loan application requesting a $200,000 farm ownership loan and a $60,000 farm operating loan. Both loan applications were denied on at least 3 occasions and Plaintiff STOVALL appealed the denials to the USDA in Washington, DC. After becoming aware of his appeals, the operating loan was approved in November 1994 by the Lawrence County Supervisor. Despite the approval, Plaintiff

STOVALL did not receive the loan proceeds until March 1995. The County Supervisor advised Plaintiff STOVALL that in order to be eligible for the ownership loan, he needed to lease the farm he intended to buy for at least one year. Plaintiff later discovered that there were no such requirements that he lease the land he intended to buy.

6. Following the County Supervisor's instructions, Plaintiff STOVALL proceeded to lease the farm he intended to buy, paying $5,000 to the lessor and then purchasing 59 head of cattle. Before he took possession of the leased property, the Lessor reneged on the lease, leaving Plaintiff STOVALL with no place to keep his cattle. Plaintiff STOVALL sought assistance from the FSA but received none. Consequently, Plaintiff STOVALL had no choice but to lease property from a person who repeatedly made veiled threats against him regarding his cattle. After making repairs to the newly leased property, Plaintiff STOVALL moved to the leased property to begin his cattle operation. During a major snow storm, Plaintiff STOVALL was unable to get to his farm. Upon his return, he discovered that a large portion of his herd had been stolen. Through information and belief, the stolen cattle had been sold to other farmers in the community. Plaintiff STOVALL was not unable to find ant of the cattle nor did he find any carcasses or fresh burial sites. Nevertheless, STOVALL was charged with inhumane and cruel treatment of animals, a felony, and was arrested. STOVAL, having no resources or assistance, felt helpless and intimidated, was forced to plead guilty to the charges. The USDA confiscated the remaining cattle and, without cattle, STOVALL was unable to realize a profit or to continue to make his payments on the USDA loan.

7. Plaintiff STOVALL's problems continued in 1995 and 1996. On January 4, 1996, he filed a complaint with the OCR claiming discrimination in the denial of his

application for a farm ownership loan in 1994, the denial of his application for a low interest rate operating loan in 1995 and the denial of his application for a farm ownership loan in 1995. After being denied technical assistance by the FSA, he attempted to secure outreach and technical assistance from Alabama A&M University's School of Agriculture. On January 31, 1996, FSA officials informed A&M that Stovall's case was beyond the agriculturists' ability to assist and encouraged them to completely separate themselves from STOVALL.

8. The Program Complaint Final Decision, issued by the OCR on Plaintiff's January 4, 1996 Complaint, found discrimination on the basis of race in the denial of his 1994 farm ownership loan application and in the denial of his 1995 application for a low interest rate operating loan. The OCR found that the agency did not provide STOVALL with the assistance needed to be a successful farmer and, in fact, stated that "this step backward can be perceived as nothing more than an indication of the agency's willingness to allow this farmer to fail." *Id.* Notwithstanding the OCR's findings and statements, the FSA continued and continues to ordain the fate of minority farmers and continue seeking to ensure Plaintiff Stovall's failure. During these years, STOVALL was forced to seek medical and psychological help as the strain and pressure exerted by being held in tandem by the FSA was manifesting itself physically and psychologically.

9. Upon information and belief, in June 1997, two years after STOVALL's last complaint filing, the OCR employed D.J. Miller & Associates, an independent company, to conduct an investigation into Plaintiff Stovall's discrimination complaints. In August 1997, Plaintiff and his attorney were interviewed by the investigators and provided documents detailing the discrimination. Based on such investigation,

Defendants, by and through Lloyd Wright, Director of the OCR, found that Plaintiff had been the victim of discrimination. Despite such finding, in order to protect Defendants from substantial exposure, the OCR never formally entered a Final Agency Decision as required by 7 CFR § 15.52, *et seq.*

