**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| MICHAEL STOVALL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05-400C |
| | ) | Judge Allegra |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JAMES W. MYART, JR.**

"My name is James W. Myart, Jr. I am over 18 years of age and a United States citizen. I have personal knowledge of the stated herein. I make this Declaration under the penalty of perjury.

"I have been Mr. Michael Stovall's attorney since 1997.

"OCR issued a Final Agency Decision in the Michael Stovall case finding that Mr. Stovall had been discriminated against by the USDA in violation of statutory law and USDA regulations.

Settlement in this case was accomplished on February 27, 1998. The Resolution Agreement was signed by all parties on February 27, 1998. The Resolution Agreement is found at Compl., Exhibit B, same being incorporated herein as if fully set forth verbatim.

"The Resolution Agreement, by intent and by its four corners, provided valuable, ascertainable equitable and injunctive relief which the parties knew if breached would cause significant damages to Mr. Stovall.

"The injunctive and equitable relief provisions at ¶ 2(a-i), Resolution Agreement, were intended to place Mr. Stovall in the economic position he would have been but for the discrimination and to re-establish his previously profitable farming operation. These injunctive and equitable relief provisions provided Mr. Stovall an economic benefit, which if breached, would cause Mr. Stovall to suffer actual and consequential damages.

"The USDA breached it' contract in completely violating and/or delaying the processing of all these provisions, including his new loans, causing Mr. Stovall's farming operation to fail and for him to suffer economic damages which were foreseeable.

"The DEFENDANT and the USDA have admitted discrimination against minority farmers, like Mr. Stovall. In February 1997, the USDA Civil Rights Action Team submitted a report, "CRAT". The report is replete with admissions fully applicable

to this case as follows:

"USDA Civil Rights Action Team released a report, dated February 1997, condemning DEFENDANTS' lack of civil rights enforcement and lack of accountability which, inter alia, were a cause of the drastic decline in the number of African American farmers. (The Report is hereinafter referred to as "CRAT"):

> According to the most recent Census of Agriculture, the number of all minority farms has fallen –from 950,000 in 1920 to around 60,000 in 1992. For African Americans, the number fell from 925,000, 14 percent of all farms in 1920, to only 18,000, 1 percent of all farms in 1920.

[CRAT, p.14].

CRAT found a common problem involved minority farmers applying to DEFENDANTS loans:

> The minority or limited-resource farmer tries to apply for a farm operating loan through the FSA county office well in advance of planting season. The FSA county office might claim to have no applications available and ask the farmer to return later. Upon returning, the farmer might receive an application without any assistance in completing it, then is asked repeatedly to correct mistakes or complete oversight in the loan application. Often these requests for correcting the application could be stretched for months, since they would come if the minority farmer contacted the office to check on the loan processing. By the time processing is completed, even when the loan is approved, planting season has already passed, and the farmer either has not been able to plant at all, or has obtained limited credit on the strength of an expected FSA loan to plant a small crop, usually without the fertilizer and other supplies necessary for the best yields. The farmer's profit is then reduced.

[CRAT, p.15 (emphasis added)]

CRAT found systematic mistreatment of minority farmers:

> If the farmer's promised FSA loan finally does arrive, it may have been arbitrarily reduced, leaving the farmer without enough money to repay suppliers and any mortgage or equipment debts. In some cases, the FSA loan never arrives, again leaving the farmer without any means to repay debts. Further operating and disaster loans may be denied because of the farmer's debt load, making it impossible for the farmer to earn any money from the farm. As an alternative, the local FSA

> official might offer the farmer an opportunity to lease back the land with an option to buy it back later. The appraised value of the land is set very high, presumably to support the needed operating loans, but also making repurchase of the land beyond the limited-resource farmer's means. The land is lost finally and sold at auction, where it is bought by someone else at half the price being asked of the minority farmer. Often, it is alleged that the person was a friend or relative of one of the FSA county officials.

[CRAT, p.16 (emphasis added)]

CRAT found insufficient oversight of farm credit to minorities:

> Currently, the Farm and Foreign Agricultural Services (FFAS) Mission Area, which manages the FSA program delivery system, provides ineffective oversight of the local delivery of farm credit services.

[CRAT, p.16 (emphasis added)]

CRAT found a lack of diversity in FSA program delivery structure:

> Because of the ways in which State and county committees are chosen and county offices are staffed, FSA lacks diversity in its program delivery structure. Federal EEO and Affirmative Employment laws and policies do not govern the FSA non-Federal workforce except by agency regulation.

[CRAT, p.18 (emphasis added)]

CRAT found a lack of minority employees in FSA county offices: "A recent GAO study indicated that in the 101 counties with the largest concentration of minority farmers, one-quarter had no minority employees in their offices." [CRAT, p. 18].

CRAT found lower participation rates and lower approval rates for minorities in FSA programs:

> Recent studies requested by Congress and FSA have found lower participation and lower loan approval rates for minorities in most FSA programs. Participation rates in 1994 in programs of the former Agricultural Stabilization and Conservation Service (ASCS), particularly commodity programs and disaster programs, were disproportionately low for all minorities. The GAO found that between October 1, 1994 and

> March 31, 1996, 33 percent of minority applications but only 27 percent of non-minority application in the Agricultural Conservation Program (ACP) were disapproved. During the same period, 16 percent of minority but only 10 percent of non-minority loans in the direct loan program were disapproved.

