UNITED STATES OF AMERICA
DEPARTMENT OF AGRICULTURE

In Re:

*WILL* SYLVESTER WARREN, USDA Docket No. 1194

HUDALJ No. 00-19-NA
Complainant December 19, 2002

fComplainant,

Pro s8
Assisted by John Warren

Ronald VTalkow, Esq.
Fcr the Government

Before: *Constance T*. O'Bryant
Administrative Law Judge

DETERMINATION

This case arises out of complaints dated January 10, 1992, May 14, 1995, and January 2$,1997, filed with the United States Department of Agriculture ("USDA"); by Will Sylvester Warren ("Complainant") alleging that an agency within USDA, the Farmers I-Tome Administration ("FmHA") and its successor agency, the Farm *Service* Agency ("FSA"), (hereinafter referred to as FSA), discriminated against him based on race ("Black") in violation of the Equal Credit Opportunity Act ("ECOA"). 15 U.S.C. *1691 et seq*. Mr. Warren alleges that the USDA discriminated against him based on his *race by* denying his loan and/or *loan* servicing applications *and then* retaliating *against* him for filing a *discrimination* complaint. The USDA's Office of Civil Rights ("OCR") determined that Mr. Warren's complaints were eligible for consideration under the provisiorr> of Section 741 of the Agriculture, Rural Development, Food and Drug

'Th.e term "USDA" shall include the U. S. Department of Agriculture and all of its agencies, instrumentalities, agents, officers, and employees, including, but not limited to, the state and county conunittees and their staffs which administer USDA credit programs-

Administration, and Related Agencies Appropriations Act, 1999, enacted in Division A, section 101 (a) of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277 ("Section 741 "). On August 16, 2001, Mr. Warren requested a hearing before an administrative law judge. OCR then forwarded the administrative record to this office, with its Position Statement on the merits of the matter, for review pursuant to Section 741.

The trial of the case was delayed after the parties requested the assistance of a settlement judge. The USDA stipulated to liability on the complaints and sought the assistance of a settlement judge in resolving the remedy issue. When settlement was not reached, the case was again put on the trial calendar and came on for hearing on Decembef04, 7001, in Virginia Beach, Virginia. Because the USDA "stipulated" to liability for racial discrimination in the case, the trial was limited .to the issue of damages and other appropriate remedy. At trial, the USDA stipulated that Mr. Warren was . entitled to an award of actual damages for injuries he suffered as a result of discrimination at least since 1985. Following the trial, the parties submitted post-trial briefs, the: last being received on May 4, 2002. The case is now ready for decision.

## BACKGROUND

*Mfi.* Warren alleged in his several complaints that FSA discriminated against him based on his race, as follows; 1) since the early 1980`s - by failing to keep an accurate account of his indebtedness to FSA, including the inclusion of incorrect loans on his account; 2) since 1985 - in the denial of his application for Farm Operating loan, Primary and Preservation Loan Servicing, and disaster benefits; and 3) since 1992 - by retaliating against him for filing a series of successful appeals and for filing a race discrimination complaint. The act of retaliation, he alleged, was the mailing of a finding that he had acted wit1i "lack of good faith" in his dealings with FSA, a finding which barred him further participation in FSA's loan programs.

Mr. Warren alleges that FSA consistently employed a pattern and practice of discrimination against him based on his race - that FSA county supervisors and/or the county committee members involved *in his case* consistently used his illiteracy and lack of understanding of the complicated FSA and USDA, regulations to impede and harm him and that as *a result he* has suffered severe economic and emotional harm. In his 1992 complaint he wrote:

> I believe I am the victim of an insidious scheme of racial discrimination, designed to cause or to permit African-American farmers in this rural, peanut-rich, southeastern Virginia county, to lose their land to the sons

> and grandsons of wealthy white farmers and businessmen in this area. The scheme, I believe, involves the cooperation, wittingly or unwittingly, of at least one Farmers Home Administration ("FHA") official, viz., Mr. Ronald E. Norton, FHA's Southampton County Supervisor. RR,Ex 1 a?

Mr. Warren filed two other complaints, one in 1995 and another in 1997, in which he repeated the same allegations. However, in these complaints he added the allegation that Mr. Norton had retaliated against him for filing the 1992 discrimination complaint.

In 1997, OCR contracted with a law firm to conduct an investigation of Mr. Warren's ;omplaints. An extensive investigation was done. On the basis of the investigator's report and recommendation, OCR *concluded that* there was merit to Mr. Warren's complaints, atleast since 1988. It found insufficient *evidence* to establish discrimination prior to that date. At trial, the USDA "stipulated" to liability for acts of discrimination since 1985. Based on the USDA's stipulation of discrimination, the testimony of the witnesses at the hearing, and the documentary evidence of record, I make the following findings of fact. These findings are based on the preponderance of the evidence.

## FINDINGS OF FACT

1. Mr. Will Sylvester Warren is a 77-year old, African-American male farmer who has resided in Southampton County, Virginia for his entire life. He was born and raised on a 104-=e farm that he purchased from his father in or about 1951. His father had been a "share farmer" on the land before he purchased it in the 1940's. Mr. Warren's present home is about four miles from where he was born. Cx-119.

2. Mr. Warren received no formal education, and as a result cannot read or write, except for his name. He has spent his entire life working on the farm Farming has been his life - it is all that he knows. Id..

3. Mr. Warren married at age 21 and through the course of his marriage had fourteen surviving children, *nine sons and* five daughters. Mr. Warren's wife *died in 1988 of a* heart attack at age 56. Her death was abrupt and unexpected. Id.

[2]The abbreviations used in this decision are as follows: RR-#, for the bound volume or "running record" submitted by FSA; Cx-# for the Complainant's exhibits; Rx-# for the Respondent's exhibits; and Tr. #, for the hearing transcript.

4. Throughout the years leading up to the discrimination, Mr. Warren had been an active and respective member of his local community. He is a deacon and trustee of his church. lie is considered by those who know him as a God-fearing man, and one of decency, honesty and integrity. Cx-18, Cx-107, RRex11. At the trial, r found him to be a highly credible witness. .

5. In or about 1959, Mr. Warren and *his wife, bought an* additional 76-acre farm, giving him a total of 180 acres of owned farm land. His successful farming allowed him and his wife to raise and support fourteen children. The land is rich in fertility and with the help of his children, *Mr.* Warren was able to produce excellent crops. He was a "first*rate farmer."* Cx-18, Cx 107. *r.* _

6. Diring *the years from* 1950 to the late 1969s, Mr. Warren lived in a rural, racially segregated community. In Southampton County, White residents owned all of the major commercial enterprises in the community - farm supply companies, feed companies, equipment sales companies, financial lenders, etc.

7. As a Black farmer, *Mr. Warren* enjoyed a fairly good relationship *with the local* commercial banks and local farm suppliers until about 1969-1970, when he spoke up at a local school board meeting. At the meeting, he "publicly and vehemently" opposed segregated school busing in the County. Immediately afterwards, he began to feel repercussions from his outspoken stance. Many White residents expressed disapproval of his position *on the* busing issue and of his perceived activism. When he next went to the bank where he had done business for years, the bank called in his demand loan, and refused to extend him further credit. Tr. 52-60, Cx-71. Other banks followed suit, refusing to extend credit to him, even though at the time he was quite creditworthy in that he had one farm free and clear of debt. Thus, in 1970, he *turned to FSA* for financial *assistance, as a lender of* last resort. [3]

8. Mr. Warren's relationship with FSA was not without difficulty. He, as did all Black farruers in the County, had to deal with the local FSA county committee members who approved or disapproved farm loans. The committee members were all local White farmers. Despite these substantial odds, he was able to thrive as a farmer through his hard work and industry. Tr. 59, Cx-119.

3'fh, FSA, an agency of the USDA, lends money to farmers and ranchers who are unable to obtain loans elsewhere. 7 U.S.C. § 1922 (1988)- USDA's regulations provide that if a person is able to obtain credit from another source at a reasonable rate, they have an obligation to obtain credit froth that source. Cx-i06.

9. Ire May 1970, Mr. Warren and his wife obtained from FSA a Farm Operating Loan of $58,280. His two farms were used as collateral.

10. With the help of FSA; Mr. Warren enjoyed a successful farm operation into the early 1989s- For more than ten years, Mr. Warren received and paid off numerous operating loans made to him by FSA. He expanded his operation beyond his 180 acres of land by leasing farm land owned by others. He was *selected as one of an elite group of* farmers to grow certified, registered foundation peanuts in cooperation with the Agricultural Experiment Station at Virginia *Polytechnic Institute and* State University ("VPI"j. In order to qualify to participate in the VPI program, he had to meet the high standards of the Virginia Crop Improvement Association, which placed him in the top echelon cf Virginia farmers. Only one out of one hundred farmers were so selected. Cx 18, Cx-99. He grew certified, registered foundation peanuts for nearly twenty years for Severn Peanut Company, under the scrutiny of the VPI program, ending in the early 1990's. Cx-18.

*11. By the early 1980's, Mr.* Warren was producing on 763 acres of land, all of it leased except for 170 acres that he owned. In 1983 and 1984, he was farming 300 acres of soybeans, 250 acres of peanuts, 213 acres of corn, and was producing hogs for market. Tr. 46. Cx-99.` He had become one of the largest farmers in Southampton County of any race. Cx-99, Cx-121, CX-38, Cx-79, Cx-80.

12. All of Mr. Warren's children grew up on the farm. All nine of his sons worked on the farm after school and during vacations. All of his sons worked on the farm after finishing high school. Moreover, all of his sons had intentions of making their living on the farm. Mr. Warren had intended to expand his farm. It was his goal to leave land to each of his sons upon his death so that *they could* continue the successful farming tradition in his family. However, as of 1992 only one son was still in the business. Cx-37.

13. Beginning in the early 1980's, Mr. Warren began to experience significant problems in his dealings *with FSA.* Although he obtained Farm Operating loans from

4Tbe USDA has challenged this number of acres farted in 1983. However, Mr. Warren submitted affdavits from two county farm extension agents who worked with him in the late 1970's and early 1980's who stated that Mr. Warren farmed approximately 800 acres of land during that time. Moreover, in his own affidavit. Mr. Warren identified the farms he leased by owner, acreage and farm number. Cx-99. The USDA has not rebutted this information- 1, therefore, find that Mr. Warren farmed 763 acres i» 1983 and 1984.

FSA up to 1984, he usually received funds late in the planting season.' He noticed that White farmers were being given their money early in the spring, while he and other Black farmers received their money late in the spring. Cx-103, Cx-119.

14. The county supervisor serves as the local office manager as well as the loan approval official. The county supervisor is required by FSA regulations to offer sincere assistance to the farmer. 7 C.F.R_ 1910.3. and 1910.7. The county supervisor is responsible for completing loan applications, with the farmer's input, if the farmer is illiterate. It is FSA's policy to do so. Cx-106. Because he could not read or write, Mr. Warren necessarily relied upon the county supervisors for their sincere assistance. RR, ex.7.

15 Because Mr. Warren cannot read or write, he relied upon the county supervisor to prepare his application package, including the required Farm and Home Plan ("FHP") - a plan used to determine farm loan eligibility.' When he applied for loans he often signed a blank application. On other occasions he would signed an application after it had been completely filled in by the county supervisor. Mr. Warren depended on the county supervisor for accurate and fair assistance in helping him fill out virtually all of the loan application package. He trusted the county supervisor to act in his best interest in helping him to obtain the maximum loan and services for which he qualified. Mr. Warren believes that in the *1980's, the* county supervisors did not always include *accurate* information on his MIN to his detriment.' Tr. 46-54.

50p.-,rating loans are critical to farmers because they are used to purchase livestock, poultry. equipment, need, seed, farm chemicals and supplies and to provide soil and water conservation. In general, farmers come in to their local offices between November and February to obtain and submit their applications. The goal is to get the operating money in hand before planting season. Cx-106.

6In order to qualify for an operating loan, the farmer fills out an application packet.. bcludel in the packet is a farm and home plan. This plan shows financial details of the farmer's operation. It shows assets, liabiIities, capital expenditure, household expenditures, live stock, debts and payment of debts. The plan is the foundation of the application and is critical for FSA_ Cx-106.

'The record shows that Mr. Warren obtained an FSA loan in ,April 1983 for $48,380. Cat-3. He stated that he learned, well after the fact, that his FHP for 1983 showed that he farmed 299 acres of land. C5c-99. I have found that the preponderance of the evidence supports his claim that he farmed 763 acres of land in 1983. F.of F. at 111. Had the FHP accurately reflected the full 763 acres cultivated by Mr. Warren, Mr. Warren would likely have qualified for a substantially ***higher loan in*** 1983 than he received. In 1983, operating loans were available up to $200,000. Cx-106.

