# In the United States Court of Federal Claims

No. 05-400 C

(Filed: July 5, 2006)

————————

| | |
|---|---|
| MICHAEL W. STOVALL, Plaintiff, v. THE UNITED STATES, Defendant. | * Motion to dismiss; African-American farmer; * Alleged breach of USDA settlement agreement * involving racial discrimination claim; Tucker Act * – claim based upon "any express or implied * contract with the United States"; *Kania* * construed – proprietary versus sovereign actions; * *Sanders*; Requirement that claims be payable in * money; "Contracts" under the Tucker Act * generally not required to contain money- * mandating language; Preemption; Court of * "limited jurisdiction;" Jurisdiction found. |

————————

**OPINION**

————————

*James W. Myart, Jr.,* San Antonio, Texas, for plaintiff.

*Douglas K. Mickel,* Commercial Litigation, U.S. Department of Justice, Washington, D.C., with whom was *Assistant Attorney General Peter D. Keisler,* for defendant.

**ALLEGRA, Judge:**

Michael Stovall (plaintiff), an African-American farmer in Alabama, brings suit against the United States for breach of his settlement agreement with the Farm Service Agency (FSA), an arm of the U.S. Department of Agriculture (USDA). This claim was originally part of a broader lawsuit that Mr. Stovall filed in the United States District Court for the District of Columbia. In that forum, defendant vigorously asserted that plaintiff's contract claim should be dismissed because this court had exclusive jurisdiction over it. In response, the district court transferred the claim here. Now, defendant moves to dismiss that same contract claim under RCFC 12(b)(1), asserting that this court lacks jurisdiction. Indeed, it goes so far as to contend that ***no*** court has jurisdiction to consider whether the USDA has breached the settlement agreement (or otherwise to enforce that agreement), raising the prospect that the "settlement" of plaintiff's long-standing discrimination claims against the FSA was little more than a paper charade. Fortunately, the law indicates otherwise. At the conclusion of the oral argument on defendant's motion to dismiss, the court summarily denied the motion. Owing to the seriousness of this matter, this opinion amplifies the reasoning underlying that oral ruling.

# I. BACKGROUND[1]

In 1993, plaintiff, a lifelong Alabama farmer, attempted to apply for farm loans through the FSA office in Lawrence County, Alabama, but was denied even an application. In 1994, he received an application form and submitted requests for an ownership loan and farm operating loan, both of which were denied by the FSA office. Plaintiff pursued an administrative appeal, after which the application for the operating loan was approved. In March 1995, those loan funds were disbursed.

After failing in other attempts to obtain loans, plaintiff, in January 1996, filed a complaint with the USDA's Office of Civil Rights (OCR), charging FSA with racial discrimination. OCR ruled in his favor, finding that the FSA discriminated against him in denying the 1994 farm ownership loan and a 1995 farm operating loan. On February 27, 1998, plaintiff and OCR settled his administrative complaint, memorializing the settlement in a "Resolution Agreement." Under that agreement, Mr. Stovall waived any rights against USDA and its employees arising from his complaint in exchange for USDA's promises to pay him $145,000 in compensatory damages, discharge his debts to FSA, offer him priority consideration on future loan applications, provide reasonable attorney's fees and costs, and other relief.

In early 1998, plaintiff purchased farm land from the FSA's inventory property, and filed a new application for a farm ownership and operating loan from FSA, this time obtaining the assistance of several USDA employees, including Carolyn Cooksie and Sam Snyder. The loans were approved in March 1998, and plaintiff received these funds in November 1998. In April 1999, plaintiff applied for additional funds to build two chicken houses. In December 1999, FSA approved an additional $35,000 loan to build those houses. However, following a meeting with a contractor and local FSA employee, Richard Knouff, it became apparent that additional funds were necessary to construct the projects. Plaintiff requested these funds from Mr. Knouff, who responded that plaintiff had reached his loan limit with the FSA. Plaintiff alleges that Mr. Knouff told the contractor to terminate the project.

Plaintiff contacted Mr. Snyder, who developed a "Farm and Home Plan" to assess the commercial viability of the chicken houses. According to plaintiff, Mr. Snyder and other USDA employees purposely set up the plan so that he could not demonstrate adequate cash flow, causing his request for additional loans or loan restructuring to be denied by the FSA in October of 2001. Plaintiff alleges this was a collective ploy to force him out of business. In October of 2001, Mr. Knouff again notified Mr. Stovall that FSA could not consider additional loans or loan restructuring.

---

[1] The court construes allegations in the complaint most favorably to the plaintiff, resolving ambiguities in his favor. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236-37 (1974)). However, the court may look beyond the pleadings and "inquire into jurisdictional facts" in order to determine whether jurisdiction exists. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991).

