FROM : [redacted] PHONE NO. : [redacted] Apr. 09 2002 01:14AM P1

United States Department of Agriculture · Office of the Secretary · Office of Civil Rights Enforcement · Washington, D.C. 20250

# CONFIDENTIAL

TO: James Gilliland
General Counsel
Office of the General Counsel

FROM: Lloyd E. Wright
Director
Office of Civil Rights

JUL 10 1997

SUBJECT: Carpenter Case

This is a reply to your memorandum addressed to "File and for Interested Parties" dated July 7, 1997, concerning the Carpenter case. This memorandum is clear documentation showing how you, in a very malicious way, are misinterpreting the facts. Also other memorandums that have been written by J. Michael Kelly and others from the Office of General Counsel (OGC) have been designed to distance the OGC from decisions that were made that you or your office fully participated in the development of and approved prior to implementing. Further, it is very clear to me that I cannot trust or depend on OGC for any assistance in dealing with civil rights issues at USDA. Also, it is very clear to me that OGC will do everything it can to discredit me personally and professionally and to obstruct any effort to improve civil rights at USDA.

cc: Dan Glickman, Secretary
Richard Rominger, Deputy Secretary
Pearlie Reed, Acting Assistant Secretary for Administration
File and for Other Interested Parties

03 2309

FILED
NOV - 7 2003
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# Declaration of Henry Ramsey, Jr.

1. My name is Henry Ramsey, Jr. and I am a resident of California and over the age of 18. My residence and mailing address is 2955 Avalon Avenue, Berkeley, CA 94705.

2. I served as Special Consultant on Civil Rights to The Secretary of Agriculture, U.S. Department of Agriculture, from February 1997 through September 1998.

3. I served as a Judge of the California Superior Court, in and for The County of Alameda, from November 1980 until my retirement in January 1991. My assignments during my judicial tenure were: Civil Jury Trials (Jan 1988 – Dec. 1990), Presiding Judge (Jan. 1986 – Dec. 1987), Civil Law and Motion Judge (Jan. 1984 – Dec. 1985), Criminal Jury Trials (Nov. 1980 – Dec. 1983) and member of the Appellate Division (Jan. 1982 – Dec. 1983)

4. I served as Dean and Professor of Law, Howard University School of Law, Washington, DC from November 1990 – August 1996.

5. I served as Acting Vice President for Legal Affairs and General Counsel, Howard University, Washington DC from May 1994 – August 1995.

6. I served as a Professor of Law, University of California, School of Law [Boalt Hall] Berkeley, CA from July 1971 – Nov. 1980.

7. I was assigned to work with Mr. Lloyd E. Wright, Director of the Office of Civil Rights (OCR) at the National Headquarters of the U.S. Department of Agriculture in Washington, DC, during much of my tenure as Consultant on Civil Rights to The Secretary of Agriculture. My primary work with Mr. Wright was directed towards reducing the backlog of cases involving complaints of racial discrimination by units or components of the U.S. Department of Agriculture. I worked closely with Mr. Lloyd E. Wright to, among other things, negotiate individual settlements in cases that had been brought against the U.S. Department of Agriculture by black farmers.

   Mr. Wright and I worked closely with lawyers from the Office of the General Counsel (OGC) in negotiating such cases. These OGC lawyers were primarily responsible for preparing settlement documents intended to memorialize all agreements negotiated by Mr. Wright, with my assistance, and the black farmer claimants and their lawyer(s).

8. I recall the events and circumstances involved in the OCR 1998 negotiations with Mr. James W. Myart, Jr. and his clients concerning Dexter and Phyllis Davis discrimination claim. The issue now being disputed before Administrative Law Judge Constance T. O'Bryant, specifically, whether the parties intended the Final

Agency Decision in the Davis matter to apply (1) to liability for the entire claim of discrimination being made by the claimants or (2) only to liability for damages not then barred by the statute of limitations, was also a subject of negotiations in several other cases at or about the same time as the Dexter and Phyllis Davis claim was being negotiated.

It is my specific recollection that it was the intent of the OCR Director, Mr. Pearlie Reed, Acting Assistant Secretary for Administration, and The Secretary of Agriculture to fairly and quickly resolve as many of the so-called black farmer cases as was possible, particularly those constituting part of the civil rights case backlog. The farmers also wanted to resolve their claims expeditiously, but did not want to waive *damages* that were barred by the statute of limitations. Mr. Wright, in his capacity as Director of the Office of Civil Rights, and acting pursuant to specific authority delegated to him by the Secretary of Civil Rights, had found that there was liability for unlawful discrimination in the Davis case and in other matters. The barrier to settlement was not any issue or issues concerning liability. Rather, the barrier to settlement was that damages could not be paid in certain instances where, although liability had been found, certain *damages* could not be paid because the specific damages were barred by the statute of limitations then in force.

There was general recognition by the principals directly involved in the negotiations—the claimants, Mr. Lloyd Wright and me--that legislation then being considered by the U.S. Congress, if enacted and signed into law, would permit claimant farmers to collect damages which was—at the time of our negotiations—barred by the statute of limitations.

