**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **WILLIAMS, et al.,** | § | |
| **Plaintiffs.** | § | |
| **v.** | § | **Civ. No. 03-2245 (CKK) (JMF)** |
| **JOHANNS, et al.,** | § | |
| **Defendants.** | § | |

**MOTION TO CORRECT AND/OR AMEND FINDINGS IN COURT'S OCTOBER 30, 2007 AMENDED MEMORANDUM OPINION AND REQUEST FOR HEARING**

Come now Plaintiffs Robert and Laverne Williams and file this Motion to Correct and/or Amend Findings Court's October 30, 2007, Amended Memorandum Opinion[1] [174] and Request for Hearing and would show upon the Court the following:

[1] **The Court is informed that the Honorable John M. Facciola is the Magistrate Judge in two other black farmer cases in which Counsel is the Plaintiffs' Counsel and which are pending before the Court, *Bradshaw v. Veneman,* Civ. No. 04-1422 (PLF/JMF) and *Hilderbrandt v. Veneman,* Civ. No. 04-1422 (PLF/JMF)**

**The Court is further regretfully informed that Judge Facciola has issued orders in both actions adopting this Court's [172] Order and [174] Memorandum Opinion, to wit:**

***Hilderbrandt v. Veneman,* Civ. No. 04-1422 (PLF/JMF)**

**MINUTE ORDER granting [78] plaintiffs' motion for a 45-day stay and denying [87] plaintiffs' motion for stay until December 20, 2007. The stay shall run from the date of [78] plaintiffs' motion and shall expire on November 30, 2007. This court adopts the language and reasoning of the Order and Opinion issued by Judge Kollar-Kotelly on October 30, 2007, in Williams v. Veneman, Civil Case No. 03-2245. Signed by Magistrate Judge John M. Facciola on 11/13/07. (lcjmf1)**

***Bradshaw v. Veneman,* Civ. No. 04-1422 (PLF/JMF)**

**MINUTE ORDER granting [75] plaintiffs' motion for a 45-day stay and denying [84] plaintiffs' motion for stay until December 20, 2007. The stay shall run from the date of [75] plaintiffs' motion and shall expire on November 30, 2007. The Magistrate Judge adopts the language and reasoning of the Order and Opinion issued by Judge Kollar-Kotelly on October 30, 2007, in Williams v. Veneman, Civil Case No. 03-2245. Signed by Magistrate Judge John M. Facciola on 11/13/07. (lcjmf1)**

## INTRODUCTORY STATEMENT

The legitimate purposes of this action, relief from government-sponsored discrimination and retaliation, have been essentially destroyed. Unless the Court takes actions only within its discretion to somehow right, if even possible, all the wrongs preceding, underlying and spun from the Court's October 30, 2007 Memorandum Opinion and Order and other orders, the Defendants' obvious purposes, defeat and punish Robert and Laverne Williams at all costs and by any means necessary, will have been accomplished.

Neither Plaintiffs Robert and Laverne Williams, nor their Counsel, however, concedes.

The matter is out of control. The Defendants have seized upon the Magistrate Judge's prior discovery orders, including a lengthy appendix, and the District Judge's Memorandum Opinion. The ultimate injury occurred when Defendants' Department of Justice attorneys, Jeffrey S. Bucholtz, Acting Assistant Attorney General, Jeffrey A. Taylor, United States Attorney, Michael Sitcov, Assistant Branch Director, and Paul A. Dean, Trail Attorney, U.S. Department of Justice, Civil Division, Federal Programs Branch, as well as Rick Gibson, Attorney Advisor, United States Department of Agriculture, filed their response to Plaintiffs' Objections to Magistrate Judge John M.

---

**This circumstance requires Counsel to file Notice to the Court of the instant pleading to the Honorable United States District Judge Paul L. Friedman and to take actions to file a Motion to Recuse John M. Facciola in those actions as being done in this cause.**

**Plaintiffs' Motion to Recuse necessarily lost priority to the instant pleading. It will, however, be filed shortly.**

**Counsel now has to file a reply to this pleading and numerous pleadings in *Hildebrandt* and *Bradshaw* and the Motions to Recuse while he remains under doctors' orders and care in Florida and Texas.**

Facciola's Discovery Orders essentially accusing Counsel of being a liar,[2] supporting their baseless statements on this Court's Memorandum Opinion, an opinion based, in significant part, on wholly incorrect and harmful information, and Magistrate Judge Facciola's discovery orders. ***See*** [180], Dfts. Opp. Plts. Objs. (See Magistrate Judge's July 26, 2007 Memorandum Opinion; District Judge's October 30, 2007 Memorandum Opinion.)

**PLEADINGS AND MEMORANDUM OPINION AT ISSUE**

1. Plaintiffs filed [149] Notice to the Court that the transcripts of matters before the Honorable John Facciola had been ordered. Plaintiffs filed [159] Motion Plaintiffs Motion for Continuance or in the Alternative Stay Pending Counsel's Release from Medical Care and Request for Expedited Ruling. Defendants [161] filed opposition to said motion. Plaintiffs [169] filed a Second Motion for Continuance or in the Alternative Stay Pending Counsel's Release from Medical Care and Request for Expedited Ruling. Defendant [170] filed an opposition to Plaintiffs' second motion. Plaintiffs did not file replies to [161] or [170] attempting to comply with medical orders. Said replies would have been filed against medical advice and would have constituted practice of law. Plaintiffs' motions at [159] and [169] were necessarily filed to notify Court of medical orders to Counsel.

2. The Court issued [172] [3] orders on the pleadings above delineated granting [159] but denying [169]. The Court [173] issued its Amended Memorandum Opinion in

[2] **". . .that charge is ridiculous coming from someone willing to lie. . ." [180 at p. 7], Dfts. Opp. Plts. Objs.**

[3]

explanation of the denial.3. Plaintiffs did not seek review of the Court's order and instead complied with said order by timely filing [178, Exhibits 1-3] Plaintiffs Robert and Laverne Williams' Objections to Magistrate John M. Facciola's Discovery Orders. In the Objections' pleading, Counsel for Plaintiffs noted the following:

> **SPECIAL NOTES TO THE COURT as to [172] and [174]**
>
> **(a) Despite being under physician's medical orders not to work until November 30, 2007, Counsel, still recuperating from illness and injuries, files in respect of and compliance with the ORDER of the Court Plaintiffs Robert and Laverne Williams' Objections to Magistrate John M. Facciola's Discovery Orders.**
>
> **(b) Counsel shall shortly file with the Honorable US District Judge Colleen Kollar-Kotelly a Motion for First Amended Memorandum Opinion in a respectful effort to correct specific findings which Counsel reverently believes are based on erroneous and incorrect information. Counsel shall not seek a reconsideration of the accompanying ORDER.**

Id at FN1.

## SUMMARY OF INSTANT MOTION

3. The instant motion is made respectfully and in full reverence to the Court. It is made in a humble effort to correct what may be the Court's impression of Counsel's lack of propensity for truthfulness and efficacy. Counsel has determined that the [174] Court's Memorandum Opinion contains inaccurate and serious allegations of **"untruthfulness and deceit"** against Counsel. Id at p.4.