10. In January 1998, the OCR, on behalf of the USDA, and Plaintiff STOVALL reached a Resolution Agreement, signed by all parties. *See* Exhibit A, Resolution Agreement attached hereto as Exhibit A. The Resolution Agreement provided, among numerous other injunctive relief. that Plaintiff STOVALL would be permitted to purchase farmland from the list of inventoried property held by the USDA in the Alabama-Tennessee area. During the negotiation of the Resolution Agreement, Defendant VENEMAN, through her attorneys, insisted that a clause requiring Justice Department approval be included. Plaintiff and his attorney objected to the inclusion of such a clause and stated in writing that the DOJ did not have the authority to invade the administrative province of Defendants. The objection was made because, Plaintiff's counsel suspected, and later confirmed, that Defendant's OGC attorneys were clandestinely communicating with DOJ attorneys to stop the OCR and Mr. Wright from settling black farmer cases including Plaintiff's. Mr. Wright, angered by the actions of the OGC, wrote a letter to James Gilliland with the OGC (and copied to Defendants) decrying the OGC's deceit. Mr. Wright stated in his letter:

> This is a reply to your memorandum addressed to 'File and for Interested Parties' dated July 17, 1997, concerning the Carpenter case. This memorandum is clear documentation showing how you, in a very malicious way, are misinterpreting the facts. Also other memorandums (sic) that have been written by J. Michael Kelly and others from the Office of General Counsel (OGC) have been designed to distance the OGC from decisions that were made that

> you or your office fully participated in the development of and approved prior to implementing. Further, it is very clear to me that I cannot trust or depend on OGC for any assistance in dealing with civil rights at USDA. Also, it is very clear to me that OGC will do everything it can to discredit me personally and professionally and to obstruct any effort to improve civil rights at USDA.
>
> cc: Dan Glickman, Secretary; Richard Rominger, Deputy Secretary; Pearlile Reed, Acting Secretary for Administration; File and other interested parties.

10. Pursuant to the terms of the Resolution Agreement, STOVALL attempted to purchase at least 4 farms but was unable to do so because of discriminatory actions of the various county supervisors and staff at the FSA offices. In March 1998, STOVALL made application for an operating loan in Tennessee. The loan was approved but STOVALL, feeling harassment from the Tennessee FSA officials, did not purchase land there. When STOVALL moved to Alabama, it took six months to redo the Farm and Home Plan.

11. After filing two additional discrimination complaints and making numerous calls to the OCR in Washington, DC, the OCR sent staff members to sit with the local FSA staff to verify that STOVALL's applications were being processed. Nearly ten months after the Resolution Agreement, STOVALL was finally able to purchase a farm.

12. Plaintiff STOVALL has filed complaints since the 1998 Resolution Agreement because the FSA has delayed the processing of loan applications, has failed to provide appropriate technical assistance and has delayed notifying the appropriate bureaus that the FSA debt was eradicated. The FSA debt remained on Plaintiff STOVALL's credit report until December 2001. Plaintiff STOVALL applied for farm

ownership and farm operation loans in March 1998. The loans were approved in August 1998. STOVALL did not actually receive the money until November 1998 when the money was placed in a supervised account. Between March 1998 and November 1998, he was told there was no money to fund his loans.

13. In July 1998, Plaintiff STOVALL contacted the FSA National Office in Washington, DC and requested assistance from Defendants SNYDER and COOKSIE, the FSA Administrator, in solving his cash flow problems. Defendant SNYDER met with Plaintiff STOVALL and completed the Farm and Home Plan. In November 1998, after finally receiving the loan proceeds, Plaintiff STOVALL purchased 159 acres of farmland.

14. In April 1999, Plaintiff contacted Ms. Carolyn COOKSIE because he did not have enough money to complete two chicken houses. COOKSIE advised she would confer with Mike SNYDER and see if they could come up with additional funds to build the chicken houses. In December 1999, almost nine months after his initial request to COOKSIE, she came up with $35,000 and added that amount to his existing loans. Plaintiff STOVALL had signed a contract for $178,000 to build the two chicken houses during a meeting with the contractor and KNOFF, the Farm Loan Officer. At that meeting, KNOFF advised that it would take $208,000 to build the chicken houses to completion. Plaintiff STOVALL asked KNOFF if the FSA was going to lend him the money and he was told that Plaintiff STOVALL was at his limit.