[CRAT, p.21 (emphasis added)]

For some states, the approval rates for farm loans were widely disparate:

> For example, only 67 percent of African-American loans were approved in Louisiana, compared to 83 percent of non-minority loans. Alabama showed a similar disparity --only 78 percent of African-American l0ans approved compared to 90 percent of non-minority loans.

[CRAT, p.21 (emphasis added)]

CRAT found minorities endured longer loan processing times:

> Again, however, some States showed consistently longer processing times for minorities. In the Southeast, for example, in several States it took three times as long on average to process African-American loan applications as it did non-minority applications. Similar disparities between non-minority loan processing and American Indian loan processing appeared in records for a number of States included in FSA's Northwest region.

[CRAT, p.21].

CRAT found discrimination complaints at USDA were often ignored:

> Farmers who told the CRAT stories of discrimination and abuse by USDA agencies also described a complaints processing system which, if anything, often makes matters worse. They described a bureaucratic nightmare where, even after they receive a finding of discrimination, USDA refuses to pay damages. They charged USDA with forcing them into court to seek justice, rather than working with them to redress acknowledged grievances. They painfully described the toll these ongoing battles with USDA have taken on their families, and on their health.

[CRAT, p. 22-23].

CRAT found decisions favoring farmers routinely not enforced by USDA: "However, many farmers, especially small farmers, who have managed to appeal their cases to FSA charge that even when decisions are overturned, local offices often do not honor the decision. They

claim that decisions favoring farmers are simply "not enforced".

CRAT found a lack of USDA regulations for discrimination complaint processing:

> Program discrimination complaints generally fall within two categories: (1) programs conducted directly by a USDA agency, such as USDA loan programs, and (2) federal assisted programs, where USDA does not directly offer services to customers, but recipients of USDA funds do. The recipients must obey civil rights laws, and USDA can be sued under such laws as Title VI, the Rehabilitation Act, IX, the Equal Credit Opportunity Act, and others. CRAT members were informed by OGC that USDA presently has no published regulations with clear guidance on the process or time lines involved in program discrimination complaints. When a farmer does allege discrimination, "preliminary investigations" are typically conducted by the agency that has been charged with violating her or his right.

[CRAT, p.24].

CRAT found discrimination complaints often are not responded to by USDA: ". . . USDA doesn't respond even when they do file complaints. In Tulsa, OK. , an advocate representing black and American Indian farmers said, "we have filed 72 civil rights complaints. Not one complaint has even been answered." [CRAT, p.24]

CRAT found record-keeping on discrimination complaints "non-existent" and that a backlog existed:

> The CRAT was unable to gather historical data on program discrimination complaints at USDA because <u>record keeping on these matters has been virtually nonexistent.</u> Complaints filed with the agencies are not necessarily reported to USDA's Civil Rights office. Some figures are available however, for cases that were open as of December 31, 1996. The largest number of pending discrimination complaints, as comments at the listening sessions suggests, are concentrated in three agencies at USDA. There were 205 cases pending, representing 42 percent of the total, against the FSS: 165, or 33.3 percent against the Rural Housing Service (RHS); and 62, or 12.5 percent against the Food and Consumer Services. Sixty-three cases, or 12.7 percent of the total, were pending against other agencies. The Department had a total of 495 pending program discrimination complaints. Approximately one-half of the pending cases are two years old or older, verifying farmer's contention that complaints are being processed slowly, if at all. According to the Complaints Processing Division at the Office of Operation (OO), which processes complaints that make it to the Department level? USDA averages about 200 new program discrimination complaints each year. However, in fiscal year 1996, an average of only 9 cases was closed per month, or 108 during the year – increasing a backlog of program

complaints.

[CRAT, pp. 24-25 (emphasis added)]

CRAT uncovered neglect of and bias against minorities by USDA, resulting in a loss of farmers' land and income.

> The recent Civil Rights listening session revealed a general perception of apathy, neglect, and a negative bias towards all minorities on the part of most local USDA government officials directly involved in decision making for program delivery. A reporter at the recent listening session in Tulsa, Oklahoma observed that minority farmers are not sure which condition "was worse – being ignored by the USDA and missing potential opportunities or getting involved with its programs and facing a litany of abuses. Minority farmers have lost significant amounts of land and potential farm income as a result discrimination of FSA programs and the programs of its predecessor agencies, ASCS and FmHA. Socially disadvantaged and minority farmers said USDA is part of a conspiracy to take their land and look to USDA for some kind of compensation for their losses.

[CRAT, p. 30].

CRAT found USDA the fifth worst (of 56 government agencies) in hiring minorities:

> According to the US Department of Labor, between 1990 and 2000, women, minorities, and immigrants will account for 80 percent of the United States labor force growth. The "Framework for Change: Work Force Diversity and Delivery of Programs," a USDA report released in 1990, found that USDA had a need to remedy under-representation in its workforce by providing equal employment and promotion opportunities for all employees. When this statement was made, USDA ranked 52 out of 56 Federal agencies in the employment of minorities, women, and individuals with disabilities.