16. Any loans proceeds paid to Mr. Warren by FSA were deposited *into an FSA* account sapervíscd and controlled by the county supervisor. All Mr. Warren did was sign the application and waited for the check to arrive, once the application was approved. With a supervised account, the farmer brings a bill in from a supplier or other creditor. Both the farmer and the county supervisor sign the check arid the creditor is paid.

17. Li 1981 and 1983 to 1984, Southampton County farmers experienced disastrous farm conditions. '1 "his severely affected all farmers, Black and White. In those years, Mr. Warren applied for and received three loans. However, Mr. Warren has questioned whether he received the full face value of the loans reported. RR, ex. l a.

18. Reany event, the loans of 1983 and 1984 would be the last loans Mr. Warren would obtain from FSA, although he applied each year thereafter. Beginning in 1985, and continuing through 1991, Mr. Warren would go through a process where he would apply for a loan or loan services, his application would be denied, he would appeal the denial, FSA's decision would be reversed, and FSA would be ordered to continue to process his application. However, despite these victories on appeal, FSA never approved any of Nh-. Warren's applications after 1984.

19. Throughout the 1980's, White farmers would come to Mr. Warren wanting to buy his farm. Mr. Warren had no intention of selling any part of his farm and had given no indication that he was interested in doing so.

DENIAL OF OPERATING LOAN APPLICATIONS - 1985

20. In early 1985, Mr. Warren applied for a Farm Operating Loan, and debt ***set-aside.*** His applications were denied on May 29, 1985. The county committee certification shows that the denial was based on lack of managerial ability. Cx-39. The letter to Mr. and Mrs. Warren stated the specific reasons as:

> You have shown poor managerial ability. Your past history shows no progress over the past three years. You did not follow farm plan, as submitted in the spring, as indicated by the actual analysis of your operation. Cx 40

Mr. Warren appealed the denial of his application to the National Appeals Division, USDA, ("NAD"). His appeal was heard on September 16, 1985. He was represented at the hearing by an attorney. The NAD reversed FSA's denial on October 10, 1985. The Appeals Officer stated:

> Based on information presented at the hearing and information contained in your case file, it appears that the county committee's decision was based on generality rather than specificity. Records kept by *F7nHA* county supervisor indicate an excellent attitude and good managerial ability on your part. Therefore, I question whether all the facts were presented to the county committee when its decision was made to certify you ineligible for a farm operating loan." emphasis added. Cx-41.

The evidence shows that the records to which the Appeals Officer referred included two farm visit checklists, previously completed by the county supervisor. On one visit check sheet ratu;g for-farm ownership and farm operating loan dated September 9, 1993, Mr. Warren's farm operation was described, in part, as follows:

> Borrower's crops look good considering dry weather. Should repay operating loan and other debts. Equipment and security on land is (sic) adequately maintained. CjA2

An October 5, 1984,$ visit check sheet for farm ownership/operating loan/emergency loan showed the following notation:

> Borrower crops look very good. Prospect for making obligations as stated for farm and home plan . . . is excellent. Equipment is well maintained and buildings are in good condition. Taxes and insurance have been paid Cx-43

Further, testimony from Ben S. Lee, a Southampton county farm extension agent (Black), showed that Mr. Warren's 1985 FHf showed repayment ability of an operational loan, and his opinion that Mr. Warren had the managerial ability to have carried out a successful farming operation in 1985. He also testified that it was not unusual for farmers not to follow a farm plan for a certain year *because "farmers often* make changes to earn more money." Cx-44. Further, Mr. Lee testified that Mr. **Warren did not make any** unusual deviation in his farming operation in 1983. Finally, the extension agent testified that due to weather conditions, very few farmers had made progress during the last three years. Disasters had been declared from July 1980 - 1981 and from September 10, 1983 through March 30, 1984, due to drought. Cx 31, 39, 41- 44.

gAIthough the year date is not clear on the document, it is made clear in the testimony of the county supervisor at the heating on September 16, 1985. Cx-44.

The chairman of the county committee was asked to explain why the committee determined Warren's to be ineligible for the Operating Loan. He was asked the following question and he gave his reply:

> Attorney for Mr. Warren: Did the 1985 Plan show he [Mr. Warren) would be able to repay the operating loan for this year?
>
> Committee Chair: I don't recall what his plan was. I think we considered his past history as much as the plan he presented.

Finding that the evidence did not support the basis for the denial of the operating loan, the Appeals Officer *required the county* supervisor and committee to reprocess Mr. Warren's loan applications. The county sought review of the reversal to the State Director, FSA. The State Director upheld the Appeal Officer's decision. Cx-41. Despite this victory, and the evidence which supported his qualification for a loan, Mr. Warren 1985 loan application was never approved.

21. OCR concluded that the evidence regarding the 1985 application denial was insufficient to make a determination that discrimination played a part in the denial of the application. However, I find, base on a preponderance of the evidence, that Mr. Watren's was qualified for the 1985 FSA operating loan for which he applied, that the reasons for denial of his application given by the county committee were not legitimate reasons, and that the reasons were a pretext for discrimination based on race. The fmding by the committee that Mr. Warren lacked management ability was not supported by FSA's own records. In addition to the evidence of the check sheets ratings recounted above, Mr. Warren's long and successful history of farming, which included being certified by VPI to grow registered foundation peanuts, seriously contradicted the finding that he lacked managerial ability."

22. As a result of the denial of his 1985, Farm Operating loan application, Mr. Wan= suffered significant economic loss. He was unable to adequately plant and maintain his crops. His yields dropped dramatically. FSA then used his low yields to deny him further loans. Without proper operating funds, Mr. Warren found it increasingly more difficult to produce a profit on his farm. He had the acreage and the labor, but insufficient funds to properly plant, cultivate and harvest his crops. He was forced to surrender his leases on other farms that had constituted the majority of his farm acreage. The severe cash

9 Also. evidence in the record sows that in Southampton County, disaster caused by drought had been declared for the period from September 30, 1983 to March 30, 1984.

flow problem also hampered his ability to make payments on loan obligations he had with FSA and other creditors. Cx-102.

23. The denial of Mr. Warren's loan application for 1985 contributed signifcantly to his failure to demonstrate a positive cash flow in subsequent applications and FHPs filed *with FS A.*

24. By letter .from FSA dated Feb. 19, 1986, Mr. Warren was notified that, as of December 31. 1985, his loan(s) with FSA *were in* default. Cx-08.

25. In 1986, Mr. Warren applied for a Farm Operating loan, loan servicing and debt set-aside, and for a disaster loan. His applications were denied in March 1986 due to no feasible plan of operation, in that his FHP plan did *not show sufficient cash flow to pay* all his debts. Cx-04, Cx-05.

26. In April 1986, Mr. Warren went to *the county* supervisor, seeking to have his delinquem loans rescheduled. The county supervisor agreed to reinstate Mr. Warren's application for a Farm Operating Loan for 1986, if Mr. *Warren sold* a portion of his farm. Money *from the sale of his farm, the county* supervisor advised, would give Mr. Warren money to reduce his total debt load and give his operation a positive cash flow. Cx-09. Mr. Warren reluctantly *agreed* to put his faun up for sale, believing he had no choice but *to do so. He* put the asking price for sale *on his farm at $150,000.*

27. Evidence of record indicates that a Farm Operating Loan was approved for Mr. Warren for $46,200, and the deal closed on June 2, 1986. The county supervisor wrote to Mr. Wan-en on September 26, 1986, that as of that date Mr. Warren had not met the condition for the loan, i.e., that he had not sold a part of his farm. Cx 10. By letter dated March 9, 1987, Mr. Warren was given 120 days from February 5, 1987 to liquidate his assets. He was informed that if he did not do so, FSA would reject his request for restructuring *the* debts by forcing the sale of a portion of his assets. The only significant asset he owned was his farm. Cx-12. Mr. Warren never was able to obtain a buyer of his farm at his asking price, and he never received the-benefit of the $46,200 that reportedly had been approved fox him. The county supervisor notified him that the $46,200 loan had been canceled. Cx-100, Cx 10. .

28. For the next several years Mr. Warren would apply for loan or loan servicing and his applications would be denied. Most often, the denial would be based on a mere technicality. Mr. Warren would appeal the denials, always hopeful that the appeals process would work to correct what he was sure was an unfairness at the county level. He

would win at the NAD level, and had faith in the appeals process. However, each victory on appeal was met with further denial of his applications on remand.

*DENIAL, OF* APPLICATION FOR PRIMARY AND PRESERVATION LOAN SERVICINGI0

29. By 1988, Mr. Warren's financial situation had significantly worsened. He continued to be pressured to sell one of his farms. He was having difficulty paying his real estate taxes due to lack of funds.

30. In July 1988, a new county supervisor, Ronald Norton, arrived in Southampton County.. IGIr. Norton is White. On July 8, 1988; Mr. Norton wrote Mr. Warren that his tax matters had to be turned over to the county attorney for possible foreclosure action. Cx-55. Ire early 1988, Mr. Warren's application for Primary Loan Servicing was denied. The basis for denial was failing to show a positive cash flow. A former State Director, FSA, in his 1997 affidavit, stated that an FHP showing a lack of cash flow should help a farmer qualify for Primary Loan Servicing, not harm him. Cx-106. In November 1988, Mr. Norton wrote Mr. Warren offering Primary Loan Servicing (debt restructure) due to the delinquency of his accounts. On April 19, 1989, Mr. Norton denied Mr. Warren's application. The denial was because Mr. Warren had failed to return the paperwwork within the 45-days allotted. As to this basis for denial, a former FSA State Director stated that the county supervisors have discretionary authority and routinely use *it* to avoid the rejection of late applications. Cx-106

31. In 1989, Mr. Warren applied for Preservation Loan Servicing. Mr. Norton denied this application in January 1990 for failure to circle a required item on the application. Mr. Warren appealed this denial, as well. Cx-45.

32. The appeals on the denial.of both the Primary Loan Servicing and the Preservation Loan Servicing applications were heard in June *1990. The* evidence at the hearing showed that Mr. Warren was sent the Primary Loan Servicing application package shortly

'° The Primary Loan Servicing Program is available when FSA borrowers are unable to make scheduled *payments* on *their* debts to FSA due to reasons beyond their *control.* In such *case, federal law* provides a process by which their loan accounts can be serviced to avoid foreclosure or liquidation. Pteservaticn Loan Servicing Program comes into play *after* foreclosure. When foreclosure occurs *and* FSA takes the secured property into its inventory, the borrower is provided the opportunity to apply to *lease or purchase his homestead* and up to 10 acres of land, including farm buildings. 7 C.F.R. *§ 1951.909.*

after the *sudden and* unexpected death of his wife. It showed that Mr. Norton at first accepted the application under the good faith policy (due to bereavement period) and processed it. He developed a FHP, and ran eligibility programs, etc., necessary. to qualify Mr. Warren for the loan. Inexplicably, after going through all the steps for determining eligibility for Primary Loan Servicing for 1988 and 1989, Mr. Norton denied Mr. Warren's loan servicing application due to not having provided a completed application within the stated deadline. Cx-47. The Appeals Officer determined that the original good faith finding should not have been rescinded under the circumstances and also that Mr. Norton had failed to follow the regulations and FSA policy by denying the application for failure to return within the 45-day period. FSA's regulation required the county supervisor to send follow-up notices before denial of loan servicing. Cx-45. The Appeals Officer re4ersed the denial and required Mr. Norton and FSA to continue processing Mr. Warren's Primary Loan Servicing application. With regard to the denial of the Preservation Servicing Loan application for failure to circle an item, the Appeals Officer found again that Mr. Norton had failed to follow FSA regulations and policy.

33. *As to the* technical reasons for denial, one USDA official commented that the idea that an application is rejected by the county supervisor because something is not circled is "absurd"and "I would have to wonder what his motivation was. Typically, if there was a mistake in an application, the county supervisor contacted the farmer and told him or her that the information was missing and needed to be provided." He stated that the county *supervisor had* discretion to allow Mr. Warren to correct the item, and that FSA's guidelines encouraged the county supervisors to assist farmers in filling out applications to avoid and correct these kinds of omissions. Affidavit of State Director, USDA Rural Development, Virginia. RR.-ex 7, p.131, Cx-45. Another official, an Agricultural Credit Director for FSA stated: "I cannot fathom that an application would be turned down because something was not circled." Cx-109.

34. Despite the July 1990 ruling of the Appeals Officer, Mr. Norton denied another of Mr. Warren's application for the technical reason of failure to return an application or document within the 45-day period allotted. Cx- 47.