In January of 2004, plaintiff brought suit in the United States District Court for the District of Columbia, asserting, *inter alia*, that defendant had breached the settlement agreement by failing to implement various paragraphs of the Resolution Agreement. Plaintiff sought damages of $4,000,000, plus attorneys fees and costs as a result of the breach of contract. Defendant argued that the breach of contract claim should be handled in this court, leading the district court to transfer that portion of plaintiff's case here. On April 21, 2005, plaintiff filed an amended complaint in which he alleged that this court had jurisdiction over his contract claims under the Tucker Act, 28 U.S.C. § 1491(a), and the Contract Disputes Act. On June 16, 2005, defendant filed its motion to dismiss under RCFC 12(b)(1), seemingly also invoking RCFC 12(b)(6), for failure to state a claim for which relief may be granted. Plaintiff filed his response to defendant's motion on July 25, 2006, and filed a Second Amended Complaint, alleging jurisdiction solely under the Tucker Act, abandoning his CDA claim, on August 3, 2005. Defendant filed its reply on August 23, 2005, and plaintiff filed a sur-reply on January 10, 2006.

## II. DISCUSSION

The plain language of the Tucker Act applies to claims based upon "any express or implied contract with the United States." Regarding this language, the Federal Circuit has repeatedly stated – "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999) (citing *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)); *see also Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 113 (2002). And the decisional law leaves no doubt that settlement agreements generally fall within this definition. *See Massie*, 166 F.3d at 1186; *Hall v. United States,* 69 Fed. Cl. 51, 55 (2005); *see also Kasarsky v. Merit. Sys. Prot. Bd.*, 296 F.3d 1331, 1336 (Fed. Cir. 2002) ("Disputes involving settlement agreements are governed by contract principles."); *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988) ("It is axiomatic that a settlement agreement is a contract."). Despite this, defendant argues that plaintiff's breach claim does not involve a "contract" within the meaning of the Tucker Act because the United States was acting in its "sovereign" capacity when it entered into the relevant settlement agreement. In this regard, it brandishes *Kania v. United States*, 650 F.2d 264, 268-69 (Ct. Cl.), *cert. denied*, 454 U.S. 895 (1981), for the proposition that this court has jurisdiction only over agreements that the United States enters in its proprietary capacity.

While *Kania* distinguishes between contracts relating to proprietary versus sovereign actions – holding that the latter is outside the purview of the Tucker Act – it only loosely mapped the contours of those governmental spheres. There, the Court of Claims stated –

> The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds. The Congress undoubtedly had in mind as the ***principal*** class of contract case in which

> it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves.

*Id*. at 268-69 (emphasis added). Subsequent cases, particularly *Sanders v. United States*, 252 F.3d 1329, 1334-35 (Fed. Cir. 2001), have clarified that an agreement falls within the excluded sovereign realm only where it is the sort that can ***only*** be executed by the sovereign.[2] While the sovereign concept is not limited to plea, witness protection, informant and other forms of criminal agreements,[3] that doctrine necessarily is narrow in scope and, importantly, does not include every action taken by the government in its "sovereign capacity."[4] Correspondingly, the concept of what falls within the "proprietary" realm – and thus within this court's Tucker Act jurisdiction – is relatively broad and includes not only the "principal class of contract" involving the procurement of goods, lands, and services, but any other agreement undertaken by the Federal government that has a private analogue, that is, categorically of the sort that can be executed among private entities and individuals. *See Houston*, 60 Fed. Cl. at 511 (referring to contracts

---

[2] *See* Michelle Visser, "Sovereign Immunity and Informant Defectors: The United States' Refusal to Protect its Protectors," 58 Stan. L. Rev. 663, 686 (2005) ("Sovereign contracts . . . refer to contracts for which there could be no private analogue – where only the government, as the sovereign, has the authority necessary to make the promises made."); s*ee also Houston v. United States*, 60 Fed. Cl. 507, 511 (2004) ("a plea bargain is the type of contract that the government makes in its sovereign capacity, since private parties cannot make [such] agreements"); *Sadeghi v. United States*, 46 Fed. Cl. 660, 662 (2000) ("Because administering the criminal justice system is an activity that lies at the heart of sovereign action, breach of contract arising out of the criminal justice system does not ordinarily give rise to an action under the Tucker Act for damages.") (citing *Drakes v. United States*, 28 Fed. Cl. 190, 193 (1993)).

[3] *See Moore v. United States*, 48 Fed. Cl. 394, 397 (2000); *Doe v. United States*, 37 Fed. Cl. 74, 77-78 (1996); *Grundy v. United States*, 2 Cl. Ct. 596, 598-99 (1983).