It was I who suggested to the parties that perhaps this barrier could be avoided and desired settlements achieved, if the claimants would accept the OCR's settlement offer of damages and OCR would allow the claimants to reserve any claim for additional damages, should the statute of limitations be extended by Congress. That would permit the claimants in the Davis case, and claimants in other cases where this question was in issue, to resubmit a claim for the previously barred damages if allowed by the statute of limitations extension. The parties found my suggestion acceptable and a Final Resolution Agreement, including the controversial paragraph 9, was drafted by the OGC, and subsequently signed by the parties.

9. Paragraph 9 of the Dexter and Phyllis Davis Resolution, dated March 4, 1998, is unclear concerning the intention of the parties who signed the Resolution Agreement. Specifically, the following language can be read as limiting the reserved right to filing a claim for (1) damages and liability or (2) monetary damages:

> That this settlement is only a settlement of Mr. and Mrs. Davis' claims for relief for the years 1995 through 1998 that were raised in Mr. and Mrs.

Davis' November 13, 1995, discrimination complaint. The parties further agree that this agreement does not waive Mr. and Mrs. Davis' right to file an action for compensatory damages against USDA as to events between the years 1988 through 1994 that were the subject of their November 13, 1995, discrimination complaint.

10. In this instance, I am prepared to testify that it was the intention of those who negotiated the settlement—Mr. Lloyd Wright, Mr. James Myart, myself, and Mr. and Ms. Davis—that to settle all liability issues and to reserve the issue of damages then barred by the statute of limitations, in the event that the statute of limitations was extended. It is notable that at no place in paragraph 9 is it explicitly stated that the settlement is not for any claims based on events between the years 1988 through 1994. It simply says that the Davis' are free to make claims "for compensatory damages against USDA" as to those events. Unfortunately, in the heat of the moment, I believe we understood those words to mean that they would be permitted to negotiate the precise compensatory damages that they were entitled to and for which liability had already been established.

11. More careful attention should have been paid to the language of paragraph 9. If more careful attention had been paid, it is likely that ambiguities and the present dispute would have been avoided. However, the negotiations were often tense and hurried, and towards the end of the day, everyone was rushed to get the tentative oral agreements on paper and signed. I think there was always concern by everyone that if we did not get the documents prepared and signed as quickly as possible, there was significant danger that the settlement would be lost.

12. Neither the present Secretary of Agriculture nor anyone acting on her behalf has contacted me concerning any of the matters discussed or mentioned in this declaration.

13. I was contacted by Mr. James W. Myart, Jr. and asked what I recalled of the negotiations in the Davis matter and the intention of the parties concerning paragraph 9. He also asked me if I would be willing to prepare a declaration setting forth my recollection.

I have reviewed the foregoing Declaration and declare under Penalty of Perjury that it is true and correct to the best of my personal knowledge.

HENRY RAMSEY, JR.

February 19, 2003
DATE

**DECLARATION**

1. I am over 18 years of age and a United States citizen. My business address is: 11307 Baritone Court, Silver Spring, Maryland 20901.

2. From March 1997 through May 1998, I served as the Director of the Office of Civil Rights (OCR) at National Headquarters in Washington, DC.

3. Once a complaint is filed with a program agency, that agency assigns an employee to conduct a preliminary inquiry (P.I.). The P.I. reports provided the necessary background information that helped assist the OCR Investigators with their investigation. The OCR Investigators would forward their report to the Adjudicators, who would determine whether discrimination occurred. If the Adjudicators recommended a finding of discrimination, the proposed decision was sent to the Office of the General Counsel (OGC) for their concurrence with the decision. Upon obtaining approval from OGC, the Director would sign the decision.

4. Once a FAD had been signed, the complainant would file a claim for damages. The damage claim and the complainant's file were sent to the Economist who reviewed the report and determined the amount of damages sustained by the farmer. The final stage of this process consisted of negotiating with the farmer on settlement terms.

5. With concurrence from OGC, I signed a Final Agency Decision (FAD), which found that Mr. and Mrs. Dexter Davis had, in fact been discriminated against by the Farm Service Agency for the years delineated in the 1998 FAD. Based on the FAD, the USDA OCR reached a Resolution Agreement with Mr. and Mrs. Davis for 1995 through 1998, which was the period of the FAD within the limitations.

6. Paragraph #9 of the Resolution Agreement was intended to allow Mr. and Mrs. Davis to file an action for compensatory damages for 1988 through 1994, should Congress extend the limitations period in the ECOA of 1972, as amended. It was intended that Mr. and Mrs. Davis would file a claim for damages for the years 1988 through 1994 and not be subject to the steps, as outlined in item #3 above, because the 1998 FAD included the years from 1988 through 1998.

I have reviewed the foregoing Declaration and declare under penalty of perjury that it is true and correct to the best of my personal knowledge.

Lloyd E. Wright [signature]

September 11, 2002
Date

EXHIBIT "3"