---

| | | |
|---|---|---|
| **10/30/2007** | **172** | **ORDER granting Plaintiff's 159 Motion for a 45-day Stay and denying Plaintiff's 169 Motion for a Stay until December 20, 2007. The stay shall run from the date of Plaintiff's 159 Motion and shall expire on November 12, 2007. If Mr. Myart and his clients decide that Mr. Myart cannot continue to represent them for medical reasons or any other reason, or if they decide that it would be advantageous to pursue this matter in a forum closer to where they are located, appropriate motions for the same shall be filed no later than November 13, 2007. If Mr. Myart and his clients decide to continue with the current representation in the current forum, Mr. Myart's objections to the July 26 Order and September 4 Order shall be filed no later than November 13, 2007. The Court Clerk shall issue a copy of the Order and accompanying Memorandum Opinion directly to Plaintiffs Mr. and Mrs. Williams. Signed by Judge Colleen Kollar-Kotelly on October 30, 2007. (lcckk1) (Entered: 10/30/2007)** |

4. Moreover, the Plaintiffs' case and pending and future motions when considered in light of

**(a)** this case's **"long and tortured"** history [174 at p. 1];

**(b)** Plaintiffs Robert and Laverne Williams' Objections to Magistrate John M. Facciola's Discovery Orders [178];

**(c)** Plaintiffs' Motion to Recuse (Filed Under Seal); and,

**(d)** the matters discussed here

may very well be unmistakably detrimental to both Plaintiffs, their case, Counsel and in other matters pending in a variety of United States District Courts. **(Emphasis added)**

5. Thus, this pleading specifically addresses the following:

(a) **COUNSEL'S ACTIONS SUBSEQUENT TO RECEIPT OF ORDER AND MEMORANDUM OPINION**

(b) **THE COURT'S MEMORANDUM OPINION: II. DISCUSSION**

***A.*** ***Availability of Transcripts*** **at pp 5-7**
***B.*** ***Medical Condition*** **at pp 7-9**

6. Plaintiffs and Counsel are deeply distressed over the findings in the Memorandum Opinion. See Affidavits of Robert and Laverne Williams attached to [178, Exhibits 1, 2, 3] Plaintiffs Robert and Laverne Williams' Objections to Magistrate John M. Facciola's Discovery Orders[4]. [178] Plaintiffs Robert and Laverne Williams' Objections to Magistrate John M. Facciola's Discovery Orders and all Exhibits attached thereto are incorporated herein by reference as if fully stated verbatim; ***See also***

**[4] [178] Plaintiffs Robert and Laverne Williams' Objections to Magistrate John M. Facciola's Discovery Orders and all Exhibits attached thereto are incorporated herein by reference as if fully stated verbatim.**

Declaration of James W. Myart, Jr., (hereinafter, "JWM DCLR."); same being incorporated herein as if fully stated verbatim.

7. Plaintiffs and Counsel, thus, seek the Court to amend its Amended Memorandum Opinion to reflect the true facts of the matters in accordance with the testimony and facts here presented.

## ARUGMENT AND AUTHORITIES

## STANDARD OF REVIEW

8. It is well settled that the District Judge is the finder of fact in the matter before the Court. ***Anderson v. City of Bessemer City, N.C***. 470 U.S. 564, 573, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985)(The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.)

9. There is no doubt that the District Judge's [174] Memorandum Opinion contains extensive findings of fact regarding Counsel's actions and activities whether such actions as reviewed by the District Judge were perceived or real and based on clearly erroneous evidence, documented or oral. Counsel believes his actions real when the District Judge determined and found they were real. Id. More, findings of fact of district court are presumptively correct and burden of persuading Court of Appeals that they are clearly erroneous rests upon appellant. ***Case v. Morrisette,*** 475 F.2d 1300, 1307 (C.A.D.C. 1973)

10. ***Anderson*** involved the Supreme Court's interpretation of Rule 52(a), Federal Rules of Civil Procedure and the meaning of the phrase, "clearly erroneous" within the context of a Title VII discrimination case. The Supreme Court set out the standard of review of a trial court's findings of fact and whether the Appellate Court

erred in reviewing the trial court findings of fact. ***Anderson v. City of Bessemer City, N.C.*** 470 U.S. at 573. ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The question before us, then, is whether the Court of Appeals erred in holding the District Court's finding of discrimination to be clearly erroneous.) *See also* ***Barbour v. Browner,*** 181 F.3d 1342, , 1345 (C.A.D.C 1999), 80 Fair Empl.Prac.Cas. (BNA) 683, 76 Empl. Prac. Dec. P 46,040, 337 U.S.App.D.C. 50; ***Kinsey v. First Regional Securities, Inc.,*** 557 F.2d 830, C.A.D.C.,1977) (In reviewing district court's findings of fact, in employment discrimination action, Court of Appeals is governed by the "clearly erroneous" test; under this test, a finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake was committed. Fed. Rules Civ. Proc. rule 52(a), 28 U.S.C.A.)

11. Citing ***Anderson*** extensively in ***Andre v. Bendix Corp.*** 774 F.2d 786, 793 (7th Cir .1985), the 7th Circuit Appellate Court said,

> **In *Anderson* the Supreme Court considered a case where the court of appeals had failed to give proper deference to the district court's finding of discrimination. The Court went to some lengths to explain the meaning of the clearly erroneous standard. Although the meaning of the phrase "clearly erroneous" is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles ... is that "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."**

Id

12. Counsel believes that the District Judge's review of the Memorandum Opinion, pursuant to the instant motion, may be governed by ***Anderson;*** and, thus Counsel employs ***Anderson*** by analogy here.

13. Counsel is genuinely concerned that in the Memorandum Opinion, the District Judge essentially adopts the various filings and exhibits of the Defendants in issuing the findings. *See* [174] Memo. Opn., pp 7-9 and FNS. 3, 5. Such a practice, in deed, is permissible. However, Counsel was not afforded an opportunity to respond to the Defendants' pleadings due to illness. Thus, the Court's findings were made without the benefit of the Plaintiffs' response.

14. Although not directly on point but surely analogous to the matter before the Court is ***Schilling v. Schwitzer-Cummins Co.*** The DC Circuit Court of Appeals stated clearly the following regarding preparation of findings by opposing Counsel and a trail Court's adoption thereof. "What the law requires in this respect is that the findings as made, shall be those of the trial judge himself. The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision, and whether they are supported by the evidence." ***Schilling v. Schwitzer-Cummins Co.,*** 142 F.2d 82, 83-4 (C.A.D.C. 1944). Here, there was no evidence submitted by Plaintiffs to counter the Defendants' "pouring on" of supposed negative deceitful acts of Counsel. It appears clear that the District Judge relied on the Defendants' filings to support the October 30, 2007 Order and the Memorandum Opinion.

**COUNSEL'S ACTIONS SUBSEQUENT**
**TO RECEIPT OF ORDER AND MEMORANDUM OPINION**

15. While recuperating in Orlando, Florida and under physician's care in the State of Florida, Counsel viewed on or about November 1, 2007 the Court's [172] Order and [174] Memorandum Opinion. Counsel was in sheer shock at the Court's denial of his second request to continue the case based on medical reasons and was absolutely distressed at the rationale delineated for the denial[5] in the Court's Memorandum Opinion. Counsel immediately contacted his Florida physician to inform her that he must abruptly cease his planned treatment and fly immediately to Washington, D.C. to ascertain how the Court received such utterly incorrect information and to view the transcripts of the instant matter to prepare for a pleading which the Court ordered to be filed by November 13, 2007.