15. During the construction of the chicken houses, Plaintiff STOVALL had to let the contractor go when deadlines were not being met. He then contracted with another to complete the construction of one chicken house. Due to delay and rising prices, Plaintiff STOVALL did not have enough money to build two chicken houses. The second

contractor was on the job for four days when he and his workers were told to leave by KNOFF. When confronted, KNOFF denied ordering the contractor to leave. It was three weeks before the contractor returned and completed the construction.

16. After the contractor was paid, a balance of $42,000 remained on the supervised account. Plaintiff STOVALL was concerned about the interest being charged on the latent balance. After numerous attempts, he reached SNYDER to discuss his concerns. SNYDER advised Plaintiff to focus on completing the one chicken house. Plaintiff STOVALL took a leave of absence from his employment. Several weeks later, SNYDER met with Plaintiff STOVALL and discussed the 1915S loan servicing and prepared a Farm and Home Plan. Under the Plan, Plaintiff STOVALL did not have any cash flow. In preparing the Farm and Home Plan, SNYDER including the amount of $32,000 for attorneys fees. The inclusion of the attorney's fees as income to STOVALL in the Farm and Home Plan was improper as those funds were paid to STOVALL's attorney pursuant to the 1998 Resolution Agreement. The Resolution Agreement specifically excepted any proceeds from the agreement in consideration for injunctive relief provided in said agreement. On information and belief, COOKSIE, SNYDER, FAUST and KNOFF with intent to breach the settlement agreement and collectively and intentionally orchestrated this ploy to ensure that STOVALL could not farm and would effectively be out of business. In October 2001, KNOFF sent STOVALL a notice stating that the FSA could not consider additional loans or restructuring because of the nonfeasability of Plaintiff's revised Farm and Home Plan and because he had reached the maximum limits of loan feasibility.

17. Defendant, by and through the local county supervisors, repeatedly

rebuffed Plaintiff STOVALL's efforts to benefit from FSA farm loan programs. The loans he did receive were time-delayed to the extent that the crop yields at harvest were lower than anticipated. If the loans had been timely, yields would have fulfilled projection. Moreover, the loan amounts were inadequate to sustain Plaintiff's farm acreage. No equipment loans were granted even though applied for. The loans received were too little and too late, all because Plaintiff is black.

18. Plaintiff STOVALL was qualified for credit, attempted to and did apply for credit and FSA assistance. Plaintiff STOVALL was denied credit and/or adequate credit while white farmers received ample credit for farm purchases, equipment, operating and emergency and disaster loans. Defendant violated and continue to violate Plaintiff's rights to due process and equal protection under the law as guaranteed by the Fourteenth Amendment.

19. Plaintiff suffered and continues to suffer injuries and damages as a result of Defendant's illegal actions, including, but not limited to, injury to his business, his credit reputation as well as his standing in the local farm community. Plaintiff has suffered almost incalculable pecuniary and non-pecuniary damages, and will in all probability, continue to suffer damages in the future unless and until this Court intercedes.

20. Plaintiff is entitled to recover his reasonable attorneys' fees, including paralegals' fees, and expenses associated with the litigation of his claims. Plaintiff is entitled to recover a sum from Defendants to compensate Plaintiff for a reasonable fee for his attorneys' fees, including paralegals' fees, in the preparation and prosecution of this action as well as a reasonable fee for any and all appeals to other courts.

## V.
## CAUSE OF ACTION

### BREACH OF CONTRACT

21. Plaintiff restates and re-alleges paragraphs 1-20, above, as if fully stated herein and would further show the Court as follows:

22. Defendant VENEMAN breached the 1998 Resolution Agreement with Plaintiff in, but not limited to, the following ways each of which proximately caused Plaintiff's damages, as described above and as follows:

a. Their handling of Plaintiff's loan applications submitted subsequent to the January 1998 Resolution Agreement;

b. Their denial of Plaintiff's loan application submitted subsequent to the January 1998 Resolution Agreement; and

c. Their failure to remove the FSA debt, released in the 1998 Resolution Agreement, from Plaintiff's credit report until December 2001.

23. All conditions precedent, if any, to Plaintiff's right to recovery under his contract with the OCR have been satisfied.

24. Plaintiff's extended money and non-pecuniary damages were foreseeable by the Defendant; and Plaintiff alleges that such actions were in furtherance of the Defendant's discrimination against Plaintiff.