[CRAT, p.33].

CRAT found the lack of diversity at USDA adversely affects program delivery to minorities: "USDA's workforce does not reflect the diversity of its customer base. The lack of diversity in field offices adversely affects program delivery to minority and women customers of USDA." [CRAT, p.45]

CRAT found a lack of resources at USDA to ensure fair and equitable (non-

discriminatory ) program delivery to farmers:

> The Assistant Secretary for Administration is USDA's senior official responsible for civil rights. Although that position has the responsibility for civil rights policy and compliances, it does not have the authority or resources necessary to ensure that programs are delivered and employees are treated fairly and equitably.

[CRAT, p.46].

CRAT found enforcement of civil rights at USDA in program delivery lacking:

> Another problem with enforcing civil rights in program delivery is fragmentation. Agency civil rights directors have a number of responsibilities. For example, USDA agencies each perform come complaint processing functions. However, the Commission noted that the respective roles of OCRE and the agencies were not clearly defined. The Commission also found that OCRE was providing technical assistance to agencies on civil rights statutes, not proactively, but only when requested.

[CRAT, p.51]

CRAT found a lack of civil rights specialists and knowledge for program-related civil rights issues at USDA:

> The Civil Rights Commission's report on the lack of Title VI enforcement also pointed to USDA's lack of civil rights specialists in program-related civil rights issues. Many of the Department's civil rights resources are devoted to processing of employment discrimination complaints. Of the current staff in the Department's two civil rights offices, two-thirds work on EEO complaints. That means only a small percentage of USDA's civil rights staff works on civil rights issues relating to program delivery. According to the Commission, the 1994 civil rights reorganization was deficient because OCRE did not separate internal and external civil rights issues into separate offices. The Commission predicted that "a probable consequence is that USDA's Title VI enforcement program may suffer as OCRE responds to pressures to improve USDA's internal civil rights program." It recommended that USDA establish "two separate units, with different supervisory staff," one for internal and one for external civil rights issues.

[CRAT, p.54]

CRAT found DEFENDANTS' counsel hostile to civil rights, if not racist:

> The perception that the Office of the General Counsel [at

> USDA] is hostile to civil rights has been discussed earlier in this report. OGC's legal positions on civil rights issues are perceived as insensitive at the least, and racist at worst. Correcting this problem is critical to the success of USDA's civil rights program.

[CRAT, p.55]

CRAT found DEFENDANTS' counsel often have no civil rights experience or education:

> However, the CRAT has found that attorneys who practice civil rights law at [USDA's] OGC are not required to have specialized experience or education in civil rights when they are hired. They acquire their civil rights experience on the job. In addition, most of OGC's lawyers working on civil rights issues work on non-civil rights issues as well.

[CRAT, p.55]

In sum, CRAT concluded that DEFENDANTS does not support or enforce civil rights:

> USDA does not have the structure in place to support an effective civil rights program. The Assistant Secretary for Administration lacks authority and resources essential to ensure accountability among senior management ranks. There has been instability and lack of skilled leadership at the position of USDA Director of Civil Rights. Dividing up the Department's Civil Rights office between policy and complaints has further exacerbated the problem. The division of responsibility for civil rights among different USDA offices and agencies has left confusion over enforcement responsibilities. Finally, OGC is perceived as unsupportive of civil rights.

[CRAT, p. 56]

I have reviewed the foregoing Declaration and declare under penalty of perjury that it is true and correct to the best of my personal knowledge.

/s/__________________________________ July 22, 2005
James W. Myart, Jr. Date

> USDA] is hostile to civil rights has been discussed earlier in this report. OGC's legal positions on civil rights issues are perceived as insensitive at the least, and racist at worst. Correcting this problem is critical to the success of USDA's civil rights program.

[CRAT, p.55]

CRAT found DEFENDANTS' counsel often have no civil rights experience or education:

> However, the CRAT has found that attorneys who practice civil rights law at [USDA's] OGC are not required to have specialized experience or education in civil rights when they are hired. They acquire their civil rights experience on the job. In addition, most of OGC's lawyers working on civil rights issues work on non-civil rights issues as well.

[CRAT, p.55]

In sum, CRAT concluded that DEFENDANTS does not support or enforce civil rights:

> USDA does not have the structure in place to support an effective civil rights program. The Assistant Secretary for Administration lacks authority and resources essential to ensure accountability among senior management ranks. There has been instability and lack of skilled leadership at the position of USDA Director of Civil Rights. Dividing up the Department's Civil Rights office between policy and complaints has further exacerbated the problem. The division of responsibility for civil rights among different USDA offices and agencies has left confusion over enforcement responsibilities. Finally, OGC is perceived as unsupportive of civil rights.

[CRAT, p. 56]

I have reviewed the foregoing Declaration and declare under penalty of perjury that it is true and correct to the best of my personal knowledge.

James W. Myart, Jr. (signature)

James W. Myart, Jr.          July 22, 2005
                             Date