35. On September 20, 1990, Mr. Norton offered Preservation Loan Servicing (Homestead Protectionllreasebacklbuyback) to Mr. Warren. Mr. Warren had not wanted Preservation Loan Servicing but Primary Loan *Servicing.* In any event, Preservation Loan senicing was denied because Mr. Norton determined that FSA could not obtain clear title to Mr. Warren's land because of a junior lien on the property. Mr. Warren appealed this denial. On June 27, 1991, the Appeals Officer reversed the county's decision, again, finding that the reason for denial did not comport with FSA's regulations. The regulations required *that FSA,* before denying an application, determine *whether* it

was in the best interest of the government to settle the junior liens and then accept the *voluntary conveyance. The Appeals Officer urged that FSA not* only reprocess the *Preservation* Loan Servicing application, but believing that Mr. Warren had not been given appeal rights on a denial of a previous Primary Loan Servicing Application, encouraged FSA to give Mr. Warren opportunity to restart that process. Cx-03

36. Upon the reprocessing of Mr. Warren's Primary Loan Servicing application, it was again denied. Cx-47.

37. In 1991, Mr. Warren came under rapidly escalating financial pressures. FSA was continuing to threaten foreclosure on his farm." He had become delinquent on an SBA loan, as will. Fe borrowed money from ***his sister to*** prevent a judgment against him by SBA.

RETALIATION: THE TIMBER INCIDENT/FINDING OF LACK OF GOOD FAITH

38. By the fall of 1991, Mr. Warren's financial situation had become desperate. Mr. Warren sought permission from Mr. Norton to sell some timber on his land so that he could make money to pay his sister back and to help pay on other bills. The approval was needed because FSA had a secured interest on the farms. Mr. Norton approved the cutting of the timber. During that same time period, Mr. Warren brought the subject of cutting 'timber on his farm in conversation with an attorney with whom he had dealt for years. He told the attorney that Mr. Norton had no objection to his cutting the timber. His attorney told him that it would be fine to cut the timber since Mr. Norton had no objection to the *cutting: of the timber. Selling* the timber on the land did not significantly put at risk *FSA's li--n on the property.* The timber that was cut had not been on ***the property*** when the lien ivas placed. Cx-06.

39. It was not uncommon for FSA county supervisors *to give approval* for such used of secured property, and to give it orally, rather than in *writing. Cx-45. However, Mr.* Norton would later deny giving Mr. Warren such approval.

z t1-7SA may acquire title to property securing a particular loan if the borrower ***defaults on*** the FSA loan. 7 U.S.C.§ 1985(3).

40. Sometimes around December 1991, Mr. Wairen and his sons began cutting, hauling and selling the timber in question. Mr. Warren used the proceeds to pay his sister and other non-FSA bills.

41. The heating on Mr. Warren's July 1991 appeal was held on December 19, 1991. At the hearing, Mr. Warren raised, for the first time, a claim of race discrimination. He was frustrated that the appeals process had not worked for him. Fee asserted that FSA was not willing to help Black farmers as they did White farmers. He observed that White farmers were coming to lm trying to buy his land. *He did not want to sell. He* had seen other Black farmer lose their land which was then bought up by White farmers. He stated his belief that it was the intent of *Mr.* Norton and the county committee to force Black *farmers into foreclosure go that White* farmers could buy their land.

TI-ie Appeals Officer found that in denying the application for Primary Loan Servicing, FSA had not complied with its regulations. He reversed the denial and directed the county to again process Mr. Warren's Primary Loan Servicing application. He also informed Mr. Warren on how to file a discrimination complaint.

*42. In late* December 1991 to early January, 1992, Mr. Warren, aided by his attorney, Robert H. Cooley, 111, filled out the application for Primary Loan Servicing for reprocessing pursuant to the Appeals Officer's decision. Attorney Cooley assisted Mr. Warren in filing his FHP'for *the operational* loan being sought. The FHP showed a positive ;.ash flow, but was not complete because Mr. Warren needed information on how much he needed to pay the USDA."

43. On January 7, 1992, Mr. Warren filed an official complaint of race discrimination with the USDA. In his complaint, he specifically named Mr. Norton as one of the chief perpetrators of the discrimination. Cx-102.

44. In March, 1992,1vlr. Norton invited Mr. Warren to come to his office to discuss the Primary Loan Service package Mr. Warren had submitted. When Mr. Warren mentioned the timber cutting, Mr. Norton said to him "I got you, now." Mr. Norton then asked Mr. Warren for an:: accounting of the timber. Mr. Waxen realized at that time that he had been "set *up" by* Mr. Norton with regard to the timber matter. Id., RR-ex8.

"'According to Attomey Cooley. he tried for months to get the information needed for the f<AP from Mr- Norton, but Mr. Norton delayed in providing the information for over a year. RR-ex-8

45. Mr. Norton subsequently sent a memorandum to USDA's Office of General Counsel ("OGC") for an opinion on whether the facts, as he alleged them, supported the prosecution of Mr. Warren for fraudulent conversion of secured property, lie reported that Mr. Warren had cut and sold timber from land on which FSA had a security interest without approval by FSA,and had then spent the money on non-FSA bills. OGC declined to pursue prosecution, citing a lack of evidence of criminal intent. However, it was OGC's opinion that the facts allowed for a finding of "lack of good faith," based on the scenario sent to it by Mr. Norton. Cx-21.

46. FSA regulations require that before eligibility is established for a loan, a showing must be made that a borrower has acted in good faith by demonstrating sincerity and *honesty immexiing* agreements made with FSA. A farmer who has received such a finding can never receiveloans or assistance from the USDA, with one exception - a farmer can benefit from Homestead Preservation, i.e., he can retain his farmhouse and ten acres on which it sits. 7 C.F.R. § 1951.909 (c)(2).

47. 'The underlying decision on whether good faith exists is a determination to be made by the FSA county super*isor who has wide discretion in deciding whether to make a finding of lack of good faith. Cx-21. While a technical conversion could occur, *the* county supervisor may nonetheless decide that, based on the borrower's sincerity, that the borrower- did operate in good faith. Cx-21,22.

48. On May 29, 1992, Mr. Warren wrote *Mr.* Norton, statinng that he had told him on two different occasions wing the past winter that he was going to cut some timber off his land and that he had never told him of any negative consequences. He stated that he believed he bad increased the value of the land, overall, because he would soon be able to farm more acres that had been cleared. off. He sought help in getting his debt restructured. Cx-17.

*49.* *;By letter* dated *July* 20, 1992, Robert H. Cooley, III, a local attorney, wrote to the FSA State Director, on heir. Warren's behalf, regarding the timber incident. Attorney Cooley stated his knowledge of Mr. Warren as an honest, Christian man, *a hardworking,* "master farmer" and that he "believed him completely when he said that he sought Mr. Norton approval before cutting the timber. He described Mr. Warren and his family as one of the "most industrious, hardworking, gentle, and God-fearing families" that he had the pleasure of knowing ;and working with." Cx-18.

Attorney Cooley stated that he had known Mr. Warren for at least 18 years and that Mr. Warren had been a law client of his late father. He stated that he was convinced that Mr. Warren had acted innocently

and in the best of good faith in cutting the timber on his

land in that he had relied ion the apparent authority of the county supervisor *in cutting the* timber. Attorney Cooley, stated that Mr. Warren was still actively engaged in farming, even though he has had no substantial funding assistance from FSA or any other *commercial source since* '1985. He related that Mr. Warren had sought and obtained Mr. Norton's approval to cut the timber in the fall of 1991, and that Mr. Warren, after cutting the timber, took the timber receipts to Mr. Norton. These facts, he argued, certainly negated Amy conclusion that Mr. Warren acted in bad faith. Moreover, he stated, Mr. Norton. vas a neighbor of Mr. Warren's and he could not have concealed the timber cutting from Mr. Norton, even had he wanted to.

Attorney Cooley stated that the issue of the timber cutting came after Mr. Warren's success, after numerous appeals, in obtaining the opportunity to apply for Primary Loan Servicing and on the heels of a January 10, 1992, complaint file with [EEO] in which Mr. Warren complained of having been racially discriminated against by FSA, in *general, and* by Mr. Norton, in particular. He stated his view that Mr. Norton used the timber incident as an opportunity to interfere with, or to completely block, Mr. Warren's efforts to qualify for additional financing ahd Primary Loan Servicing, and was being most unfair to Mr. Warren. He noted that the timber that was cut represented "absolutely no impairment to the Government's security." That the FSA loans were well-secured by the vast farmlands of Mr. RYarren's and were in no way jeopardized by Mr. Warren's efforts to survive. He asked thaxt FSA forgive Mr. Warren's actions and, assist him in restructuring his debt and continuing his farming operation. Cx-18. Attorney Cooley later signed an Affidavit to the same effect. RR-ex.8.

50. Attorney Cooley also stated that, in December 1991, Mr. Warren asked him about the propriety of cutting the timber, and that he told him that as long as he had obtained the concurrence of Mr. Norton, then he saw no objection. He regretted having given Mr. Warren that advice, although it was appropriate at the time. He knows now that, considering all the difficulties Mr. Warren was having with Mr. Norton, that he should have told Mr. Norton to get the approval in writing. RR-exs.

51. In September 1992, Mr. Norton made the finding that Mr. Warren had acted with a "lack of good faith" by cutting and selling timber on property secured by FSA without FSA's prior approval. Using this finding, he denied Mr. Warren's 1992 application for Primary Loan Servicing. Cx-57, 58.

53. Tire finding of "lack of good faith" has not been made against ***any other*** farmer in Southampton County, Virginia - only in Mr. Warren's case. Cx-16, Rx-1.

54. In a letter to the FSA State Director, in July, 1992, Mr. Norton never flatly denied that Mr. Warren spoke to him about cutting the timber, but said that he "did not recall" ever discussing the sale of timber with Mr. Warren. He ***stated,*** however, that he learned of the cutting of the timber on January 30, 1992, when one of Mr. Warren's creditors called hiin to tell him so. Cx-113, Cx-19. When asked why he did not speak to Mr. Warren about the matter, or intervene to stop the cutting, Mr. Norton responded that he was too busy preparing a loan package for Mr. Warren -which package was required by the NAD decision - to do so. Cx-19. **He later told** the investigator that he had not spoken to Mr. Warren because he wanted to investigate the allegation before ***speaking with Mr.*** Warren. Rx-1.

55. USDA guidelines require a county supervisor to use his discretion to prevent a farmer's conversion of secured property in the interest of the farmer and to protect FSA's lien interest. Cx-106.

56. Internal USDA memoranda showed that USDA State officials believed that Mr. Warren'. problems were caused by incompetent legal advice. They believed that Mr. Warren had a claim of malpractice against the attorney who told him it was fine to cut the timber and advised that he should obtain money for restitution from the attorney. Cx-14, Cx-24.

57. Mr. Warren appealed the denial of his Primary Loan Service application which was based on lack of good faith. His appeals hearing was held in 1993. For ***the first tine*** in his dealings with FSA, the denial of his application was upheld. Cx-57, 58.

58. All applications filed by Mr. Warren after 1992 were denied for lack of good faith. Cx-62, C-63, C-64. The denial notices stated, in part, that "it has been ***determined that*** you have not acted in good faith when timber on which FmHA [FSA) holds a first deed of ***trust was sold . . . ." See,*** e.g. Cx-63.

59. Mr. Warren was informed that he could be considered again for loan servicing if he made restitution of *the amount of money he obtained from the* cutting of *the* timber (approximately $26,000.) He did not have the funds to do so. Attorney Cooley tendered a promissory note to FSA on Mr. Warren's behalf. His note was rejected for lack of adequate consideration. RR-ex8. Mr. Warren's church offered to pay the amount on Mr. Warren's behalf, but that offer, too, *was rejected. The church's bishop was told that* it

was too late for Mr. Warren to make restitution. Cx-110. Mr. Warren also sought to develop a repayment installment plan, but his plan was rejected. Rx-1.

*60.* *Despite the* finding of lack of good faith *which Mr.* Norton made, and FSA maintained, Mr. Norton continued to send Mr. Warren invitations to apply for loans and debt *restructuring, as* well as announcements of new programs available to farmers. When Mr. Warren would apply for these, he would be rejected based on the finding in his record of lack of good faith. In 1993, e.g., the USDA offered two programs for disadvantaged farmers. The first offered farmers loans at market or below market rates to purchase or enlarge farms, exclusive opportunity to purchase farm land in USDA inventory, and debt restructuring at a reduced rate of interest. Cx-53. The second offered low interest loans to low income farmers who could not afford to borrow at regular rates under other programs Debt restructuring was also available. Cx-60. Mr. Warren was notified of these programs on March 25, 1993. It had always been Mr. Warren's dream to significantly expand the number of acres he owned; however, because of the lack of good faith finding, he was not eligible for these programs.

61 _ On September 24, 1994, Mr. Norton notified Mr. Warren that he was eligible for Homestead Protection services. The letter listed ten items Mr. Warren was required to provide azthin 30 days. Cx-6.5. piny November 1, 1994, without further correspondence with Mr. Warren, Mr. Norton denied Mr. Warren's application for Homestead Protections because of his failure to supply the ten items within the 30-day time period required. Cx-66.