[4] A broad formulation of what is "sovereign" would sweep in every authorized action taken by the government and inevitably run into the same difficulties that have led the Supreme Court to abandon the "proprietary/governmental" distinction in other contexts, including cases involving the Interstate Commerce Clause. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545-47 (1985); *see generally*, Janice C. Griffith, "Local Government Contracts: Escaping from the Governmental/Proprietary Maze," 75 Iowa L. Rev. 277 (1990). Indeed, depending on how expansively one defines the term, the United States is not acting in a "proprietary" capacity even when it procures goods and services. Thus, in *Federal Land Bank v. Board of County Commissioners*, 368 U.S. 146, 150-51 (1961), the Supreme Court stated "our decisions have made it clear that the Federal Government performs no 'proprietary' functions" and that "any constitutional exercise of [the government's] delegated powers is governmental." *Id*. at 151 n.15; *see also* Ralph C. Nash & John Cibinic, "Postscript: Dealing With the Sovereign," 19 No. 2 Nash & Cibinic Rep. ¶ 6 (2005); Ralph C. Nash & John Cibinic, "Dealing with the Sovereign: Risky Business," 18 No. 2 Nash & Cibinic Rep. ¶ 53 (2004).

made in the government's sovereign capacity as a "narrow exception" to the "broad category of proprietary contracts").

That *Kania* did not limit this court's Tucker Act contract jurisdiction to procurement contracts is a thought perhaps too banal to merit remark were it not for the fact that defendant somehow reads the quoted language above as if the word "principal" was not there. Any notion that the word "contract" in the Tucker Act should be so limited does not bear scrutiny. For one thing, defendant can anchor its hollow view of this court's jurisdiction neither to the natural reading of the language of the Tucker Act nor to any binding precedent construing that statute. Adoption of its view, indeed, would be a remarkable *fin-de-siécle* retrenchment that could only mean that, over the last decade, this court (with the complicity of the Supreme Court and the Federal Circuit) has usurped jurisdiction not only over dozens of so-called *Winstar* cases, *cf.*, *e.g.*, *Winstar Corp. v. United States*, 64 F.3d 1531, 1539-40 (Fed. Cir. 1995) (en banc), but also over hundreds of cases involving spent nuclear fuel, *cf.*, *e.g.*, *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 178 (2005); *Fla. Power & Light Co. v. United States*, 66 Fed. Cl. 93 (2005); low-income housing agreements, *cf., e.g., Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002), *on remand*, 61 Fed. Cl. 718 (2004) (concerning breach of FmHA agreement); *Cuyahoga Metr. Housing Auth. v. United States*, 57 Fed. Cl. 751, 759 (2003) (concerning breach of HUD agreement); and government grant programs, *cf., e.g., San Juan City College v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004) (breach of grant agreement); *California v. United States*, 271 F.3d 1377, 1382-83 (Fed. Cir. 2001) (breach of flood control agreement). None of these cases involved procurements of goods, services or lands, yet all of them were readily found to fall within this court's Tucker Act jurisdiction. As defendant cannot account for these cases, they stand as further evidence that defendant's take on *Kania* is wishful thinking.[5]

To be sure, claims under the Tucker Act must be payable in money. *See United States v. King,* 395 U.S. 1, 3 (1969) (claim presented must be for "actual presently due money damages from the United States"); *N.Y. Life Ins. Co. v. United States*, 118 F.3d 1553**,** 1556 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998) (to invoke this court's jurisdiction, a plaintiff's "claim must . . . be for money"). Yet, for the wide majority of contracts, this requirement is met by a simple presumption – that damages will be available upon a breach. *See Sanders*, 252 F.3d at 1334 ("It is no doubt also true that in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement."); *see also United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) ("[D]amages are always the default remedy for breach of contract.") (plurality opinion) (citing, *e.g., Restatement (Second) of Contracts* § 346, cmt. a (1981)).[6] As such, there is no

---

[5] Indeed, at oral argument, defendant's counsel indicated that he had not considered the broader implications of the jurisdictional argument he was posing.