16. Counsel then contacted Plaintiffs Robert and Laverne Williams in Texas and discussed with them in detail the Court's Order and Memorandum Opinion. Counsel informed the Plaintiffs that he was going to ignore his physicians' orders and fly to Washington D.C. to view the transcripts in the Office of the District Clerk in preparation for the Objections to Magistrate John Facciola's Discovery orders ordered to be filed on November 13, 2007 and to ascertain how such an error could have been made. Counsel

[5] **Counsel does not question the Court's authority or sound discretion in issuing its order. Nor does Counsel question the Court's authority or discretion in issuing findings and facts as the Court sees fit. In fact and because the matter appeared so egregious, it was Counsel's choice not to seek the Court's reconsideration of the Order but rather to comply immediately in the best interest of Plaintiffs Robert and Laverne Williams.**

**Counsel further informs the Court that because of the seriously debilitating nature and the potential seriously debilitating nature of the Court's Order and Memorandum Opinion and fear of sanction from Judge Francis Allegra based on same, Counsel choose not to file a second stay motion in *Stovall v. USA*, No. 05-400C (Judge F. Allegra), a case transferred from the DCDC. Counsel filed pleadings in *Stovall* due on November 12, 2007 resulting from the initial stay granted by Judge Allegra.**

assured Plaintiffs Robert and Laverne Williams that he had, in fact, ordered the transcripts from Pro Typist at the time he represented to the Court that he had made the order. Id.

17. Counsel further informed Plaintiffs Robert and Laverne Williams that he was more deeply distressed about the Court's [174] statement and FN3 in the Memorandum Opinion at page 6. Counsel read to Plaintiffs Robert and Laverne Williams the Court's statement, including FN3, as follows:

> **This Court considers it a serious matter that Mr. Myart, as an officer of the Court, has made misrepresentations concerning the status of the transcripts he apparently needs to file objections to the July 28 Order and September 4 Order. FN3. These misrepresentations are both highly inappropriate and equally unnecessary.** ***(FN3 omitted here)***

Id.

18. Counsel explained to Plaintiffs Robert and Laverne Williams that this statement as expressed by a federal judge was extremely serious because if any lawyer did in fact make any intended misrepresentations to a federal judge that attorney could be disciplined, possibly disbarred and charged criminally and convicted of perjury. Id.

19. Counsel further explained to Plaintiffs Robert and Laverne Williams that he was under no illusions as to the motives of the Department of Justice attorneys in piling on negative matters, i.e. having been charged with perjury and having previously served a nearly ten (10) year-old disciplinary suspension, etc. in which Counsel may have been or may be involved even though such matters were completed and remain non-adjudicated allegations. Id.

20. Additionally, Counsel informed Plaintiffs Robert and Laverne Williams that he was certain the DOJ attorneys filed such pleadings and documents for the express

purpose of raising the ire of the Court and to attack Counsel's credibility. Plaintiffs Robert and Laverne Williams and Counsel agreed that DOJ attorneys' actions in the instant matter were indeed consistent with their actions against Plaintiffs Robert and Laverne Williams and Counsel's because of their historically long and arduous legal fight against discrimination and racism by the Defendants[6]. Id. ***See also*** Affidavits of Robert and Laverne Williams and FN3 above.

21. Counsel flew, via Southwest Airlines, to Baltimore/Washington on November 4, 2007.[7] Id.

22. On or about November 6-7, 2007, Counsel went twice to the DCD Office of the District Clerk to read the hearing transcripts of all hearings conducted by Magistrate Judge John Facciola. Id.

23. On or about November 7, Counsel contacted Honorable Judge Kollar-Kotelly's court reporter to ascertain copies of the hearing transcripts of the telephonic April 20, 2006 hearing conducted on [65] Judge Facciola's Motion to Show Cause issued against Counsel. Receipt of this transcript was imperative for the purposes of Counsel's preparation of Plaintiffs' Motion to Recuse Magistrate Judge John Facciola. Counsel was

---

[6] **Counsel and Plaintiffs are here referring to the initial legal actions, administrative and judicial, filed against the USDA, i.e., *Williams et al v. Glickman* 1:94-cv-01149-(TAF) and related cases, *Pigford v. Veneman*; 97-cv-01978 (PLF); *Davis v. Veneman* 03-cv-02309; *Keepsegal v. Veneman* 99-cv-03119(EGS); *Hildebrandt v. Veneman* 04-cv-01423(PLF); *Stovall v. Veneman*, 04-cv-00319, transferred to the Court of Claims at No. 05-400C (Judge F. Allegra); *Williams et al v. Glickman et al*, 001149(TAF); *Powell v. Espy* 94-cv-00526(TAF) *Bowie v. Espy* 94-cv-00525(TAF); *Long v. Espy* 94-cv-00524(TAF); *Bradshaw v. Veneman*. 04-cv-01422(PLF), and *Black Farmers and Agriculturalists Association v. Veneman* 04-cv-01561(PLF) just to name a few.**

[7]

| Passenger Information | | |
|---|---|---|
| **Passenger Name** | **Ticket#** | **Account Number** |
| MYART/JAMES | 526-2344673879-6 | - None Entered - |

| Itinerary | | |
|---|---|---|
| **Date** | **Flight** | **Routing Details** |
| Sun Nov 04 | 458 | Depart ORLANDO INTL (MCO) at 9:30 AM<br>Arrive in BALTIMORE-WASHNTN (BWI) at 11:35 AM |
| Fri Nov 09 | 426 | Depart BALTIMORE-WASHNTN (BWI) at 1:30 PM<br>Arrive in ORLANDO INTL (MCO) at 3:55 PM |

informed that Mr. Edward Hawkins, retired, was the court reporter on the date the hearing was conducted. Mr. Hawkins and Counsel spoke and Counsel provided Mr. Hawkins the date of the hearing and ordered a copy of the transcript. Mr. Hawkins called Counsel back and indicated that he could not find the transcript of the hearing for that date. After five minutes into the second conversation and Counsel's insistence that he had given him the correct hearing, Mr. Hawkins did, in fact, find the transcript for the date given him by Counsel. Mr. Hawkins apologized to Counsel for the oversight and indicated that he would immediately e-mail Counsel the transcript.[8] He did. Id.

24. On the same date, Counsel contacted Pro Typist, Inc. Court Reporters and spoke with Carol Grant. ***(Ms. Grant's responses are discussed in detail below.)*** At the time of this contact, Counsel was unaware that Ms. Grant was the Office Manager referred to in the Memorandum Opinion [174 at p. 5]. Counsel explained to Ms. Grant that he was deeply distressed that anyone from Pro Typist, Inc would report to the Court that he had not ordered the Judge Facciola hearing transcripts. Counsel informed Ms. Grant that he was in very deep trouble and was subject to probable discipline, disbarment and/or criminal charges for perjury for what the Court found were ". . . misrepresentations concerning the status of the transcripts. . ." Id. 5. Counsel further informed Ms. Grant that he [149] noticed the Court on August 15, 2007 that he had ordered the transcripts. In desperation, Counsel read to Ms. Grant the Court's findings at

**[8] On November 8, 2007, Mr. Hawkins e-mailed the April 20, 2006 PDF transcript to Counsel with the following statement:**

> **Mr. Myart,**
>
> **Attached is the transcript you requested for April 20, 2006. Please acknowledge that you are able to open this file. An invoice will be submitted electronically later.**
>
> **Ed Hawkins**

II. DISCUSSION: *A. Availability of Transcripts* at pp 5-7 and told Ms. Grant that he would send to her that portion of the Court's Memorandum Opinion.