25. Plaintiff's loss of his farm was foreseeable by the Defendant and Plaintiff alleges that such actions were in furtherance of the Defendant's discrimination against Plaintiff.

26. Plaintiff seeks recovery of all damages as a result of the Defendant's intentional breach of contract.

27. Plaintiff is entitled to recover his attorneys' fees from Defendant to compensate Plaintiff for a reasonable fee for his attorneys' fees, including paralegals' fees, in the preparation and prosecution of this action as well as a reasonable fee for any and all appeals to other courts.

**PRAYER**

WHEREFORE, Plaintiff MICHAEL W. STOVALL requests that Defendant UNITED STATES OF AMERICA be required to appear and answer herein, and that the Court:

Grant Plaintiff MICHAEL W. STOVALL judgment against Defendant for:

(1) Breach of Contract damages and all damages flowing there from; including but not limited to damages resulting from the contracted injunctive relief not provided pursuant to the Resolution Agreement;

(2) Reasonable attorney's fees and expenses;

(3) Costs of suit; and

(4) such other and further relief as appears just and equitable.

Respectfully submitted,

James W. Myart, Jr. P.C.
306 Preston Avenue
San Antonio, Texas 78210
Phone: (210) 533-9461
Fax: (210) 533-4815

By:____________________________
James W. Myart, Jr.
Federal Bar No. TX 0021
Jwmyart@aol.com

ATTORNEYS FOR PLAINTIFF

**ATTORNEY ADMISSION
TO COURT OF FEDERAL CLAIMS COURT PENDING APPLICATION
TIMELY SUBMITTED**

# UNIT_D STATES DEPARTMENT OF AGRICULTURE

## RESOLUTION AGREEMENT – Michael Stovall

This agreement is by and between the complainant, Michael Stovall, and the United States Department of Agriculture (USDA). Michael Stovall is represented by attorney James M. Myart, Jr. of San Antonio, Texas. This agreement constitutes a full, complete, and final settlement of all claims for relief raised in Mr. Stovall's January 4, 1996, discrimination complaint submitted to USDA. This agreement is authorized by civil rights statutes and USDA regulations.

The parties wish to set forth the terms of the agreement in writing. The agreement is entered into for the purpose of resolving Mr. Stovall's discrimination claims for relief in a mutually acceptable voluntary agreement. The Farm Service Agency (FSA) reserves the right to follow-up on any information developed as a result of the complaint and to take corrective action concerning FSA employees or policies as appropriate. This agreement is intended to supercede the resolution agreement entered into by the parties on January 20, 1998.

USDA AGREES:

1. To pay Mr. Stovall the sum of $145,000 in compensatory damages. A check in the amount payable to Mr. Stovall and James M. Myart, Jr. of San Antonio, Texas, will be issued as soon as practicable but no later than 30 calender days after this agreement has been signed by all parties.

2. To provide Mr. Stovall with programmatic relief as follows:

    a. USDA will release Mr. Stovall from liability on his outstanding debt to USDA such that Mr. Stovall will have no debt to USDA. This release will not trigger the statutory provisions found at Section 648 of the Federal Agriculture Improvement and Reform Act of 1996 that preclude an individual who has received debt forgiveness from obtaining further farm loans from USDA or from obtaining future debt forgiveness.

    b. FSA will give Mr. Stovall priority consideration on any application for inventory property located in Madison, Jackson, Limestone, Lauderdale, Colbert, Franklin, Lawrence, Morgan, Marshall, and DeKalb Counties located in Alabama, and all Tennessee counties bordering Alabama. FSA will give Mr. Stovall the best purchase price available under law for such inventory property. FSA will provide notice of such property's existence to Mr. Stovall within 30 days of execution of this agreement. For the next five years, but only until such time as Mr. Stovall acquires a piece of inventory property, FSA will provide notice in writing to Mr. Stovall at

Michael Stovall, 105 Cramer Road, New Market, Alabama 35671, within 30 calendar days of newly acquired inventory property.