62. Mr. Warren, through his daughter, Vivian, repeatedly wrote and made telephone calls to the USDA, seeking a resolution of his discrimination complaint. A notation made by one USDA staffer indicated: "Vivian Warren continues to call on a regular **basis, requesting** the status of her father's discrimination complaint." Cx-72. When he received no resolution, he corresponded with his Congressman, seeking assistance in getting his claim resolved. *He* complained *to the* Congressman that *the* finding of lack of good faith had been made in retaliation for his filing a civil rights complaint. The Congressman wrote to the USDA, yet the USDA took no apparent effort to resolve the complaint. Cx-20, 26-28, 33.

63. Still receiving no formal response, Mr. Warren filed two other complaints of discrimination: the second was filed on May 15, 1995,(Cx-74) and a third on January 22, 1997. Cx-102. He was repeatedly told that his complaints were being considered and would be resolved. Cx-54, 84, 25, 116-117.

64. On September 5, 1995, the District Director, FSA, wrote Mr. Warren that if he did not pay his loans in 30 days, foreclosure action would begin- Cx-29. Upon receipt of this notice, Mr. Warren and Vivian Warren repeatedly called USDA officials, and the Congressman in an attempt to stop the foreclosure until there had been an investigation of the discrimination complaints. Cx-72.

65. In October 1995, Mr. Warren received notice that the foreclosure action was being rescinded pending the resolution of the civil rights claim. Cx-30-31. However, his case was flagged, erroneously, for foreclosure in June, 1996. Cx-32.

66. In 1997, OCR commissioned an investigation of Mr. Warren's complaint by the independent law firm of Delany, Siegel, Zorn & Associates. The investigating attorney spent three months on the investigation and provided a report and recommendation to OCR in October 1997. RR-ex. l .

67. In March 1999, based on the investigator's report, *the* Special Assistant to the Director, Office of Civil Rights, made a "Decision" on Mr. Warren's complaint. He concluded. that the evidence supported finding that Mr. Norton had discriminated against Mr. Warren, based on race. Rx-1. Based on all the evidence available, the "Decision" found that Mr. Norton discriminated against Mr. Warren by: 1) denying him adequate loan servicing from 1988 to the present; and 2) by retaliating against Mr. Warren by giving hun a bad faith determination for the sale of timber which secured his loans. It made the credibility determination that Mr. Warren informed Mr. Norton of his intentions to cut and. sell timber from his property to pay non-FSA debts, and concluded that Mr. Norton decided to make a finding of lack of bad faith against Mr. Warren in retaliation for his successful NAD appeals and for the filing of his race discrimination complaint on January 10, 1992. It concluded:"[w]e can find no other credible explanation fpr [Mr. Norton's] actions." Rx-1.

I agree *with* the "Decision" and .accept these findings as they are adequately supported by the evidence *of record. See Cx18, Cx-19, Cx-104, Cx-108, Cx-106-7,* Cx-110, 113 and 114. In *the words of* the investigator regarding the timber incident and Mr. Norton's involvement: 'This action reeks of retaliation." RR-ex. 1.

68. Considering all the evidence, I further conclude that the preponderance of the evidence supports these additional findings:

a) that the objective of the county committee in denying Mr. Warren's Farm Operating Loan in 1985 and every year thereafter, and Mr. Norton's and the county committee's objective, beginning in 1988, was to deprive Mr. Warren of the financing he

needed to successfully operate his farm with the *ultimate goal of forcing Mr, Warren* to lose his land. Cx-12, Cx-13. Cx-106.

*b) that* the USDA, through its FSA county supervisors, failed to provide Mr. Warren the assistance he needed *to understand* the application process and to correctly and fairly complete his Farm and Home Plans. Its failure to do so was *based* on race.

c) that Mr. Norton, knowing Mr. Warren was uneducated and *illiterate, used* technicalities contained in the USDA regulations against Mr. Warren in direct violation of his responsibility as county supervisor. His objective in doing so was to deny Mr. Warren loan benefits based on race. Cx-104. His ultimate objective was to cause Mr. Warren to lose his land. -

69. Mr. Warren continues to be ineligible for FSA loan services based on *the* finding of lack of good faith.

FAILURE TO GIVE PROPER ACCOUNTING OF LOAN HISTORY:

70. Mr. Warren and lawyers, acting on his behalf, have attempted to get an accurate accounting of Mr. Warren's loans, yet the USDA has not given Mr. Warren an official and accurate accounting of his FSA loan record.. An internal memoranda from USDA reflects the fact that FSA's accountants *could not fully* explain some entries on Mr. Warren's account. Cx-06, Cx-117.'3

Mr. Warren had never received an official accounting of three loans he received in 1983 and 1984. While Mr. Warren was charged with the full face value of the loans, it is unclear how much of the money was used on Mr. Warren's behalf. One note accompanying Mr. Warren's records from FSA stated: "I could not locate the old management card, but I did piece together the information for you with the exception of one loan that I could not find." Cx 112. In 1995, the District Director wrote to Mr. Norton that Mr. Warren's "ageredit history" must be corrected before FSA proceed to foreclosure. Cx-06. On January 13, 1997, the Agricultural Credit Manager stated that the "Problem Explanation Sheet" concerning Mr. Warren's Farm Ownership loan showed a principal halance significantly larger than the note amount. The Finance Office had attempted. to follow the history of the loan to determine how *the* numbers were developed, but had difficulty doing so. Cx-07.

'3As *of the date of the trial, Mr. Warren's request for an official accounting of the balance due* and owing on his account still *was not available.* Tr. 12.

BEGINNING DATE OF DISCRIMINATION

71. h-Ir. Warren alleges damaging beginning 1983. Cx-99_ *However, he has not* established, by a preponderance of the evidence, any act of discrimination occurring before 19 35.

USDA'S ADMISSION OF NATIONWIDE RACIAL DISCRIMINATION

72. The USDA has admitted that FSA county supervisors and county committees throughout the United States discriminated against Black farmers. It has admitted that as a result of that discrimination, Black farmers have lost their land and *their* livelihoods. *See Conscht Decree in Pigford et al v.* Glickman, Dist Ct. DC (Civil Action No. 98-1693 *(PI-F))*

FINDINGS ON DAMAGES

Economic

73. Due to USDA's discrimination against him, based on race, Mr. Warren suffered substantial economic loss. He: 1) lost the opportunity to expand his farming operation, including opportunity to purchase his sister's farm of 365 acres of land; 2) lost all leases he had on farmland in the County; 3) lost his prized peanut production *under the VPI* program; and 4) was forced to give up his swine operation. Moreover, his ability to obtain credit was destroyed.

Emotional

74. A , a direct result of the USDA's discrimination against him, Mr. Warren has suffered severe emotional distress over nearly a 17-year period. He has watched the emotional suffering of his family, as well.

DISCUSSION AND SUBSIDIARY FINDINGS

Mr. Warren brings this claim pursuant to the provisions of the Equal Credit Opportunity Act ("ECOA"), 15 USC §§ 1691 et seq., which was enacted in 1974, and became effective on October 28, 1975, and amended in 1976. It is a provision of the Consumer Credit Protection Act, 15 USC §§ 1601 et *seq.*

The ECOA prohibits creditors from discriminating against any applicant, with respect to any aspect of a credit transaction on the basis of race. 15 USC § 1691(a)(1)_

Regulation B defines "credit transaction" as including "[e]very aspect of an applicant's dealings with a creditor regarding an application for credit, or an existing extension of credit (including but not limited to information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures.)" Reg. B, 12 C.F.R..§ 202.2 (m).

The ECOA applies to the USDA and the FSA. The statute provides that when the government or a governmental subdivision, agency or instrumentality extends credit, it is subject to the provisions of the ECOA, except that no action can be brought against a governm3ntal creditor for punitive damages. 15 USC 1691e(b). The USDA agrees that the ECO,*applies to FSA's loan servicing transactions. Rx-1.

The USDA stipulated to liability in this case for discriminating against Mr. Warren on the basis of race, beginning in 1985.'°' The evidence supports that finding. Accordingly, I find that the USDA discriminated against Mr. Warren with respect to aspects of numerous credit transaction on the basis of race in violation of 15 U.S.C § 1691(x)(1). Specifically, the USDA, through Mr. Norton, the county supervisor and/or the county committee members, discriminated against Mr. Warren, based on his race, regarding an application for a loan or loan servicing, including, but not limited to, deliberatoly delaying action on his loan applications, denying his applications for loan or loan servicing, setting unfair conditions for the approval of loan or loan servicing, and falsifying information and using that information to deny loan servicing. In addition, the USDA, through FSA and Mr. Norton, violated the ECOA by retaliating against Mr. Warren for exercising a right granted him under the Consumer Credit Protection Act, i.e., the right to protest the illegal and discriminatory action of a credit lender. Sec. 1691a(3).

DAMAGES

Section 7t6(a) and (b) and 702(g) of the ECOA provides that any creditor that fails to comply with a requirement imposed by the Act or the regulation is subject to civil liability for actual damages suffered by the individual. 15 U.S.C. 1691e. See also 12 CFR 202.14. Actual damages are damages deemed to ***compensate*** the injured party for losses sustained as a direct result of the injury suffered. They "are the damages awarded to a persona. a compensation, indemnity or restitution for harm sustained by him." Restatement (Second) of Torts § 903 (1979). One purpose of actual damages is "to make

14 Sw Rx_3.

persons vehole for injuries suffered on account of unlawful discrimination." *Albemarle* Paper Ca. v. Moody, 422 U. S. 405, 418 (1975)

There are two categories of actual or compensatory damages: tangible and intangible Tangible includes economic loss. Intangible damages include compensation for emotional distress, and pain and suffering, *Bohac v. Dept ofAgriculture,* 239 F. 3d 1334, (Fed. Cir. 2001); injury to personal and professional reputation, *Fabry v Comm'r* of IRS, 223 F. 3d 1261 at 1265, (11th Cir_ 2000); injury to credit reputation, mental anguish, humiliation or embarrassment, *(Fischl v. General Motors Acceptance Corp.,* C.A.5 (La.) 1983, 708 F. 2d 143); "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering" U. S. *v. Burke, 504* U. S. 229,112 S. Ct. 1867 at 1874 (1992); and intentional infliction of emotional distress. *Ricci v_ Key Bancshares, Inc.,662 F. Supp* 1132 (D.C. Me. 1987).

While damages, may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference= although the result be only approximate. *Tri County Industries, Inc. v. District* of Columbia, et al, 200 F. 3d 836 at 851 (D. C. Cir. 2000) The inquiry must *be whether* the damage award is within a "reasonable range within which the jury may properly *operate." Langevine v D. C., 106* F. 3d 1018 at 1024 (D.C. Cir 1997).

## TANGIBLE DAMAGES

### Loss of Farm Income

As a result of the USDA's discrimination against him, Mr. Warren suffered loss of income from farming operations. FSA never approved a loan for him after 1985. He was denied farm operating loans, disaster assistance loans and/or grants, Primary and Preservation Loan Servicing. Because he was denied a loan in 1985 and every year thereafter, Mr. Warren did not have the money to buy fertilizer, seed, chemical, equipmen *t, etc. that was* needed to carry on a successful farm operation. Despite his best efforts, without funds, he could not hold'on to the leased lands that he farmed, and thus suffered a devastating loss of farm income from that year forward. Moreover, the finding that Mr. Warren had acted with lack of good faith precluded him from qualifying for these benefits. Cx-79.

Mr. Warren seeks a total of $3,972,104 in loss of farm income for the period from 1983 to 2001, This claim is based upon the report *and analysis of* his expert economist, Dr. Adell Brown. Specifically, he seeks $1,389,429.31 for farm crop and swine losses,

$270,0D0 for replacement costs on farm equipment *and machinery from 1983-2001 (@* $15,000 per year), and interest on $1,561,677.08 at 9_9% compounded over the 17-year period. Cx-99.

The USDA challenges Dr. Brown's assessment of loss and presents instead a calculation of loss that is between $301,731 and $323,720, minus actual income earned by Mr. Warren over the same 17-year period. Accordingly, the determination of which expert opinion should be accepted is of critical importance in this case.

Both economists have similar academic backgrounds, both having obtained PhD *degrees* in Agricultural Economics - Dr. Brown from Louisiana State University (1983) and Dr. Glaze from Mississippi State (1985). Dr. Brown is currently associated with Southern. University and has spent a substantial amount of time working with farmers in his capacity as Agricultural Program leader in the Universities' Cooperative Extension Program at Baton Rouge, Louisiana. He has worked as an extension specialist in the area of farm management and as a consultant for the National Office for Small-Scale Agricultire. He has also worked with farmers, assisting them in putting together budgets, preparing their FHPs and helping *them in* their management practices. Dr. Glaze has worked as an economist for *OCR-USDA since 1997. His resume shows* that he has received recognition for leadership in developing *and implementing* farm-level budgets.