[6] *Sanders* explains that one reason criminal agreements do not come within this court's jurisdiction is that they do not enjoy this presumption. *Sanders*, 252 F.3d at 1334 ("Although agreements that are in part civil and in part criminal may be governed by the presumption concerning the availability of damages in civil cases, a different rule obtains where the agreement

generic requirement under the Tucker Act that contracts must include specific language indicating that damages will be paid upon a breach. The twin seminal cases describing the money-mandating requirement, *United States v. Testan*, 424 U.S. 392, 398 (1976) and *Eastport S.S. Corp. v. United States*, 372 F.2d 1002 (1967), are consistent with this view, as they were careful to exclude from that analysis contract cases.[7] Cases in this court that can be read otherwise appear to conflate the requirement that claims be payable in money with the *Eastport* money-mandating analysis, thereby abetting, at the least, erroneously theorized judgments. *See, e.g.*, *Schnelle v. United States*, 69 Fed. Cl. 463, 466 (2006); *Griswold v. United States*, 61 Fed. Cl. 458, 465-66 (2004); *Lee v. United States*, 33 Fed. Cl. 374, 378 (1995). Rather, the requirement that there be unmistakable language mandating a payment upon a breach applies only to the relatively narrow band of cases that can be correctly characterized as involving agreements only entered into by the sovereign. To recur, were the law otherwise, this court would have lacked jurisdiction over *Winstar* and all of its various progeny, none of which involved contracts containing "money mandating" language. *See generally, San Juan City College*, 391 F.3d at 1361 ("Normally contracts do not contain provisions specifying the basis for the award of damages in case of breach, with the exception of provisions governing damages in particular situations, such as liquidated damages for delay or other specified breaches.").

Indeed, most cases in which courts have refused to exercise contract jurisdiction do not turn upon the proprietary/sovereign distinction at all, but rather are properly viewed as involving statutory preemption, that is, situations where Congress has either expressly or impliedly withdrawn this court's grant of Tucker Act jurisdiction in favor of some other court. S*ee Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1373-74 (Fed. Cir. 2005); *Massie*, 166 F.3d at 1188; *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1367 (Fed. Cir. 1998) ("There are, of course, instances in which courts find that Congress has displaced Tucker Act jurisdiction in favor of some other remedial scheme."); *see also Chevron U.S.A.*, 2006 WL 1493822 at *24 (noting this distinction). Most commonly, this occurs where Congress has assigned to another court, usually the district courts, exclusive subject matter jurisdiction over a particular category of case, making it eminently logical that agreements to settle such cases be considered by the same court. Concrete examples include: (i) criminal or quasi-criminal matters, *see e.g., Sanders*, 252 F.3d at 1335-36 (citing *Santobello v. New York*, 404 U.S. 257, 263

---

is entirely concerned with the conduct of the parties in a criminal case. . . . [*Kania*] has previously established that in those circumstances a damages remedy is not ordinarily available.") (footnote omitted).

[7] *See Testan*, 424 U.S. at 400 (contrasting money-mandating claims with claims seeking "the return of money" and those that "rest . . . upon a contract"); *Eastport*, 372 F.2d at 1008 n.7, 1009 (money-mandating analysis does not apply to claims that "fall under another head of jurisdiction, such as a contract with the United States"); *see also Chevron U.S.A. v. United States*, 2006 WL 1493822 at *20-23 (Fed. Cl. May 31, 2006) (extensively analyzing this point and concluding that "as a matter of law, Chevron is not required to identify a specific money-mandating provision in [its agreement with the government], because inherent in every breach of contract is a right to money damages).

(1971)); *Trudeau v. United States*, 68 Fed. Cl. 121, 129 (2005), *aff'd, per curiam,* Order No. 2006-5004 (Fed. Cir. Jun. 13, 2006); (ii) settlements of Title VII actions, *see, e.g., Taylor v. United States*, 54 Fed. Cl. 423, 425 (2002); *Mitchell v. United States*, 44 Fed. Cl. 437, 439-40 (1999); (iii) settlements involving the Civil Service Reform Act, *see*, e.g., *Bobula v. U.S. Dept. of Justice*, 970 F.2d 854, 857 (Fed. Cir. 1992); *Amin* v. *Merit Sys. Protection Bd.*, 951 F.2d 1247, 1252-53 (Fed. Cir. 1991); and (iv) any case in which another court has retained jurisdiction to supervise implementation of a settlement, *see, e.g., Good v. United States*, 23 Cl. Ct. 744, 746 (1991). Unfortunately, the preemption point tends to get lost in cases that see the world almost entirely through the prism of the sovereign versus proprietary distinction, an approach that often leads to an overly expansive concept of what is "sovereign," and, concomitantly, an unduly constricted view of this court's jurisdiction. *See, e.g., Awad v. United States*, 61 Fed. Cl. 281, 284 (2004). Other cases have avoided this flaw in rejecting similar claims of lack of jurisdiction. *See Chevron, U.S.A.*, 2006 WL 1493822 at *25.[8]