25. At this point, Counsel was more concerned about getting the transcripts he had already ordered but Counsel did mention to Ms. Grant that he would need an affidavit from her explaining that he had, in fact, ordered the transcripts and that he had provided his credit card information to pay for and acquire the transcripts. Ms. Grant informed Counsel that the transcripts were available and that they would be e-mailed to Counsel that day. Counsel painstakingly read and re-read his e-mail address to Ms. Grant, at least four (4) times. Counsel was assured by Ms. Grant that she had the e-mail address correct. Counsel asked Ms. Grant if she had the credit card information. Ms. Grant stated that she did not need the credit information again as she had retained such information when Counsel ordered the transcripts in August. Ms. Grant asked Counsel's permission to charge the cost of the six (6) transcripts to his credit card. Counsel gave permission to Ms. Grant to charge the credit card. **The transcripts were not delivered as promised that day**. Id. Counsel then began to understand why the transcripts had not been delivered subsequent to his order in August.

26. In sheer frustration, Counsel again called Ms. Grant on August 8, 2007 to inquire why he had not received the promised transcripts. Ms. Grant explained that there was one transcript that could not be found, that she was not proficient on sending e-mail via computer and that she would have to wait for someone to come to the office who could e-mail the transcripts to Counsel.

27. Counsel again, in desperation, told Ms. Grant that it was absolutely imperative that he receive the transcripts, all the transcripts ordered in August. Ms. Grant

apologized for the delay in Counsel's receiving the transcripts via e-mail as promised on August 7. Ms. Grant again apologized to Counsel for incorrect information having been given to the Court. It was in this conversation that Ms. Grant explained to Counsel that there was obviously some confusion over the order because the dates Counsel gave her were the docket entry dates and not the actual hearing dates. Counsel asked Ms. Grant, "If that was the case, why did you not call me to inform him of the problem?" Ms. Grant could not answer the question. In fact, Ms. Grant told Counsel that she was very sorry about the confusion and that she was very sleepy at the time the order was made. Ms. Grant informed Counsel that he would definitely receive the transcripts that day, August 8, 2007. **Counsel did not receive the transcripts that day.** Id.

28. Now, and in horrible desperation, Counsel again called Ms. Grant on November 9, 2007 to inform her that he had not yet received the transcripts as ordered in August and promised on November 7th and 8th. Ms. Grant explained that somehow the person who was to send the transcripts got Counsel's email address incorrect. Counsel again gave Ms. Grant his e-mail address, this being the fifth (5) time Counsel had done so. Counsel again explained to Ms. Grant this whole affair has resulted in the Court perceiving Counsel to be a liar. Ms. Grant explained that she had spoken to someone named Jarred whom she believed to be Judge Facciola's new law clerk. Ms. Grant told Counsel that she informed Jarred that it was not Counsel's fault that Counsel had not received the transcripts. Counsel said to Ms. Grant that her statements to Jarred **would not be sufficient** in informing the Court of the errors and that he would unquestionably need a detailed affidavit from her explaining the matter relating to the transcripts. Ms. Grant agreed that she would provide Counsel an affidavit. Id.

29. Counsel finally received, via e-mail, five (5) transcripts on November 9, 2007, as stated in the e-mail, to wit:

M1926V.doc M1901V-2.doc M1901V-1.doc M1624V.doc m1409V.doc

The following was stated in the body of the e-mail sent by PAUL CUTLER,[9] [pro-typists@prodigy.net]:

> **Hi, Mr. Myart, I'm sorry -- I made a mistake in your e-mail address before.**
>
> **Here they are.**
>
> **Bonnie Furlong**

Id.

30. The sixth transcript was not among those e-mailed to Counsel. Counsel, under pressure to catch his flight back to Orlando, FL scheduled for 1:30 PM that day, called Ms. Grant to inquire as to the absence of the sixth transcript. Ms. Grant said that she was going to have to fax Counsel the sixth transcript because it was not in an electronic format, but rather in hard copy only. Counsel gave Ms. Grant the hotel fax number and commenced waiting for the fax copy of the transcript. One hour passed and the transcript had not been received via fax. Counsel again called Ms. Grant to inquire as to what was wrong. Ms. Grant said she had gotten busy and had not yet faxed the transcript. Counsel told Ms. Grant that he was on a very tight schedule and needed the transcript immediately.

[9] **Counsel does not know Paul Cutler or what his position is with Pro Typist, Inc.**

31. Counsel, knowing he was going to miss his flight due to non-receipt of the faxed transcript, changed his travel itinerary to leave BWI Airport at a later time, approximately 5:10 PM.

32. About one hour later, Counsel again called Ms. Grant to tell her that he had not received the transcript. Ms. Grant informed Counsel that the fax was not going through. Counsel went to the hotel's front desk to ask the clerk if there was something wrong with the fax equipment. Counsel returned to his room and again called Ms. Grant to inform her that the fax was functioning and to please try faxing it again. The fax was received and Counsel called Ms. Grant to tell her that the fax had now been received. Counsel made his second flight. Id.

33. On or about November 19, Counsel again contacted Ms. Grant to discuss whether she would agree to present an affidavit to the Court to correct the incorrect information in the Court's Memorandum Opinion. Ms. Grant indicated that she would present an affidavit to the Court because she knew the information was incorrect and that Counsel could be in deep trouble over the error. Ms. Grant further told Counsel that she was unfamiliar with how to write an affidavit. Counsel indicated that he would prepare a draft affidavit for her including only the information Counsel had received from her in this and prior conversations. Ms. Grant agreed and asked Counsel to draft the affidavit and fax it to her because she was not good on the computer. Counsel further asked questions of Ms. Grant to insure that he could get the detailed facts to place in the draft affidavit. Counsel then proceeded to draft the affidavit for Ms. Grant's review.

34. In an abundance of caution, Counsel also drafted a letter to Ms. Grant, including in the letter a bolded and capitalized notice and disclaimer. The letter faxed to Ms. Grant on November 21 in its entirety follows:

LAW OFFICES OF
**JAMES W. MYART, JR., P.C.**
***"THE PRESTON HOUSE"***
1104 Denver Boulevard, Suite 300
SAN ANTONIO, TEXAS 78210
PHONE: (210) 533-9461
FAX: (210) 533-4815
E-MAIL: jwmyart@satx.rr.com

November 21, 2007

Ms. Carol Grant **via email and fax**
Office Manager
Pro Typist, Inc.
Washington, D.C.