c. Mr. Stovall will be given priority consideration on one farm ownership loan at his election. Such election must be made within the next five years. Mr. Stovall will be given priority consideration by FSA on any direct farm operating loan he applies for in the next five years to the extent that this is consistent with the relevant statutes governing the loan program; however, no priority consideration will be provided to Mr. Stovall on any application for a farm operating or ownership loan five years after the date this agreement has been signed by all parties. The term "priority consideration" means that an application will be given first priority as to processing and as to the availability of funds available for the type of loan at issue.

d. Any application for a farm operating loan submitted by Mr. Stovall within five years after this settlement agreement has been signed by all parties (not just those applications in which priority consideration is provided) will be viewed in a light most favorable to Mr. Stovall, and the amount and terms of the loan will be the most favorable under the law so long as this is consistent with statute as stated above. In making any determination on a loan application, FSA will not take into account the sum paid under paragraph 1 of this agreement. Mr. Stovall will need to reestablish eligibility and repayment ability for any loan that will be approved.

e. In conjunction with any application for a farm ownership or operating loan, the national office of FSA will provide or obtain reasonable technical assistance for Mr. Stovall in submitting such application, including the preparation of a farm and home plan.

f. Final approval or disapproval of any application for a USDA loan will be completed under the auspices of the national office of FSA. In addition, the national office of FSA will monitor all assistance provided to Mr. Stovall for the next five years.

g. The Office of Civil Rights will monitor FSA's compliance with the programmatic remedies set forth in this section.

h. USDA will notify the appropriate credit bureau (as provided by Mr. Stovall) that Mr. Stovall no longer has any indebtedness to USDA.

i. As soon as is practicable but not later than seven days 7 calendar days after this agreement has been signed by all parties, FSA will sign over the May 8, 1996, certified check, previously issued jointly to Mr. Stovall and FSA, to Mr. Stovall. If the bank at issue refuses to honor such check, FSA will reissue a certified check in the amount of $12,590, payable to Mr. Stovall individually.

3. To pay reasonable attorney fees and costs upon submission of a bill of particulars. A check in the amount determined, payable to James M. Myart, Jr. of San Antonio, Texas, will be

issued as soon as practicable, but no later than 30 calendar days after such submission.

MR. STOVALL AGREES:

4. That this settlement agreement constitutes a withdrawal of all of his pending discrimination complaints with USDA, including his January 4, 1996, program discrimination complaint, and that he will not file any new complaint about the issues involved in these complaints.

5. To accept the above payment of compensatory damages and other relief set forth above as a full, final, and complete settlement of all claims in connection with all of his pending discrimination complaints with USDA, including his January 4, 1996, discrimination complaint. This settlement is also in complete and full satisfaction of any and all claims Mr. Stovall may have against USDA based on facts occurring prior to the date of this agreement of which Mr. Stovall knows and reasonably should know.

6. To waive and release any and all claims or complaints of any kind arising out of the events that were the subject of the complainant's pending discrimination complaint with USDA, including his January 4, 1996, discrimination complaint, against USDA, the United States of America, any other agency of the United States of America, or any officer, employee, or agent of the United States of America, in either his or her official or individual capacity.

BOTH PARTIES AGREE:

7. To respect the privacy rights of Mr. Stovall and all other individuals involved in this matter. The fact that the matter was voluntarily resolved in a manner acceptable to both sides may be communicated by either party to any person. However, except as otherwise required by law, the explicit terms of this agreement will not be disclosed by either party, without the express permission and consent of the other party, to any person not a party except as necessary for that party to perform official government duties, to implement the agreement, or to defend themselves against any claim or cause of action.

8. That this matter is resolved through this settlement agreement. If the terms of this agreement are not carried out (other than a result of actions by Mr. Stovall), Mr. Stovall may request specific enforcement of the terms or reinstatement of his complaints by writing to the Director, Office of Civil Rights, USDA, Room 326-W, Washington, D.C., 20250. This

request should be filed as soon as practicable but no later than 60 days of the date Mr. Stoval knows or reasonably should have known of the alleged failure to implement the agreement

9. See attachment, marked Exhibit A, and same is incorporated herein as set forth verbatim.

2/27/98

Lloyd E. Wright, Director
Office of Civil Rights

Michael Stovall
Complainant

James M. Myart, Jr.
Attorney for the Complainant