Both Mr. Warren and *the USDA* agree that the way to calculate Mr. Warren's economic damages is to calculate what he would have earned with a fully functioning farm during the years since 1983, adjusted for actual income earned during the same time. Thus, both parties have not attempted to do a specific proximate cause analysis that seeks to trace the damages caused by each distinct act of discrimination. The method used by both parties takes into account all types of damages by looking at the net income that Mr. Warren would have made from farming (i.e. gross income minus costs) during the years in question if his farm operation had been *unaffected by* discrimination. The formula used by both is as follow:

Net Returns - crops = [Price x (Yield x Acres) - [Costs per Acre x Acres) +

Net Returns - hogs = (Price *x (Market Wt. x* Hogs sold] - (Cost per 100 Ibs x hogs sold]

Economic Loss = Net Returns (crops + hogs) - Actual Net Returns(crops +hogs)"

"'The First Circuit Court of Appeals found no fault *with the trial court's* jury instruction in an *employment case that= "Actual damages include any wages or* fringe benefits you find plaintiff would

Further, both used published figures from the Economic Research Service (ERS) and the National Agricultural Statistics Service (NASS), as a data source. The ERS reports price, yield and cost data based on survey *of farms on a regional* and state wide level. The NASS reports price and yield data based on a survey of farms at the *county level.* The NASS does not report on costs of production.

Tlie parties agree on the overall methodology, but have serious disagreements on the calculation of lost income. First, the USDA believes that Mr. Warren can only recover economic damages from 1985 to present, since 1985 is the earliest that discriminatory conduct was alleged in an eligible complaint. I agree. I have already determined that the evidence is *insufficient* to establish a basis for economic loss for any year priorto 1985. See Finding of Fact, 17 1. Second, the USDA contends *that there is* no support in the record for the 763 acres Mr. Warren allegedly farmed in 1983. 1 disagree. The evidence supports finding that Mr. Warren farmed 763 acres in 1983. See Finding of Fact, 111, and *fn* 4. However, since I have found that there is no basis for a finding of economic damages resulting from discriminatory acts which occurred before 1985, the first year for which Mr. Warren may be compensated is 1985.

Dr. Brown used 1983 as a base year and determined losses beginning *with* the year 1984. Because I find that the evidence does not establish calculable economic injury before 19 85, Dr. Brown's figures must be modified to show 1984 as the base year and to calculate loss beginning in 1985. By extrapolating from his data, the *calculation of loss* beginning 1985 can be made. Dr. Glaze provided calculation for loss beginning in 1985 in his report. '6 See Rx-3, tables l and 2.

The USDA's most fundamental disagreement with Mr. Warren's economic claim is the methodology used by Dr. Brown. Dr. Glaze, USDA's economist, believed *there* were serious problems with Dr. Brown's analysis. Dr. Brown attempted to simulate Mr. Warren's farming practice as it would likely have been had he had the funds and resources unfairly denied to him during the years in question. Before doing so, he visited Southampton County, and over several days talked with individuals in the community to *get* a feel for what Mr. Warren's *fanning operation was* like in 1983 and what pattUns of operation and management he could discern. He looked at farm records, visited a county FSA office, and visited others in the community who knew about Mr. Warren's farming

have earned in [his/her] employment with defendant if [he/she) had not been discharged . . .minus the amount of earnings and benefts from other employments received by [such] plaintiff during that time." Sanchez v. Sosa, F 3d _ (11 Cir. 1999).

`4Dr. Glaze presented scenarios using averages for 1985-2001 as well as averages for 1983-2001.

operation. He talked with two former county farm extension agents and visited the experiment station in the area. He concluded that Mr. Warren had a good track record and was Perceived as an excellent farmer in the area. One piece of information he had was that for nearly 20 years, Mr. Warren had been 1 out of 100 farmers selected to grow certified seed peanuts for a county in North Carolina. (To qualify for continued participadon in that program Aft. Warren had to produce a minimum yield which was higher than the reported ERS and NASS yields). He learned that Mr. Warren had a good grasp of how to farm, of farming operations, and management practices. Tr. 116-117. Dr. *Brown modified the ERS* and NASS data in an attempt to model Mr. Warren's farm operation. Cx-99.

D

r-~Brown testified that the method he used to calculate damages in Mr. Warren's case is a standard methodology used on the ground level working with farmers to determine damages, e.g., to determine what a farmer should be paid as a result of a loss suffered from disaster by flooding. He testified that the average annual net loss reflected in his calculations was excessive. Tr. 124.

Dr. Glaze contended that the better approach to take to assess fair compensation for loss in this case, and which he used, was to model the average farmer in the area. Rx-3 Mr. Warren *counters* that he was not *an average* farmer, but an excellent farmer.

For the reasons indicated below, I find Dr. Glaze's *calculation of loss to be highly* implausible and unreliable. Accordingly, I cannot credit his calculation of loss.

I find the USDA's net loss calculation to show virtually impossible results. By using Dr. Glaze's approach to calculate crop and enterprise loss, the average farmer, growing the same crops as Mr. Warren on 763 acres of land, over the 17-year period in question, would have had the following returns : `?

"Derived by subtracting yearly costs from yearly revenue. per commodity or enterprise-

Corn (213 acres) Positive net returns in 3 out of 18 years

$0 net return = 1985, 1986, 1987, 1988, 1989 ($593), 1990, 1991, 1992, 1993, 1994, 1997, 1998, 1999, 2000, 2001

So~beans (3t)4 acres) Positive net returns in 5 out of 18 years

$0 net returns = 1984, 1985,1986, 1987, 1989, 1990, 1991, 1992, 1993,1994, 1999, 21100, 2001

Swine (640 hogs) Positive net *returns in* 5 out of 18 years
(640 fahow hogs)
$0 net returns =1984, 1985, 1988, 1989,
1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 200 1

*See Appendix A*. These facts were not readily discernible from Dr. Glaze's report. His report shows annual returns on the combined commodities. Rx-3. See Appendix 5. However, a breakdown of the individual enterprises for annual return shows that, using the USDA's scenario, only the peanut crop showed *sustained profit - showing profit in all* but one year (1993).

. As shown above, the results obtained using Dr. Glaze's analysis undermine the credibility and reliability of his approach. It is totally implausible that the average farmer in Southampton County, or anyplace for that matter, would have managed his/her farm operation as suggested by these results. No farmer would have, or could have, continued to grow corn when for 10 consecutive years *(from 1985 through* 1994) that crop yielded 0 returns. Similarly, no farmer would continue to grow soybeans when for the 10-year period frcm 1984 to 1994, it netted a profit in only one year. Nor would a farmer continue to raise hogs if they, in 10 consecutive years (1992-2001) brought in 0 returns. Moreover, the chances are *nil that FSA* would continue to loan a farmer money to operate a farm in a case where he/she had numerous consecutive years of negative returns. Thus, I cannot rely on the results from Dr. Glaze's analysis as being an accurate estimate of net returns on a 763-acre farm in a Southampton County for even the average farmer *during* the period. 1985 through 2001. Certainly, such returns are in no way consonant with the management capability of Mr. Warren, as shown on this record.

Using Dr. Brown's calculation of loss, as modified to reflect the base year of 1985 rather than 1984, and extrapolating from Dr. Brown's calculation of loss from 1984 to

determine loss from 1985, yields the results shown in *Appendix* B. This shows loss through 2001 of $1,098,839.00.'8

Since the decision is coming at the end of 2002,1 have included losses for the year 2002. '9 The total calculated loss through 2002 is $1,162,723.00. That amount will be awarded.

Prejudgment Interest-

Mr. Warren seeks prejudgment interest on his economic lost, at 9.9%, compounded annually. The USDA argues that although prejudgment interest might seem reasonable to award in this case, such interest is precluded as against the United States. Citing the Supreme Court's decision in Library v. Shaw, 478 U.S. 310, at 314 (1986), it argues that interest can be recovered against the *United States only* if expressed consent to such a recovery has been given by Congress. It argues that although Congress has waived sovereign immunity from award of actual damages in ECOA cases, *(see Moore v. USDA,* 55 F. 3d 991(5`' Cir. 1995) it has not waived immunity as to interest payment. I agree.

Title 7 U.S .C § 2279 provides at Section 741 for the Waiver of Statute of Limitation in ECOA cases:

> (a) To the extent permitted by the Constitution, any civil action to obtain relief with respect to the discrimination alleged in an eligible complaint. if commenced not later than 2 I=n after the date of the enactment of this Act, shall not be bared by an statute of limitations.

It further provides that upon the filing of an eligible complaint - USDA shall:

> 2) award the complainant such relief as would be afforded under the applicable statute from which the eligible complaint arose notwithstanding any statute of limitations ...."'

" I have omitted from these calculations, the 1596 yearly depreciation costs included in Dr. Brown's calculation. Equipment and machinery depreciation costs had been subtracted from the ERS costs.

'9A. complainant is entitled- to compensatory damages incurred during the period between the conclusion of the trial and the court's rendering of its decision. Dunn v. State of New Jersey. (N. J. Super. CE P,.pp. Div. 6-15-98), Fair Housing- Fair Lending (Aspen Ill) 1 18,234.. I have used the lower of two sets of figures: 1) the average loss for combined commodities for the three-year period from 19992001, or 2) the loss for combined commodities for the last *year reported (2001).* Since the tower figure was that reported for the 2001 year. I used that figure to compensate *for loss in* the year 2002.

The applicable statute is found at 15 U. S.C. *1691e. It provides for the awarding of "actual damages" as follows:*

> *(a) Individual or class action for actual damages*
>
> Any creditor who fails *to comply with any requirement imposed under this subchapter shall be liable* to *the aggrieved applicant for any actual damages sustained by such applicant . . . 15* U.S.C. § 1691e *(a)*
>
> *(b:) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual* actions; *limitation on total recovery in class actions; factors determining amount of award*
>
> *Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for punitive damages . . .15 U.S.C. 1691e*

*In Library,* the Supreme Court held, in what has become known as the "no-interest rule," that " ['m] the absence of express congressional consent to the award of interest, separate from a general .waiver of immunity to suit, the United States is immune from an interest award." See *also Lane v. Pena, 116 S.Ct. 2092, 2096 (1996) ("We must construe* waivers of immunity strictly in favor of the sovereign)."

Although I conclude that there are strong reasons to award prejudgment interest in this case: 1) The statute waives immunity from "actual" damages. The purpose of an actual damage award is to make the injured person whole. The Supreme Court "has long recognized that . . .a monetary award does not fully compensate for an injury unless it includes ,3n interest component." Kansas v. Colorado, 533 U. S.1 (2001); 2) The statute specifically reserves governmental immunity from punitive damages, but does not specifically reserve immunity from interest. This can be seen to imply that it intended to allow interest payment as part of "actual" damages; and 3) Prejudgment interest is allowed on judgments against the United States in Title VII cases, to which ECOA discrimination cases are often compared, *(see Garcia et al v. Ponce Federal Bank et al,* 779 F. Supp 620 (D. C. for District of Puerto Rico, 1991)). I can discern no sound reason for allowing interest against the United States in a Title VII discrimination case *and not in* an ECOA. discrimination case. However, the fact is that Congress expressly waived governmental immunity from interest in Title VII cases. See Civil Rights Act of 1991, 42 U.S.C. 2000e § 114. I can find no express waiver of interest payment in ECOA cases. Accordingly, I am constrained to deny the request for prejudgment interest.

INTANGIBLE DAMAGES

Mr. Warren seeks $36,535,186 for emotional distress; $2,000,000 for damage to professional reputation, $1,000,000 for damage to reputation for honesty, $1,000,000 for damage to credit reputation, and $500,000 for damage to ability to respond to emergency and inconvenience, for a total of $41,035,000 in intangible damages.

Emotional Distress:

7'lae Complainant seeks $36,535,186 for emotional distress and mental anguish suffered as a direct result of the discrimination in this case. However, in this amount he appears tcr'have-included damages for the emotional suffering of his fourteen children. Cx-119. Although it is clear that his children have suffered emotional injury, they are not named a:: complainants in this case, and thus no award may be made fox. their suffering. Mr. Wan:en may be compensated, however, for his distress resulting from having had to watch his, loved ones suffer. (Punitive damages are not available against the government in ECQA cases). Thus, such an enormous award is not warranted based on his claim. However, I conclude that a very substantial award is justified by the facts and circumst;mces in this case.