In offering its wooden view of this court's jurisdiction, defendant also invokes the notion that this court is one of "limited jurisdiction." While defendant often quotes this language as if it had biblical proportions, this maxim "is little more than a truism, as universally applicable to lower federal courts as it is generally unhelpful in resolving any specific issue of jurisdiction or authority." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 137 (2004); *see also Klamath Irr. Dist. v. United States*, 64 Fed. Cl. 328, 333-34 (2005). This is not judicial hubris. It is simply the case that, divorced from any authority suggesting a "limitation," this "limited jurisdiction" principle offers nothing and, in particular, does not require this court to disregard jurisdiction that Congress has conferred. Indeed, while there is no gainsaying that waivers of sovereign immunity must be narrowly construed, it is equally true that courts are "vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."); *Elk v. United States*, 70 Fed. Cl. 405, 407 (2006). For these two concepts – "narrow construction" and "unflagging obligation" – to coexist peacefully, logically and jurisprudentially, this court must exercise the jurisdiction it is actually granted.

Within the jurisdictional rubric described, this is a relatively straight-forward case. The case *sub judice* does not involve a "sovereign" agreement within the meaning of *Kania* and *Sanders*. Rather, it involves the settlement of a discrimination claim, a type of agreement that

---

[8] To avoid misapplying the sovereign/proprietary distinction, care must be taken to focus primarily on the nature of the agreement and the promises contained therein, rather than the specific subject matter covered. *See Drakes*, 28 Fed. Cl. at 193. For example, contracts to procure military hardware certainly would be within this court's jurisdiction, even without the Contract Disputes Act, 28 U.S.C. § 1491(a)(2), though presumably only the government can procure (legally) aircraft carriers and fighter jets. *See Bailey v. United States*, 54 Fed. Cl. 459, 483 (2002). Indeed, history has shown that functions that once were viewed as exclusively the domain of the sovereign are now commonly contracted out.

arises frequently in the private sector. Nor does this matter involve a category of case that has been dedicated exclusively to the district courts or some other court. Indeed, as noted at the outset, defendant admits that if this court does not have jurisdiction over this matter, no court does. Accordingly, there can be no preemption here. It follows, *a fortiori*, that the Tucker Act endows this court with jurisdiction over this matter, as various cases so hold. *See Hall v. United States*, 69 Fed. Cl. 51, 55 (2005) (Tucker Act jurisdiction existed over claim that USDA breached settlement agreement with African-American farmer); *see also Brown v. United States*, 389 F.3d 1296, 1297 (D.C. Cir. 2004) (per curiam) (reaching the same conclusion based on the government's argument); *Shaffer v. Veneman*, 325 F.3d 370, 372 (D.C. Cir. 2003) (same; "[t]here appears to be no doubt that the Court of Federal Claims could entertain this case under the Tucker Act, for the purpose of which a settlement agreement is considered a contract"); *Stovall v. Veneman*, 394 F. Supp. 2d 21, 27 (D.D.C. 2005) (same).[9]

## III. CONCLUSION

This court will not paint the lily. For the reasons previously stated, defendant's motion to dismiss must be denied. The Clerk is ordered to mail a copy of this opinion to the district court judge who handled this matter in the United States District Court for the District of Columbia.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[9] In the briefs that it filed in the African-American farmer cases in the D.C. Circuit, defendant consistently argued that this court, rather than the D.C. District Court, had jurisdiction over FSA settlement agreements. Defendant claims that it has since reconsidered its position, although one must wonder how it will approach future cases in the D.C. Circuit, given the binding precedent it has helped to establish there. At least at this juncture, however, there is no occasion for the court to consider whether judicial estoppel should prevent defendant from taking a position herein inconsistent with its prior views. *See*, *however*, *Cuyahoga Metro. Housing Auth. v. United States*, 65 Fed. Cl. 534, 554-55 (2005) (indicating that the doctrine of judicial estoppel may be applied to the United States); *and compare Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 14 (1st Cir. 1999) (indicating that judicial estoppel may be invoked to prevent claims of lack of jurisdiction) *with Whiting v. Krassner*, 391 F.3d 540, 544 (3d Cir. 2004), *cert. denied*, 125 S.Ct. 2938 (2005) (indicating that such estoppel cannot be used to confer absent jurisdiction); *see generally, Zedner v. United States*, 126 S.Ct. 1976, 1987 (2006) (describing the concept of judicial estoppel). Nor is there any basis for imposing sanctions here, *see* RCFC 11, although the court believes that defendant's argument overreads *Kania*. Nonetheless, having the United States take inconsistent positions before sister courts is hardly a trifling matter, particularly, where the integrity of the judicial system is implicated, and especially, where the case involves serious claims of racial discrimination.