**Ref: Conversations Regarding Judge Colleen Kollar-Kotelly October 30, 2007 Order Accusing Lawyer of Misrepresentation: Request for Affidavit to the Court**

Dear Ms. Grant:

As I have indicated in our numerous conversations, I have been accused by Judge Colleen Kollar-Kotelly of essentially making a material misrepresentation to the Court regarding the ordering/not ordering transcripts in ***Williams*** case.

I informed you that I was terribly distressed over this as such an accusation could result in discipline and disbarment from the practice of law not to mention being charged with criminal perjury. I indicated to you on several occasions that I was in need of you to correct the information you gave the Court and/or correct the Court's interpretation of what you told them in your conversation. THE TRUTH MUST BE TOLD.

Also, as I told you I would prepare a **DRAFT (ONLY)** of the facts as I know them and as you have relayed them to me. Ms. Grant this is a **DRAFT ONLY.**

**SEE THIS NOTICE:**

**PLEASE KNOW THAT THE WORDS IN THE AFFIDAVIT ARE TO BE READ BY YOU AND THEY MUST BE ADOPTED BY YOU VIA YOUR SIGNATURE AND NOTARY PUBLIC ONLY IF YOU AGREE WITH THEM.**

**YOU MAY USE THE ENTIRE STATEMENT BUT IF YOU WANT TO CHANGE ANYTHING OR NOT USE THESE WORDS, YOU MAY DO SO. THAT IS YOUR CHOICE.**

**THE ISSUE IS THAT ALL THE INFORMATION ATTESTED TO MUST BE THE TRUTH, THE WHOLE TRUTH AND YOU MUST HAVE PERSONAL KNOWLEDGE OF ALL THE STATEMENTS IN THE AFFIDAVIVT.**

**IF THERE IS SOMETHING YOU DO NOT UNDERSTAND, IT WOULD BE ADVISABLE TO HAVE A LAWYER LOOK AT THIS AFFIDAVIT AND APPROVE IT FOR YOU. I CANNOT TELL YOU WHAT TO SAY OR WHAT TO WRITE TO CORRECT THE ERROR OR STATEMENTS MADE BY THE JUDGE.**

**I DO NOT WANT TO BE ACCUSED OF PUTTING WORDS IN YOUR MOUTH.**

If you have questions, please call me at 210-831-4759.
Thank you.

Sincerely yours,
***/original signed/***
James W. Myart, Jr.

The draft affidavit was attached to the letter. The letter was sent by fax only. Ms. Grant confirmed the same day that she received the fax and she indicated she would try to get it done that day.

35. On or about November 22, 2007, Ms. Grant telephoned Counsel and said that it was not going to be possible to get the affidavit notarized that day because of the coming Thanksgiving holiday. Ms. Grant indicated that she may change some things in the affidavit but that it was basically correct. Ms. Grant told Counsel that she would not be able to get to the affidavit to make changes to reflect the facts as she knew them or to get it notarized. Counsel told Ms. Grant that it would be fine to get the affidavit when she was able to get it done and notarized.

36. Counsel received Ms. Grant’s Declaration on November 27, 2007.

37. Counsel, by his electronic signature below, declares that the facts stated in ¶¶ 8-32 are true and correct to the best of his ability and recollection.

**COURT'S *II. Availability of Transcripts***
**CONTAINS INCORRECT INFORMATION AND**
**FINDINGS BASED ON INCORRECT INFORMATION**

***Preliminary Comment***

38. Respectfully presented, Counsel will attempt to show that the information regarding Counsel's having ordered the transcripts as he stated in his [149] Notice to the Court was correct when made and is correct today. Counsel did not make misrepresentations to the Court although the Court, based on incorrect information, has definitively found that Counsel made misrepresentation to the Court. The Court has relied on additional information supplied by Defendants' lawyers to further [174] conclude that Counsel has a history of lack of candor and that Counsel has exhibited lack of diligence in regards to his fiduciary duties to his long-time clients, Plaintiffs Robert an Laverne Williams.

39. Counsel agrees with the Court that this matter is "serious." Id. In fact, Counsel finds this circumstance no trifling matter as he and other Plaintiffs/clients have already suffered serious repercussions in two matters presently pending before this Court. *See* FN2 this pleading and Introductory Statement. Counsel foresees serious future fallout resulting from the Court's findings as Counsel is keenly aware that government defense attorneys in other contentious civil rights and government misconduct causes constantly monitor, like the DOJ attorneys here, Counsel's cases throughout the country for every possible misstep by Counsel in order that they may be reported to the various Courts. Counsel has absolutely no illusions as to why this is being done.

40. Moreover, Counsel is fully cognizant of the penalties that could be leveled against an attorney or anyone else for that matter who intentionally misleads or fabricates a pleading to a federal judge. Frankly, for an attorney to intentionally misrepresent any matter to a federal judge, as Counsel views it, is simply forbidden and an ultimate insult to the presiding judge, not to mention that it is illegal.

41. In fact, Counsel filed the [149] Notice to the Court in a continuing effort to keep the Court informed since Counsel long ago perceived that this matter was surely being specifically monitored[10]. Counsel, being ever so mindful and skeptical of possible bias by Judge John Facciola[11] against Counsel, has previously stated,

> **Plaintiffs, being mindful of the discovery difficulties and history in this case and *Court's expressed concern regarding same*, hereby, gives notice that Plaintiffs are in compliance with the Court's orders on discovery. . . (Emphasis added)**

[113] PLAINTIFFS' NOTICE TO THE COURT OF COMPLIANCE WITH SCHEDULING ORDER REGARDING DELIVERY OF DISOVERY RESPONSES AND SIGNED VERIFICATIONS TO DEFENDANTS

42. In fact, Counsel's extensive efforts to keep the Court informed can be seen at [86], [89], [113], [115], [116], [134], and [149]. These efforts stemmed directly from concerns as expressed by Counsel in ¶ 37 above. Counsel believes the pleading at [86] helps to explain why he, in part, may be subjected to bias and the onslaught of piled on

---

**[10] Counsel surely does not object to a case being monitored as that is the very nature of a matter in the Court. More, the Court has the discretion to assign discovery matters to a Magistrate Judge for the express purpose of monitoring and moving the discovery in a case. Counsel, however, objects if the monitoring of a case occurs with bias, bias which results in detriment to the Plaintiffs and their Counsel and which is manifested in discovery orders, as Plaintiffs Robert and Laverne Williams have [178] asserted is the case here.**

**[11] See generally [178] Plaintiffs' Objections to Judge Facciola's Discovery Orders and Motion to Recuse to follow.**

negative pleadings from the DOJ attorneys. At minimum, this pleading plausibly explains, to a great degree, the level of contentiousness in this and other matters pending before the Court. See also Affidavits of Plaintiffs Robert and Laverne Williams discussing their historical nightmare with the Defendants and their DOJ attorneys, particularly Mr. Michael Sitcov, Supervising DOJ Civil Division Counsel.

***<u>The Court's § II. Discussion: Availability of Transcripts</u>***

43. The Court begins its [174, p. 5] discussion with presentation of Counsel's statements in [149] and [159] that he had not received the ordered transcripts necessary to prepare objections and a recusal motion. Obviously as concerned Counsel, the Court inquired to the Office Manager of Pro-Typist, Inc. as to why the transcripts had not been delivered to Counsel. The Court then related that the Office Manager informed the Court that the transcripts had never been ordered and that there was no record of Mr. Myart ever having backed the order with a credit card. Id.