Tlte Supreme Court has said that "[m]fatal distress is a personal injury familiar to *the law, customarily* proved by showing the nature and circumstances of the wrong and its effect on the plaintiff . . . . Although essentially, subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others." Carey v. Piphus, 435 U. S. 247, 264 n. 20 (1978).

Nature and Circumstances of the Wrong:

For a period of more than 17 years, Mr. Warren has suffered through a relentless campaign byFSA staff to cause him economic and emotional harm. The acts of FSA have been continuous, severe, flagrant, and have caused Mr. Warren to suffer constant and irreparable emotional pain and suffering. The undisputed facts show that since the early 1980's, FSA staff made, at best, little effort to assist Mr. Warren in dealing with the complex loan application process for obtaining monetary assistance from ESA. Worse, it can reasonably be inferred based on the evidence, that at least since 1985, the all-White county committee.and later, Mr. Norton, the White county supervisor, conspired to damage Mr- Warren emotionally, economically and professionally, because of his race. Mr. Norton's scheme to repeatedly delay the processing of Mr. Warren's applications and then to deny them with the most technical of reasons, to use his discretion in every instance against Mr. Warren, as well as his resistance to implementing the decisions of

the NAD, could only have worked with the cooperation of the county committees or their reckless disregard for the interests and rights of Mr. Warren.

Of all the discriminatory acts committed against Mr. Warren, Mr. Norton's retaliatioa against him for fling a civil rights complaint is the most egregious. Mr. Norton retaliated against Mr. Warren by initiating a series of actions that resulted in a false USDA finding, which he made, of "lack of good faith" against Mr. Warren, and a referral of the matter to OGC for an opinion on criminal prosecution. This finding of lack *of good faith meant that* Mr. Warren would never again qualify for any USDA program assistance except for Homestead Protection, and the certain end to his farming career. It was an extraordinary and extreme finding for a program that has as its mission the assistanceibf fammers. Mr. Warren is the only farmer in all of Southampton County, Virginia, ever to have received such a finding. Cx-16.

One of the primary and specific responsibilities of Mr. Norton's job as county supervise r with FSA was to provide assistance to farmers such as Mr. Warren. That is FSA's mission. Yet, Mr. Norton used his position and his knowledge of Mr. Warren and his limited educational abilities, to sabotage and undermine Mr. Warren's professional and economic position. By his finding of lack of good faith, he branded Mr. Warren as a dishonest person, and one not to be trusted. His finding impugned Mr. Warren's reputation for honesty and integrity in his dealings and caused him extreme embarrassment in his community.

The evidence supports finding that in making the finding of lack of good faith in Mr. Warren's case, Mr. Norton sought to preclude any further successful appeals by Mr. Warren acrd force him into certain foreclosure so that Mr. Warren would lose his land, as well as to retaliate against Mr. Warren for having filed the discrimination complaint. Mr. Norton's conduct can only be described as outrageous. His suggestion of the possibility of having Mr. Warren prosecuted on false charges was callous, wanton and unconscionable. It is reasonable to infer that these actions against Mr. Warren were intended to send a chilling message, not only to Mr. Warren, but to other Black farmers, as well.

In making the finding of lack of good faith, Mr. Norton acted with malice. Actual malice exists when the defendant's conduct is motivated by ill will toward the plaintiff. Implied malice arises when deliberate conduct by the defendant is so outrageous that malice may be assumed. *See Ricci v. Key Banchares, 662 F. Supp. 1132 (U.S.D.C., Dist* of Me. April *27, 1987) citation omitted.* The evidence shows Mr. Norton's actions were motivated by ill-will against Mr. Warren and a desire to injure Mr. Warren for filing a race *disehmination complaint* against him.

The actions of Mr. Norton are even more egregious because of the fact that FSA's State offce failed to intervene to prevent the finding from being made. At the time the finding of lack of good faith was being considered, FSA's State office knew, or had **reason to know: 1) that Mr.** Norton **had repeatedly, over a course of four** years, denied Mr. W =en's applications for FSA benefits on bases that had been reversed on appeal; 2) that Mr. Warren had filed a complaint of race discrimination against FSA, specifically naming 1Vlr. Norton as one of the chief perpetrators; 3) that Mr. Warren ***had claimed*** that he had obtained Mr. Norton's approval co cut the timber, 4) that Mr. Warren had also **acted, in part, on** the advice of his attorney in cutting the timber; 5) that, even if Mr. Norton had not given his ***approval, he had*** been aware of the cutting of the timber and had watched in silence for several months while the cutting was taking place, without speaking 6b Mr: Warren about it; and 6) that the cutting of the timber on the property did not seriously put FSA's interest at risk. Cx-18. Cx-17. RR-ex8. The fact that Mr. Warren had cut the timber, in part, after his attorney had given him the go-ahead ***to do so, should*** by itself, have ended the lack of good faith inquiry. Here is a than who cannot read or write and who had ***acted on the*** advice of an attorney. These facts should have prompted the State FSA to remove the decision on a finding of lack of good faith from Mr. Norton. Despite Dar. Norton's obvious conflict of interest, the State FSA left it to Mr. Norton's ***discretion,*** **and allowed the finding to be made.**

Mr. Norton's and FSA's conduct fall within what the Restatement (Second) of Torts describes as "Outrageous Conduct Causing Severe Emotional Distress":

> 1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress

Restatement (Second) of Torts § 46 (1965). The Comments ***to the Restatement*** describe extreme and outrageous conduct, inter aalia, as follows:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in, which the recitation of the facts to an average re-mber of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

***Restatement (Second)*** of Torts § 46 Comment d (1965). Clearly, this is such a case.

By making this false claim, and referring the case to OGC for an opinion on whether Mr. Warren should be criminally prosecuted, Mr. Norton put Mr. Warren in danger of criminal prosecution for criminal conversion of property, an offense he knew

Mr. Warren had not committed. Moreover, by making the false claim against Mr. Warren, a claim that went to his reputation for honesty and integrity, Mr. Norton defamed Mr. Watxen's character. In doing all of these, Mr. Norton intentionally inflicted emotional distress on Mr. Warren

As a result of Mr. Norton's discriminatory actions, Mr. Warren suffered severe emotional distress. The finding that he had unlawfully converted secured property and acted dishonestly was devastating to Mr. Warren. It caused him to experience the most stressful time of his life - "I almost *lost my mind." He* struggled daily to hold his head up. OnI;, his family, his church and his faith in God helped him get *through one day at a* time. .Ca-48. Fh.s emotional investment in his farm is captured in his statement that "I will die torlCeep-my farm." Cx-103.

I find that Mr. Norton's conduct was outrageous. I also *conclude* that if the facts of Mr. Norton's betrayal were presented to the average member of the community, they would arouse extreme resentment against Mr. Norton's actions and lead the community member to exclaim them to be "Outrageous." I find that the acts of Mr. Norton *constitute* intentional infliction of emotional distress as it is described in the Restatement and that Mr. Norton *and FSA are* liable for damages suffered by Mr. Warren as a result thereof.

The Effect on Mr. Warren:

*Tie evidence* shows that farming was more than Mr. Warren's business, it was his life. It was all that he knew. He loved farming, not just for himself, but for his family. Farming had allowed him to successfully raise 14 children and he enjoyed having them work on his farm.

As a result of the discrimination by FSA, Mr. Warren lost nearly 70% of his farming capability. This loss has had more than an economic impact. In a family where farming was a way of life, and all members wanted to stay and farm together, the emotional toll has been great. Because of the loss of farm land, Mr. Warren's sons no longer work with him - all but one *had to* seek work elsewhere. However, all nine boys and three of the grandchildren have expressed their desire to return to farming with Mr. Warren if such were feasible. Tr.46-54. The extent to which Mr. Warren is emotionally invested in his farm and in his farming family is shown in his statement to the investigator in 1997: "I will die to save my farm." RR-exl.

In his statement to the investigator in 1997, Mr. Warren described how emotionally wrenching and "horrible" his 17-year the ordeal with FSA has been. He describes how he has shed many tears over the years, suffered headaches, stomach

problems, difficulty sleeping, great anxiety about his family's emotional and economic well-being, and suffered extreme humiliation. He has found it difficult to hold his head up and maintain his dignity. He stated that only his faith in God had brought him through the continuing ordeal. Cx-103. Despite overwhelming odds, he has been able to survive through his personal industry, perseverance, and hard work.

Mr: Warren was evaluated in 1998 for three hours over a two-day period by Dr. James Corcoran, a psychiatrist. Mr. Warren recounted the long history of discrimination against him, the finding of lack of good faith, and the consideration of possible criminal prosecution against him. Dr Corcoran observed that Mr. Warren was sad and subdued. Nit. Warren reported that he obsessed constantly about his problems, had difficulty sleeping with nightmares, had frequent *periods of no appetite and had low* energy. He related that the timber episode had been the most stressful of bus life =extremely humiliating and embarrassing. He abhored that he had been victimized because of the color of his skin, and by the government. It had caused him to isolate himself from associates, friends and neighbors. He felt comfortable only with family. Dr. Corcoran diagnosed Post Traumatic Stress Disorder. Cx-119.

Mr. Warren testified that when FSA started denying his applications in 1985, he *had faith that the USDA* system would corned the wrong denials. His reliance seemed well placed, since he won a series of appeals resulting in the reversal of county supervisor and county committee decisions. He knew that racism was common in Southampton. County. He did not believe, however, that the federal government would discriminate against him. He had faith that the program operated by the federal government, unlike .. private county businesses, would treat him with *fairness. He makes* a persistent plea throughout his many writings to the USDA and to his Congressman - you are the federal government, please help me and correct this problem! In his 1997, complaint he shows his despair and feeling of betrayal at the government's lack of response. He wrote: "[t)he agency that I thought was going to help me has only tried to help me lose my land." RR, p.81, Cx-102 at p.15.

At trial, Mr. Warren testified that he has suffered greatly since 1986 when FSA first threatened with foreclosure on his farm. He worried about *losing his farm* and everything that he had worked for. His worries and fear of losing his farm intensified in 1992. He was devastated by the finding of lack of good faith made against him -- "I tell you I likely lost my mind." It was a very "bad" time for him, he said, and it continues to be. It bothered him that he might not be able to continue to farm, but also that he might not have any farm land to leave to his sons. Tr. 48-51.

> The whole incident about the timber cutting and the finding of lack of good faith was extremely embarrassing to Mr. Warren. He lives in a small community, is a member of a church community, serving both as a deacon of the church and as a trustee of the church. Because it is such a small community, everyone became aware of his situation to his great embarrassment and humiliation. Moreover, before the discrimination by FSA, he had a good reputation as a farmer, and a sound credit reputation. He was a highly respected farmer. He was only one of a few farmers in *the* area selected to grow certified foundation peanuts. Before the discrimination, his credit allowed him to get "most anything [he] wanted" However, after the discrimination began, his credit was ruined and he had to pay for everything in cash. His limited farm operation now is run by paying cash. He is not able to get anything on credit.

Mr. Warren testified that it distressed him to see young White farmers in his commutli ty expand *their farm* operation, while he was losing land. He chronically felt sick to his stomach. He suffers chronic anxiety attacks, and has headaches. "It's a bad feeling,.I can tell you that, when people treat you like that--- for no other reason [than the color of your skin." Tr. 50. He testified that he went to doctors over the years, but that he did not keep going to them because he continued to have the same problems. He is *affected by* having to relive the cycle of denials and appeals and threatened foreclosure that he experienced. Tr. 85. It makes him nervous. He still suffers "a lot" from stomach problems every day. He says, physically, *he* constantly feels like he has a cold, but he does not actually have a cold. He has faced the threat of foreclosure on his farm since the mid I980's. Every day he wakes up to the same reality that he may not be able to continue (:o farm and *may* not have any farm to leave to his sons.

Mr. Warren found it a tremendous challenge over the years to keep his head up. The once large farmer who "could get anything he wanted to" had been reduced to going back and forth to the county supervisor for help, hoping that each time would be different. It never was. The finding of lack of good cause caused Mr. Warren to suffer extreme humiliation. When he learned that he was being considered for criminal prosecution, he nearly "last [his] mind" Cx-48, p.15.

Vivian Warren, age 35, daughter of Mr. Warren, testified to the severe suffering of her father. She described the turmoil she has seen in his life and how his life has been devastated by his long fight with USDA. She testified that she was the one who most helped her father pursue his claim of discrimination. She stated that the family's whole life was absorbed in the quest for fair credit treatment and to have the finding of lack of good faith removed from Mr. Warren's records. She and her father have tried to get the USDA to correct the unfairness to her father since 1992. Her efforts to resolve the complaint included repeated phone calls over the years, as well as *trips* to Washington to

7. –

meet with USDA officials. She testified that they went to Washington many times over the years, sometimes missing being home at Christmas and Thanksgiving. Tr.131.