44. Counsel reverently and necessarily informs the Court that this information is simply and totally incorrect. See generally Declaration of Ms. Carol Grant, Office Manager, Pro-Typist, Inc. See also this pleading, ¶¶ 8, 17, 18, 20 and 21.

45. In fact, Ms. Grant has in her Declaration stated,

> **I am deeply concerned that the Court was given incorrect information or that there is confusion as to what Mr. Myart did or did not do about ordering the transcripts as he reported to the Court in August.**

Declaration, Ms. Carol Grant.

46. Ms. Grant goes on to say,

> **I am truly sorry that there has been this confusion and I apologized to Mr. Myart for the error. I had received a call from a young man who identified himself as Jarred, Judge Facciola's new law clerk.**

> **I also informed Jarred (last name not known) that Mr. Myart had in fact ordered the transcripts as he said he did and that it was not his fault that he had not received the transcripts that he in fact ordered.**

Id.

47. Ms. Grant's testimony goes further by repeating the Court's statements and making her own comments regarding same, to wit:

> **The Office Manager informed the Court that Mr. Myart never ordered any transcripts.**
>
> This statement is incorrect. I am not exactly sure where the Court got this information or how my telephone conference with a representative of the Court was so interpreted. Mr. Myart did order the transcripts that he represented to the Court that he had ordered. The confusion may have occurred because Mr. Myart gave me the dates the transcripts were entered into the record. He gave me the docket numbers where the transcripts were entered into the record. Mr. Myart told me he was giving me the dates of entry of the transcripts in the record. I later found out the actual dates of the hearings, the information we needed to acquire the transcripts. I later got the dates of the hearings. But, Mr. Myart ordered the transcripts.
>
> **While it appears that Mr. Myart called to inquire about ordering transcripts, he said he would call back another day to place an order. He apparently never called back.**
>
> This statement, too, is incorrect. Mr. Myart ordered the transcripts.
>
> **There is no record of Mr. Myart ever having given a credit card number or other form of payment to Pro-Typist to obtain transcripts in the instant proceedings.**
>
> This statement is wholly incorrect. At the time Mr. Myart ordered the transcripts, he was asked for a credit card number and the expiration date in order that Pro Typist could charge him for the transcripts. Mr. Myart gave me the requested information at the time he ordered the transcripts.
>
> In fact, I processed the order on Friday, November 9, 2007 without having to ask Mr. Myart for his credit card information again because I had it on file since he ordered the transcripts in early August.

Id.

48. The Court's Memorandum Opinion at pp 5-7 continues and contains a scathing, professionally debilitating discussion regarding the Court's view of Counsel's lack of candor. The Court makes findings concluding the following:

> **"[T]his Court considers it a serious matter that Mr. Myart as an officer of the Court, has made misrepresentations concerning the status of the transcripts . . . These misrepresentations are both highly inappropriate and equally unnecessary.**

At FN3, citing to Defendants' [161] Defs.' Opp'n to Pls' Mot. Ex. 4 at 1-3, the Court further states,

> **[T]he Court also notes this is not the first time Mr. Myart's candor has been subject to question. . . Mr. Myart's indictment and related legal matters may raise a question as to whether he should be permitted to continue to practice as a member of this Court. . .**

The Court concludes the footnote by stating,

> **This Memorandum Opinion and related Order should not be read to express an opinion one way or the other on this question.**

49. Admittedly, it is extremely difficult for Counsel to discuss these matters as one is the subject of a pending prosecution and the other is the subject of a confidential bar investigation. As to the former, Counsel cannot further discuss the indictment allegations on advice of Counsel and 5th Amendment issues. The bar rules prohibit any discussion of the latter as bar investigations are strictly confidential. Discussion of same

could subject Counsel to discipline. Counsel assures the Court, however, that the Court will be informed at a time such information can be divulged.

50. With regard to the Agreed 48-Month Partially Probated Suspension in 1999, Counsel can only respond that at that time of the suspension, he notified all Courts in which he had active cases. Counsel successfully completed one year active suspension and was re-issued his Texas Bar License. Further, Counsel successfully completed the three years probation in 2003 in accordance with the Texas Bar Disciplinary Counsel's special conditions associated with the probation. Counsel was later re-admitted in the United States District Court, Western District of Texas, admitted in the United States District Court, District of Columbia, admitted in the Federal Court of Claims, admitted *pro hac vice* in the United States District Court, District of New Jersey, admitted in the 5th Circuit Court of Appeals, admitted in the 9th Circuit Court of Appeals (2007)[12]. Counsel disclosed his disciplinary issues to each of these Courts as required by those Courts and as required by the State Bar of Texas pursuant to the Texas Bar rules regarding a Texas attorneys' requests for Letters of Good Standing. Counsel also did so in his Applications *pro hac vice* in the United States District Court for the District of Nevada**.** Again, Counsel cannot further discuss the United States District Court for the District of Nevada matter, the subject of two of the Bexar County, Texas indictments for perjury. The third perjury charge involves the USDC Northern District of Texas.

51. In further discussing Counsel's [149] Notice to Court, the Court definitively concludes and states,

**[12] All Bar admissions listed were accomplished subsequent to the 48-month partially probated successfully completed suspension and in accordance with the Courts' disclosure requirements, including disclosure of the suspension and Letter of Good Standing from the Texas Bar Association, which requires disclosure of all disciplinary actions.**

> **[R]ather than avail himself of the transcripts the transcripts already created, Mr. Myart instead represented to the Court that he ordered new transcripts to be created when, in fact, he had not. Because Mr. Myart's failure to procure these transcripts is the result of his own lack of diligence, the Court finds that Mr. Myart's Motions for a stay are not justified by the lack of transcripts in his possession.**

[174]

52. Again, Counsel ordered the transcripts. Second, as the Court may be aware, Counsel's office is in San Antonio, Texas. He is, however, licensed in the DCD. Counsel does not have ready access to the files in the office of the DCD District Clerk due only to logistical issues. This fact, of course, is no matter to the Court, particularly since the DCD was the forum selected by Plaintiffs Robert and Laverne Williams and Counsel.

53. Counsel, however reasonably, relied, to his and the clients' detriment, on Pro-Typist, Inc. to timely provide him the ordered transcripts. Counsel does not here attempt to absolve himself of any judgment error and probably should have called Pro Typist, Inc. after the expiration of 30 days the order was placed. Counsel did not make a call to inquire about the non-delivery of the transcripts. Then Counsel was placed on medical leave as of September 21, 2007. Counsel filed [159] on September 27, 2007 in which he informed the Court that he had not yet received the ordered transcripts.

54. Finally, Counsel states that unless the Court corrects its findings and ruling in this section of [174], Plaintiffs Robert and Laverne Williams, other clients with matters pending before DCD, and he will continue to suffer irreparable injury.

**COURT'S *II. B. Medical Conditions***

55. Counsel does not object to the Court making rulings, based on whatever information it sees fit, that are clearly within the sound discretion of the Court.[13] Counsel, however, is deeply concerned that the Court relies almost solely on Defendants' pleadings in making its [174] findings that Counsel somehow is not being honest about his medical condition or that, referring to a list of activities by Counsel, as stated by the Court, to wit:

> **These activities are simply inconsistent with the actions of a person whose medical condition prevents him from performing his obligations to this Court and his clients.**

Id at 8, 9.