Ms. Warren testified that her father had thought that he would receive better treatment from the federal government than from their local county, and was crushed when it discriminated, too. She testified that her father's reputation as a farmer has suffered from the discrimination, as has his credit, and his reputation for honesty. That he went from being an excellent farmer, used to raising certified peanut seeds, to being down to a point where he is considered a poor farmer, unable to manage *his farm business. The* lack of good faith finding, and the threat of prosecution, she said, caused people to . question his honesty: He is a deacon and trustee in his church. Where he had a good credit recmd prior to the discrimination, he cannot now get credit and has to pay everything in cash. Where before he was financially independent, now his family keeps him going. He has no ability to respond to emergencies, and everything he has to do, he has to get help from someone else to do it His situation is such that he had to borrow money to take care of a relative's funeral expenses. Tr. 131-134.

When Ms. Warren was asked to discuss how the case had affected her father's mental disposition, she said that she worried about him "so much." She wonders "whether lie is going to make it." With that expression of concern, she choked up and, for a time, was unable to continue. She sobbed uncontrollably. When she was able to continue, she described how hard it had been for her to watch her father suffer. She testified that he had frequent "sick spells" and suffered from frequent headaches and stomach problems. He suffered from depression. He no longer found pleasure in things he used to do. He used to love working in his garden, but now has no interest in it. He had no appetite. She testified how it pained him to see other farmers in the field with nice tractors, harvesting their crops, when he could not do so and did not know how he would pay his bills. In her opinion, he has made it *his far "only through* the Grace of God."

Ms. Warren was a very credible witness. Her sobbing was not for my benefit, but the expression of long term pent-up feelings and heartfelt anguish of a child who grieved for a suffering parent. She also had a fear for her father's future. It is reasonable to infer *from her testimony and her* statements throughout the record that her distress came from watching her father, who had once been a proud and independent provider, financially self-sufficient, become a shell of the person he used to be. It was "hard" for her to watch him suffer, she kept saying. The record shows her many pleas in forms of repeated letters and phone calls to USDA personnel and to her Congressman, pressing them to take action to rectify her father's situation. One letter from an OCR agent related that Vivian "calls nearly every day" about her father's case. It was clear from her testimony that her concern was for Mr. Warren's emotional well-being.

Mr. Warren, too, was a very credible witness. I observed Mr. Warren both as he sat in the court throughout the day of the hearing and as he sat on the witness stand within a few fee: of me. His demeanor was consistent with that described in the report from the consulting psychiatrist, and by Mr. Warren - he was sad and subdued, seeming almost defeated, with just a flicker of hope. A considerable amount of time has passed since I heard his testimony. I have had time to reflect on the person of Mr. Warren that I saw, as contrasted to the man reflected in the hundreds of documents of record. I find it difficult to imagine that the man who sat within a few feet of me, had ever felt the independence and self-confidence and courage necessary to stand up before a hostile school board meeting and challenge the White community's resistance to integrate school busing. But the evidence shows he did just that It shows that he was a man who was proud of his. abilities af-a farmer and what he had been able to accomplish as a *fanner,* despite being virtually i lliterate. It is reasonable to infer that his self-esteem and confidence were tied to having been financially able *to provide for his large family and* to have been an accomplished farmer in the area, despite his lack of formal education.,° He was a *man* who had fought hard over the many years to preserve his belief in himself and in fair treatment for all. He was a man who believed in a government that held itself out as promoting equal treatment for all its citizens. Now, he is broken in spirit. Over and again, he mentions being betrayed by a government that held itself out as being an equal opportunity lender. He knew racism was widespread in the county, indeed, he, had been. victimized by it; however, he held on to *his faith* that the federal government *would treat* him fairly. Regrettably, he found that this was not to be. Mr. Warren challenged the establishment and he has paid a hefty price for it. Racial discrimination is vicious, destructive, and debilitating. The evidence shows that Mr. Warren has tried for years to maintain Isis dignity - to keep his head *up. He is still fighting, but the* years have taken a toll on him.

The assessment of damages for mental anguish, humiliation and embarrassment, etc., is difficult. There is no magic formula. Mr. Warren has stated that no amount of money carp give him back *what* he *has lost, nor heal the pain and* humiliation he and his family hay=e suffered, and that is likely so, but he deserves "just "compensation. Cx-48.

*The facts* in Mr. Warren's case are similar to those in the ECOA case of Ricci et al *v ,Key Bancshares of Maine, Inc. et al, 662 F. Supp 1132* (U. S. Dist Ct. Me., April, 1987), and Ricci , 662 F. Supp. 1139 (June 1997). In that case the evidence was found

for Black men, higher income has, to a great extent, positive correlation with life satisfaction and psychological well-being. Ball, RB. & Robbins, L. (1986), Black husbands' satisfaction with their family life. .Journal of *Marriage and* the Family. 48, 849-855.

sufficient for the jury to return a verdict for Mr. Ricci of $1,000,000 emotional distress resulting from discrimination against him based on national origin in violation of § 1691 (a) of ECOA, and $6,000,000 for the intentional infliction of emotional distress under state law.

The evidence before the jury showed that the defendant Bancshares responded "recklessly, callously and discriminatorily" against Mr. Ricci upon hearing allegations from state; and federal law enforcement officials connecting him to organized crime. These allegations were erroneous. That response included the immediate and permanent cancellation of further credit to Mr. Ricci; the concealment from Mr. Ricci of the specific actual reasons for the cancellation; the refusal to even discuss the allegations with Mr. Ricci or v4th others who were most familiar with Mr. Ricci's businesses; and the subsequent failure to take adequate remedial steps to cure the devastating injuries its actions caused to Mr. Ricci's business operations and personal reputation. The court found that the evidence did not support a finding that the defendant acted with malice against Mr. Ricci, but that the bank acted out of self-centered business interests. The evidence supported, the court said, the $1,000,000 ECOA award for emotional distress in that the violations were accompanied by a degree of callousness and recklessness that amounted. to intentional conduct. The court also sustained the jury's **award of $6,000,000** on a state claim for the intentional infliction of emotional distress against Mr. Ricci, based on its finding that, by the defendant's actions, it recklessly inflicted severe emotional distress upon Mr. Ricci, or was certain or substantially ***certain that such*** distress would result from its conduct.

As in ***Ricci, we have*** in Mr. Warren's case, the deliberate ***denial and*** cancellation of credit, the concealment of the actual reasons for the denial of his many applications through the technical **bases for denials, *the refusal*** to provide official and accurate information on Mr. Warren's account, and the failure of FSA and USDA to take remedial steps to remove the injurious finding of lack of good faith. However, in the Warren case we have the additional element of actual malice, which makes the case more egregious than in Ricci. There is the deliberate falsification of evidence to do injury to Mr. Warren - an act showing actual malice and ill-will against Mr. Warren, while malice was expressly not found in Ricck Indeed, the findings in Mr. Warren's case support the $6,000,000 award affirmed in Ricci for the intentional infliction of emotional distress [2].

211n **setting aside a $12,500,000 punitive damage award, the court found that the evidence did not show that the defendant acted with the sort of malice towards Mr. Ricci which the law required to support a claim for** punitive **damages - that the evidence reasonably showed only *that the* defendant was motivated by self-centered, business interests (such** as its ambitions to merge **with other banks) and** placed those interests above any **concern for the impact its actions had or might havo had upon Mr. Ricci.**

'?Me facts in Mr. Warren's case are similar to those in Passantino v. *Johnson & Johnson* Consumer Products, Ins. run, 212 F. 3d 493 (9' Cir. 2000), a Title VII case involving allegation of sex discrimination and retaliation for filing a discrimination complaint. In that case, the jury returned a verdict for the defendant CPI on the sex discrimination charge, but found for Passantino on the retaliation charge.

Jennifer Passantino began working at CPI in 1979, at age 25 years. Over the next 18 years she rose through *the* ranks at CPI to become one of the most successful female managers and was characterized by executives as "a leader in her field. Her success was all the more remarkable because she worked within CPI's "military" division, described as an "old boy network," In spite of this success, her career prospects deteriorated rapidly after she oomplained that her advancement within the company was being limited by sex discrimination. After she filed an EEO complaint, she experienced *a* range of retaliatory acts by 011, making it nearly impossible for her to perform her job effectively.

Pasentino testified *that,* as a result of this stressful series of events, she constantly worried.. cried, and felt trapped and upset. She felt she was forced to spend less time *with* her family **because** she feared she would lose her job, given that her performance rating had been declining. She testified, and her husband and sister corroborated, that she experienced substantial anxiety as well as her rashes, stomach problems, and other symptoms, as a result of her **sense** that she could no longer advance within the company. She also sought help from her pastor for this anxiety, due to CPI's retaliatory action.

The jury found for defendant CPI on the sex discrimination claim, but found that CPI retaliated against Passantino for complaining about what she perceived as sex discrimination. It awarded her $1,000,000 **in compensatory emotional** distress **damages.** CPI argued that the compensatory damages award was not supported by the evidence. In upholding the $1,000,000 award, the 911' Circuit stated that the purpose of Title VIPs antiretaliation provision is to bar employers from taking actions which could have "a deleterious effect on the exercise of these rights [to file discrimination complaint) by others. It allows employees to freely report actions that they reasonably believe are discriminatory, even if those actions are in fact lawful. Absent a judicial *remedy, the type* of actions Passantino asserted her employer engaged in could discourage other employees from speaking freely about discrimination." 212 F. 3d at 506.

The facts in Mr. Warren's case are more egregious than in *Passantino. In* Mr.Warren'S case, the race discrimination was real, not just perceived. Moreover, *it* is

In the Court's view, such motives did not rise to the level of "malice" required to support a claim of punitive damages

reasonable to infer in Mr. Warren's case that the retaliatory actions taken against him were intended to send a chilling *message* not only to Mr. Warren, but to other Black farmers, as well. The message is that they should accept what they get and not complain. It is important that farmers, such as Mr. Warren, not be discouraged from speaking freely about discrimination.

*I have* been *unable* to *fad any* case, like Mr. Warren's, which involves both the ugly specter of discrimination and retaliation, and where the *discrimination had* occurred over the long extent of time as involved in Mr. Warren's case. Here discrimination began in 1985, seventeen years ago, and continues. The retaliatory action by the finding of lack *of good faith occurred in 1992, ten years ago.*

The USDA suggest that Mr. Warren's damages should be modest. It offers no dollar figure, but suggests consideration of the fact that this is not a case involving allegations of "overt harassment, verbal slurs, or any other egregious behavior by Agency personnel". It says Mr. Warren has described the conduct of USDA personnel, even the offender, as "friendly," - "showing a problem in its decision, not in its conduct." This reference is to Vivian Warren's testimony that Mr. Norton was "friendly. He just denied everything." Tr. 128. I am disturbed by the USDA's argument. That Mr. Norton was not overtly hostile to Mr. Warren, but smiled in Mr. Warren's face while he worked to totally undermine Mr. Warren's economic and emotional security and possibly bring about his criminal prosecution does not make his conduct less *egregious, but more so. By* pretending he was acting in the interest of Mr. Warren, his duplicity was able to go undetected for nearly four years.

In making a determination of a damage award for emotional distress, X have relied upon my own observations of Mr. Warren's demeanor and testimony, the demeanor and testimony of his daughter, Vivian, as well the documentary evidence. X have considered the egregious nature of the discriminatory acts against Mr. Warren as well as their effect on Mr. Warren during the 17 *long years over which they* were committed.' I have

22 ) have considered **that** Mr. **Warren did** not present **evidence of significant medical** attention, **either** for his physical or **mental distress.** He **stated that** he **went** to **doctors** on a number of occasions, but **did not continue in treatment because he kept having the same chronic symptoms. He saw Dr: Corcoran only once - for evaluation. T do not consider the absence of doctor's visits a reason not to credit the severity of Mr. Warren's suffering. The evidence is that Mr. Warren was financially strapped. Based on the evidence in this record, he would have had to borrow to pay for the doctor's visits. Moreover, _Mr. Warren is in elderly Black man, lacking in formal education. Black men of his generation and his background rarely have seek the help of a mental health professional. They tend to seek counsel from their family. friends and church family. See W.W.Dressler (1985), Extended family relationships, social support and mental health in a southern Black Community. Journal of Health and Social Behavior, 26,**

also considered the awards which have been made in similar, but far less egregious cases. I conclude that $5,000,000 is an appropriate award in Mr. Warren's case for the discrimination, and then the mental distress intentionally inflicted upon him by retaliation, which went uncorrected for nearly ten years. 1, therefore, award that amount.

DAMAGE TO REPUTATION

ML. Warren seeks $2,000,000 for damage to professional reputation; $1,000,000 for damae to reputation for honesty; $1,000,00 for damage to credit reputation; and

w

$500,000 for damage to ability to respond to emergencies and inconveniences.