---

[13] **In fact, in Plaintiffs Robert and Laverne Williams Objections to Judge John Facciola's Discovery Orders, Counsel commented that he was not filing a reconsideration motion of the Court's denial of his Second Motion for Stay. [178]**

**In this regard, Counsel is reminded of a conversation had with a civil rights colleague, Ms. Shelly Kaufman, Geragos and Geragos, PC. Counsel was telling Ms. Kauffman that his physician put Counsel off from work first for thirty days and then extended it for thirty days. Ms. Kaufman's comment was,**

> **"James, didn't you know that lawyers don't get a leave of absence for being sick. How can you do that?"**

**After this conversation and after re-reading the Court's denial and FN4 therein, Counsel concluded that Ms. Kaufman was right. Thus, Counsel chose to give up and just go back to work despite his strictly designed recovery period, including hypertensive and diabetic disciplining, weight loss and smoking cessation programs commenced in Florida.**

**It was Counsel's effort not to divulge his medical condition to the Defendants. Retrospectively that, of course, was a pipe dream.**

56. While Counsel is loathing doing, Counsel must speak to the **"list"** from which the Court found, to wit:

> **If Mr. Myart can make public appearances, engage in civil protest, provide statements to the media, file papers in other cases, and engage in daily and even hourly contact with opposing counsel via phone and email, he clearly has enough energy and wherewithal to perform his obligations in the instant proceedings. For these reasons, Mr. Myart's motion for a stay or continuance is not justified by his medical condition.**

Id.

***THE LIST[14] WITH COMMENT AS TO EACH***

57. Although the Court corrected[15] its initially issued Memorandum Opinion to omit Counsel's arrest on December 7, 2007, the matter in full and complete disclosure requires discussion. The entry at p. 8 states the following:

- **On September 27, 2007, *(Sic)* Mr. Myart is arrested on the steps of San Antonio City Hall while protesting certain practices of the San Antonio Police Department. *See Attorney Arrested at City Hall,* http://www.ksat.com/video/10483883/index.html (last visited**

[14] **The point of this discussion is that Counsel feels that his civil rights activities and the matters listed by the Court have been complied to show him in a purely negative light before this and other Courts. Counsel strongly believes, right or wrong, that his role as a civil rights lawyer and his actions as a civil rights activist are essential and necessary toward seeking justice and a society free of abhorrent racism and discrimination, particularly that sponsored by the United States government. Counsel is not at all suggesting ill motive of the Court, but he does certainly suggest that Defendants' DOJ attorneys' motives in monitoring and reporting to the Court on Counsel are intended exactly fore that reason, placing Counsel in a purely negative light before this and other Courts. It appears clear that the DOJ attorneys have succeeded.**

[15] **AMENDED MEMORANDUM OPINION. The Court is omitting reference to Mr. Myart's arrest listed on page 8 which occurred on December 7, 2006, and not the date listed in the Opinion. It is unclear when the source article was posted, but it was available and viewed on an internet site on September 27, 2007. Accordingly, the Court does not rely on that fact for purposes of its Order and Opinion. Signed by Judge Colleen Kollar-Kotelly on October 30, 2007. (lcckk1) (Entered: 10/30/2007)**

**Oct. 25, 2007).**

Counsel was arrested at the San Antonio, Texas City Hall on December 7, 2006 in an act of civil disobedience. Exercising his 1st Amendment right to redress grievances to his government, Counsel was non-violently protesting an act of racial profiling and the shooting in the head of an innocent young black man in his twenties. Counsel, as a black and African-American citizen and as a lawyer considered, then and now, the government/police actions, much like the government's actions in the case at bar, abhorrent, intolerable and unconstitutional in a supposed democratic, free and civilized society.

Counsel at the time of the civil disobedience act did not know the young man and his friends, three others, who were falsely arrested and brutalized by the San Antonio police. Later, however, Counsel came to be the civil legal representative of all the citizen young people in this whole sickening affair and who suffered permanent injuries as a result of the unconstitutional acts of the police. While the entry itself does not make mention of the numerous other media accounts of the situation, the Court is informed that these young people were awarded $97,500 in damages in a pre-litigation mediation. More, the City ultimately admitted that the abhorrent and unconstitutional police actions were in fact not justified and were wrong. ***See additionally media accounts of the incident attached hereto as an Exhibit; same being incorporated here as if fully stated verbatim.***

In fact, San Antonio Mayor Phil Hardberger made the following quoted statements as printed in the ***San Antonio Express-News***[16],

---

[16] **The San Antonio Express-News article does not reflect the additional $17,500 paid to the other victims of the incident.**

> "I think the shooting was unjustified and shouldn't have been done," Hardberger said. "I think we were in the wrong."
>
> Rosales stopped Fennell and a friend, who were walking to work, while the officer and a colleague were investigating robberies near Jackson-Keller Road. The pair matched a generic description: a short black man in his 20s.
>
> "They weren't doing anything, nor were they in a particularly suspicious place," Hardberger said Thursday. "So I think it was a fair settlement."

City Attorney Michael Bernard said,

> Still, City Attorney Michael Bernard said the case for negotiating a settlement with Fennell was clear-cut.
>
> "There's an innocent guy walking down the street and he got capped in the head. An inch or two, and it could have been even worse," Bernard said. "In the end, that's really how it fell. It was just the right thing to do in that circumstance."

Id.

Finally, in regard to this matter, the Court is informed that as a result of this Counsel’s actions, this incident and other repulsive and illegal actions, including questionable police-involved deaths of citizens, of the San Antonio Police Department are the subject of a sweeping federal investigation. More, Counsel’s actions, legal and civil disobedient, resulted in the creation of the Human and Civil Rights Coalition of Civil Rights, San Antonio and Texas civil rights groups that have petitioned the United States Attorney General, the Director of the Federal Bureau of Investigations (FBI) and the House Judiciary Committee for a full and complete investigation of the SAPD and the Bexar County District Attorney for failure to prosecute law enforcement officials known to have violated San Antonio citizens’ civil rights. ***See Exhibit, Letter to Federal Officials and media Accounts of Complaint.*** One of the signatures to the DOJ/FBI letter is that of this Counsel.

58.

- **Between September 28, 2007, and October 3, 2007, Mr. Myart makes numerous phone calls and sends numerous emails to attorneys working for the Department of Justice. *See* [166] Defs.' Resp. to Pls.' Second Notice Ex. 3. By way of example, Mr. Myart contacted Department of Justice attorneys on October 2, 2007, at the following times: 5:32 A.M. (email), 5:43 A.M. (email), 6:53 A.M. (email), 9:00 A.M. (phone), 10:50 A.M. (phone), 12:00 P.M. (email), and 12:25 P.M. (email). *Id.* His communications are argumentative, accusatory, and laced with invective. *Id***

.