Damage t:g credit Mutation/ Damage to ability to attend to emergencies:

1

Mr. Warren suffered a significant injury to his credit reputation. Where before the discrimination, Mr. Warren was self-sufficient and financially independent - able to pay for goods and services for his farm and his family - after the discrimination he was left without any credit opportunities. Before the discrimination, he "could get anything he *wanted." After the discrimination, he had to borrow from family and pay with cash or go* without goods and services. He became seriously delinquent on his bills.

It might be said that the fact that Mr. Warren borrowed from FSA indicated that his credit was already damaged since FSA is a bank of last resort. Such is riot the case. Mr. Warren came to FSA, not because of a damaged credit history, but because of inability to borrow in the *private* industry, due to racial bigotry in the county.

*Mr. Warren* has suffered daily from diminishing credit since 1985, a period of 17 *years. 'I1e lack of* credit not only affected the size and quality of his farm operation, but *the* quality of life that he was able to provide for himself and his large family. The finding of lack of good faith virtually assured that *Mr. Warren would* have no source of credit other than family and loyal friends. Instead of being in a position where he could comfortably enjoy the "golden" years of his life as the result of his life of hard work and industry, lie lived with stress, *day in and day* out, worrying about how he would save his farm and the family business.

the evidence in this record, he would have had to borrow to pay for the doctor's visits. Moreover, .Mr. . Warren is an elderly Black man, lacking in formal education. Black men of his generation and his background rarely have seek the help of a mental health professional. 'they tend to seek counsel from their family, friends and church family. See W.W.Dressler (19$5), Extended family relationships, social support and mental health in a southern Black Community. Journal *of Health and Social Behavior, 26,* 39-48..

The damage to ability to attend to emergencies overlaps the injury to credit reputation. Because Mr. Warren no longer is able to obtain credit and has to pay for everything by cash, he is hamstrung in his ability to take care of emergencies. For *damage to credit* reputation and ability to attend to emergencies, I award $100,000.

Damage to reputation for honesty and fair dealing:

The greatest injury to reputation seemed to his reputation for honesty - by the finding of bad faith or "lack *of good faith." By* this finding, FSA branded Mr. Warren a dishonest person. Not only did Mr. Norton make a finding that he *had* lacked good faith in his dealings with FSA, but raised the specter of criminal prosecution for wrongdoing. Mr. Warrgn described his reaction to the lack of good faith finding - "I almost lost my mind" " llt was the most stressful period of my life." Mr. Warren was extremely embarrassed when he first turned to a family friend and attorney for help in paying restitution. When his attorney's promissory note was not accepted, he turned to the only other source *he* knew - he *sought the help of his church of 50* years. He described the "extreme humiliation" he felt when he turned to his church. He is a deacon at his church and a trustee. After this humiliation. he was frustrated and resentful when FSA refused the offer from his church to make restitution on his behalf, thus leaving the finding of bad faith on his record.

Ms. Warren testified that the fact that Mr. Norton had made a lack of good faith finding against him was known throughout the community and it embarrassingly reflected negatively on his reputation *for* honesty. Although Mr. Warren was convinced that all of this was done so that he would lose his land, he was aware that the finding had caused other persons who did not know him well to question his honesty and integrity - others had been saying things about him *that were not true. He* became isolated from associates, friends and neighbors. Cx-119.

Mr. Norton made the finding of lack of good faith with the specific intent to injure Mr. Warren's reputation for honesty. All of the evidence shows that Mr. Warren'had lived a long life as an honest and decent man. Cx-48. That *Mr. Norton would seek to* destroy Mr. Warren's reputation out of racial bigotry and retaliation for Mr. Warren's standing up for his civil rights, is nothing short of deplorable. The USDA has taken no action in ten years to correct that wrong. Although no amount of money can give back his good name and reputation, he deserves a substantial award. I award $250,000.

Damage to professional (business) reputation:

Damages may be awarded upon proof of actual injury for injury to professional

*reputation. See Memphis Community School District 'v. Stachura, 477 U S 299 (1986):*

Pdz. Warren has proved that he suffered a significant injury to his professional reputation. Mr. Warren's ability to farm successfully was of paramount importance to him. Fanning was his life. It was all he knew. He considered himself a "master" farmer. It can be seen from the numerous letters written *on his* behalf, that he took immense pride in the fact that he was one of a few farmers selected to grow "certified foundation" peanuts. He had built a large farming operation which he had hoped to expand so.,that he would leave farm land upon his death to all of his nine sons. This was an immerse achievement for a man who could not read or write.

However, the USDA's discrimination made it impossible for Mr. Warren to maintain a successful farm record and his reputation as a farmer suffered. As a result of the damage to his credit by the denials of farm operating funds, he was reduced to a small farmer, whose crops suffered from an inability to purchase adequate seed, fertilizer, etc. needed for a high quality yield. He tried to farm all his acres, but with inadequate resources: his yields suffered badly. The low yields were then used against him as evidence of poor farming ability. .

The injury to professional reputation is a separate injury from the injury to credit reputation.. The injury to professional reputation comes from the illegal denial of credit for the purpose of damaging Mr. Warren's reputation in his occupation. Mr. Warren has suffered severe damage to his professional reputation. Since 1985, has gone from being one of the largest farmers in Southampton County, producing on nearly 800 acres of land, to farming on 170 acres and defending daily the threatened foreclosure on these rem ining acres. Only the filing of his discrimination complaint staved off this disaster. I award $100,000.

OTHER F.ELIEF:

Mr. Warren seeks other equitable relief. Finding all requested relief appropriate, it will be ordered below. The relief is needed to allow Mr. Warren to quickly and efficiently reestablish himself as a full-time, successful and high producing farmer, able to employ his children in the business to the extent that he would have had he not been *discriminated against* beginning in 1985.

CONCLUSION AND ORDER

Having concluded that the USDA has discriminated against Mr- Warren in *violation of § 1691 of ECOA (15 U.S.C, § 1691 et seq.), it is hereby*

ORDERED that:

1. Within ten (10) days of the date on which this Order becomes final, the USDA shall pay damages in the amount of $6,612,723 to Mr. Warren *for his* injuries suffered as a result of the discrimination;

2. Tha USDA shall immediately terminate any foreclosure proceedings that have been initiated against Mr. Warren's real property in connection with the claims resolved in this case;

3. The USDA shall not take any retaliatory actions against Mr- Warren for his filing *of the complaints in this* case or any other complaint of discrimination against FSA or. any component of the USDA;

4. The USDA shall immediately remove from Mr. Warren's administrative record the finding, and any subsequent reference *thereto, that he acted with* a "lack of good faith" in cutting timber from his land in 1991-1992, and shall not use that finding against Mr. Warren upon consideration of any future application for loan or loan services.

5. The; USDA shall. discharge all of Mr. Warren's outstanding debts to the FSA that were involved in the claims resolved in this case and shall thereafter hold harmless 1VIr. Warren far such *debt." The* discharge of his debt shall not adversely affect his eligibility

*The USDA* states that it does not have a strong position on whether this finding should be removed. It claims that "the Complainant did not produce `enough' evidence at the hearing for this tribunal to determine if such relief is appropriate in this case" Post-trial brief, at 21. I find this statement quite troubling. The USDA has admitted that the determination of lack of good faith and its inclusion it Mr. Warren's record resulted from a discriminatory act, (Rx-1), yet it does not, even now, agree to its deletion. Tie correction is essential to repairing the damage done to Mr. Warren..

2'Ttte USDA objects to this requested relief. It argues that discharge of the debt it addition to damages would be a double recovery. However, I find that the discharge of any indebtedness to FSA growing out of loans charged to his account prior to 1985 is appropriate and reasonable based on the fact that FSA has failed to date to provide Mr. Warren with an official and reliable accounting of his debt. Based on the evidence of record, I have no confidence that an accounting at this time would accurately reflect that amount which is just and owing by Mr. Warren.

for future; participation in any USDA loan or loan servicing program, and will not trigger the statutory provisions of Section 648 of the Federal Agriculture Improvement and Reform Act of 1996 that preclude an individual who has received debt forgiveness from obtaining future farm loans from USDA or from obtaining future debt forgiveness, or otherwise be used in any negative manner in conjunction with Mr. Warren's applications for, or participation in, any USDA program, benefit or activity;

6. The USDA *shall give Mr.* Warren, within the next three years at his election, priority consideratioe for the pitxchase, lease, or other acquisition of farms in the USDA inventory in Southampton County, Virginia, including farms with peanut allotment'quotas, on the most favorable terms permitted by law. Mr. Warren must exercise hiss right to the relief provided in this section *in writing* within the three year period. Priority consideration as used in this Order means that an application will be given first priority as to processing and as to the availability of funds for the type of loan at issue, above all other applicants listed in 7 C.F.R. 1955.107(f)(1);

7. The USDA shall provide Mr. Warren with priority consideration for any direct farm ownership loan and any farm operating loan that he applies for at any time up to the next three. years after the date of this Order. Mr. Warren has the obligation to notify the USDA in writing when he decides to exercise his right under this provision to priority consideration in order to receive such consideration. His election must be made within the three year period allowed;

8. Any application for a farm ownership or operating loan, or for inventory property, submitted by Mr. Warren within three years of the date of this Order shall be viewed by the USDA in a light most favorable to Mr. Warren, and the amount and terms of any loan shall be the most favorable permitted by the law and USDA, regulations. Arty outstanding

2`Ptiority consideration for a direct farm operating or direct farm ownership loan - applications receiving "priority consideration" me expodited and processed ahead of other applications (the applicant must in= a.ll regular eligibility requirernents for the loan, of course). If the loan is approved but there is limited funding available for loans, the priority application will be funded before non-priority applications.

Priority consideration on inventory property - Le, will be considered before outer persons, in purchasing property in inventory from USDA. For example, if property is first offered to those who meet the definition of a "beginning farmer," prevailing farmr who meet that definition will have the opportunity to purchase the property before any other "beginning farmers." If there are no "beginning farmers," and the property becomes available for purchase by others, prevailing members have the opportunity to purchase the property before any other farmers.

debt against Mr. Warren which is to be discharged pursuant to this Order shall not adversely affect Mr. Warren's eligibility for future participation in any USDA loan or loan servicing program- In making a determination on a loan application, the USDA will not take into account the sum paid to Mr. Warren under paragraph I of this Order. Mr. Warren will still have to *meet eligibility* requirements for loans as set forth in 7 CFR 1941 and 1943:

9. The USDA shall, upon request of Mr. Warren and in conjunction with any application from him for farm ownership or operating loan or for inventory property, provide Mr. Warren with reasonable technical assistance and service, including the preparation of a Farm and Home Plan, and the assistance of qualified USDA employees, **in connection with** Mr. Warren's preparation and submission of any such application;

10. Final approval or disapproval of any application for a USDA loan will be completed under the auspices of the national office of FSA. In addition, the national office of F'SA will monitor all assistance provided to Mr. Warren for the next three years; and

11. OCR will monitor FSA's compliance with the programmatic remedies set forth above.

This Determination shall become final 35 days after issuance unless reviewed within that time by the Assistant Secretary for Administration of the United States Department of Agriculture, either upon the Assistant Secretary's own initiative or pursuant to request by the Complainants. *See 7* C.F.R. § 15f.24.

1

CONS ANCE T. O'BRYA Admi strative Law Judge

CERTIFICATE OF SERVICE

I hereby certify that copies of this ORDER WITHDRAWING DETERMINATION ISSUED ON DECEMBER 17, 2002, and DETERMINATION of December 19, 2002, issued by CONSTANCE T. O'BRYANT, Administrative Law Judge, in HUDALJ No. 00-19-NA, were sent to the following parties on this 19th day of December, 2002, in the manner indicated:

Chief Docket Clerk REGULAR MAIL:

Mr. Will Sylvester Warren
28464 ViACSVille Road
Sedley,V A 23878

Mr. John E. Warren Maximuni Controls, Inc.
_1025 Executive Blvd., Suite 113
Chesapeake, VA 23320

**INTEROMCE MESSENGER:**

*Sadhna G. True, Esq.*
Deputy Associate General Counsel
Office of the General Counsel,
3312-S South Building
1400 Independence Ave., SW
Washington, DC 20250

Ronald Walkow, Esq.
Office of the General Counsel
United States Department of Agriculture
3308 South Building
1400 Independence Ave., SW
Washington, DC 20250

Charles Q. Pearson, Director
Program Adjudication Division
Office of Civil Rights
1400 Independence Avenue, S.W.
Washington, D. C. 20250

David W inningham, Acting Director
Office of Civil Rights
Office of the Assistant Secretary for Administration
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250-9410

Arleane Leland
Associate General Counsel
Civil Rights.
U.S. Department of Agriculture
1400Independence Avenue, S.W.
Washington, DC 20250-9410