This is true. Counsel was placed on medical leave on September 21, 2007. Counsel soon came to discover that it took him at least two or more weeks of medical leave to get ready to be on medical leave. These e-mails were sent, not from Counsel's office, but from Counsel's home where Counsel was recuperating. Defendants are entitled to characterize the communications as they please, but those characterizations do not constitute evidence of anything. Counsel was ill and hurting, but not bedridden or dead. In fact, Counsel reasserts that this information was provided to the Court only to raise the Court's ire, which it appears was accomplished.

59.

- **On September 29, 2007, Mr. Myart provides a statement to the Dallas Morning News criticizing a federal City Hall corruption probe involving his client. *See* [162] Defendant's Notice of Filing dated October 1, 2007, Ex. 1. He also grants a related television interview from his home. *See* [166] Pls.' Second Notice of Intent ¶ 7.**

This is true. The Court is, however, unaware that one of the subjects of the extensive public corruption investigation, Dallas City Councilman, Mr. Leo Chaney, Jr., for whom the interview was reluctantly granted, is Counsel's maternal and blood cousin. Counsel volunteered without trepidation, and with solemn commitment to his deceased father and mother, to represent his cousin free of charge more than two years ago when the

investigation commenced. Counsel met with the US Attorney in Dallas. The US Attorney promised Counsel that before any information on Mr. Chaney would be publically released, Counsel would be contacted in advance. That did not happen. On the night of September 28, Counsel's cousin, Leo, Jr., contacted Counsel in a panic over rumors and press coverage that indictments against Dallas City Council members would be announced on the following Monday. Leo feverishly told Counsel that he was being hounded and followed by the press and that he, Leo, was deeply afraid because he did not know whether he was going to be indicted. Leo further told Counsel that the press was staking out his parents' home, the home of Mr. and Mrs. Leo Chaney, Sr., also Counsel's **FAMILY.** Leo asked Counsel if he could find out what was happening in the US Attorneys' office and to help get the press away from him, his family and his parents' home and other employment locations. Counsel informed Leo that he was ill, but that under the dire circumstances, Counsel would do everything possible to find out what was going on in the US Attorneys' office and to stop the press from hounding him and his parents. See Affidavit of Leo Chaney, Jr.; same attached hereto and incorporated as if fully stated verbatim. Counsel declares that the statements here are true and correct.

Mr. Chaney has in part stated,

> **He repeated, "Leo, that's what family is for." He said he had to do it if we were going to stop the press frenzy as it related to me.**
>
> **He issued a statement telling the public that I was no longer a target and that I would not be indicted. He also criticized the US Attorney for allowing me to live under a cloud when they knew at the beginning of the investigation that I had not violated any criminal laws.**
>
> **I agreed with his statements and so did my entire family.**
> **Immediately after James issued his statement and gave the interview from his home, the press stopped hounding me and my family. They stopped**

> **staking out my home, my job and my parents' house. We were all very happy and, again, relieved.**
>
> **I believe it unfair for my cousin to be ridiculed for coming to the aid, free of charge, of a family member in serious trouble.**
>
> **We all appreciated James' efforts and we have thanked him for doing so even while he was sick.**

Id.

In fact, Counsel was angered by this circumstance and felt the manner in which the US Attorney had handled this matter was deplorable. Counsel determined (a) that Leo was not going to be indicted and (b) the only way to pull the press off his family was to issue a statement and grant the interview being requested by the TV reporter. Council did exactly that, even telling the reporter from KENS TV 5 that he was sick, but that it was a **FAMILY** matter; and, therefore, he, Counsel, had no choice but to give the interview. Frankly, if Counsel had it to do all over again under the same or similar circumstances, Counsel would do it exactly as he did in the matter here discussed. After all, it was **FAMILY** business and personal **FAMILY** issues at stake. Yet, the DOJ attorneys would do as they did, again, try and then successfully raise the ire of the Court.

60.

- **On October 1, 2007, Mr. Myart files a Complaint in the United States District Court for the Western District of Texas. *See Paschal Evans, et al. v. Sculley, et al.*, Civ. A. No. 07-747 (W.D. Tex. Oct. 1, 2007).**

This is true. This pleading was an amended complaint that I asked my staff to prepare and file. But, Counsel filed numerous other pleadings in federal and state Courts notifying them of his medical leave. That took a tremendous amount of energy. It had to be done, however.

61.

- **On October 9, 2007, Mr. Myart is arrested after disrupting a San Antonio city council meeting. *See* [170] Defs.' Opp'n to Pls.' Motion, Ex. 1.**

Yes, this is true. On October 9, 2007, Counsel was at home in his bed, when he received a call from Mr. Ron Gardley, deceased. Mr. Gardley, a close friend to Counsel, died suddenly on November 12, 2007. Mr. Gardley informed Counsel that the San Antonio Police Department, the subject of numerous complaints of the use of excessive force resulting in injury and death to SA citizens, and the Mayor had ordered silent protestors to depart the City Council chambers telling them that it was illegal for them to be there. This, Counsel knew, was a direct violation of the protestors' constitutional right to be in the meeting and to redress their grievances to the government under the 1st Amendment. Even sick, Counsel assured Mr. Gardley that he, Counsel, would come to the City Hall Chambers to see what was going on. Upon arrival at the City Council Chambers, Counsel ascertained that the blockade of the silent protestors from a public city council meeting was a direct and repugnant violation of the 1st Amendment of the United States Constitution. Counsel, in direct and unabashed civil disobedience, vociferously made this fact known to the Mayor, City Manager and City Attorney. In fact, the Mayor and City Attorney agreed with Counsel and allowed the protestors back into the meeting, but ordered Counsel arrested for interference with a public meeting. What the Court was not informed of by Defendants is that that act of civil disobedience not only landed Counsel in jail, but also, at the same time, landed him in the Baptist Hospital for three days, accruing approximately $27,000 in medical bills. Counsel declares the statements made here are true and correct to the best of his ability and recollection.

## **CERTIFICATE OF CONFERENCE**

62. Counsel has conferred with Mr. Dean on this motion. The Defendants are opposed.

## **CONCLUSION**

63. For the reasons above delineated and in the interest of justice in law and equity, Plaintiffs Robert and Laverne Williams pray the Court make additional or substitute orders and findings it deems necessary for correcting its Order and Memorandum Opinion the subject hereof. Irreparable injury has occurred and in all probability will continue to occur against Plaintiffs Counsel if this matter is not corrected.

64. Plaintiffs and Counsel seek a hearing on this matter.

Dated: November 28, 2007

Respectfully submitted,

James W. Myart, Jr. P.C.
1104 Denver Blvd
San Antonio, Texas 78210
Phone: (210) 533-9461
Fax: (210) 533-4815

By: /s/______________________
James W. Myart, Jr.
FBN: TX0021
Jwmyartlaw@satx.rr.com
ATTY FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served via overnight delivery to Mr. Paul Dean on this 28th of November, 2007.

By: /s/______________________
James W. Myart, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | § | |
| **WILLIAMS, et al.,** | § | |
| | § | |
| **Plaintiffs.** | § | |
| **v.** | § | **Civ. No. 03-2245 (CKK) (JMF)** |
| | § | |
| **JOHANNS, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**PROPOSED ORDER**

The Court is taking this matter under advisement.

Hearing is set in the matter on ________________________.

______________________________
**COLLEEN KOLLAR-KOTELLY**
**UNITED STATES DISTRICT JUDGE**