# In The United States Court of Federal Claims

No. 05-400C

(Filed: August 13, 2010)
_____

| | |
|---|---|
| MICHAEL W. STOVALL,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>　　　　　　Defendant. | *　Breach of contract; Cross-motions for<br>*　summary judgment; Breach of contract –<br>*　genuine issues of material fact preclude<br>*　judgment as a matter of law; Damages;<br>*　Expectation damages – lost profits; *Energy*<br>*　*Capital* – *per se* rule rejected regarding lost<br>*　profits from third-party transactions;<br>*　Genuine dispute as to material questions of<br>*　fact regarding proximate causation;<br>*　Foreseeability and specificity;  Reliance<br>*　damages; Direct vs. incidental reliance<br>*　damages; Foreseeability; Limitations on loss<br>*　recovery; Genuine issues of material fact<br>*　preclude granting of summary judgment;<br>*　Trial required. |

_____

**OPINION**
_____

*Howell R. Riggs,* Dick Riggs Miller LLP*,* Huntsville, AL, for plaintiff.

*Devin A. Wolak*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

**ALLEGRA, Judge:**

　　Michael Stovall (plaintiff), an African-American farmer, brings this action for damages arising out of the alleged breach of his settlement agreement with the Farm Service Agency (FSA), an arm of the U.S. Department of Agriculture (USDA).  Defendant has moved for summary judgment under RCFC 56, admitting that whether this agreement was breached presents questions of fact, but claiming, as a matter of law, that plaintiff has inadequately supported his damage claims.  Plaintiff has cross-moved for summary judgment, contending that he is entitled to judgment as a matter of law both as to liability and damages.  Following briefing and oral argument, and for the reasons that follow, the court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, defendant's motion for summary judgment and **DENIES** plaintiff's cross-motion for summary judgment.  The court will set this case down for trial at first opportunity.

I.      **FACTS AND BACKGROUND**[1]

Plaintiff grew up in Alabama, on a family farm, and has long desired to be a full-time farmer. In 1993, he attempted to apply for farm loans through the FSA office in Lawrence County, Alabama, but was denied even an application. In 1994, he received an application form and submitted requests for ownership and farm operating loans, both of which were denied by the FSA office. Plaintiff pursued an administrative appeal, after which the application for the operating loan was approved. In March 1995, those loan funds were disbursed.

After failing to obtain other loans from the FSA, plaintiff, in January 1996, filed an administrative complaint with the USDA's Office of Civil Rights (OCR), charging FSA with racial discrimination. On February 27, 1998, plaintiff and OCR settled his complaint, memorializing the settlement in a "Resolution Agreement." In that agreement, Mr. Stovall waived any rights against USDA and its employees arising from his complaint in exchange for USDA's promises to provide him compensatory damages and "programmatic relief." The former took the form of a check for $143,000, together with the payment of certain other expenses, reasonable attorney's fees and costs. The latter took the form of USDA's agreement to: (i) release plaintiff from liability on his outstanding debt and notify the appropriate credit bureaus of such; (ii) give plaintiff "priority consideration" on any application for inventory property located in certain counties in Alabama and neighboring Tennessee; (iii) give plaintiff "priority consideration" on one farm ownership loan at his election; (iv) view plaintiff's future applications "in a light most favorable" to him, affording him the "most favorable" terms consistent with law; and (v) provide plaintiff with "reasonable technical assistance" in conjunction with any application for a farm ownership or operating loan.

On or about February 27, 1998, plaintiff filed a new application for farm ownership and operating loans with the FSA, as well as a farm and home plan that envisioned his ownership of cows and bulls. In preparing and filing these documents, he obtained the assistance of several USDA employees, including Carolyn Cooksie and Sam Snyder. On March 3, 1998, the OCR formally found that the FSA had discriminated against plaintiff in denying him a 1994 farm ownership loan and a 1995 farm operating loan.[2] On March 16, 1998, plaintiff was found eligible to receive loans under the FSA programs. Between March 20, 1998, and April 20, 1998, he pondered whether to purchase farm property in southern Tennessee or Northern Alabama. Plaintiff finally settled on a farm prospect in Lawrence County, Alabama, at which he intended to

---

[1] These facts shall be deemed established for purposes of future proceedings in this case. RCFC 56(d)(1).

[2] In its decision, the OCR found "discrimination, based on race (black), in the denial of the complainant's 1994 farm ownership loan application" and "in the denial of complainant's 1995 application for a low interest rate operating loan." The OCR did not find discrimination in the denial of Mr. Stovall's 1995 farm ownership loan, but found that the poor credit history that led to that denial was the result of the agency's actions with respect to the 1994 farm ownership loan and the 1995 operating loan.

farm poultry and cows. When plaintiff informed the FSA of his plans, it transferred his file to its office in Lawrence County, Alabama.[3] On April 28, 1998, after reviewing that file, the Alabama FSA office informed plaintiff that his application was incomplete and that he needed to provide, *inter alia*, a history of his farming training/experience; a written description of and financial plan for the planned poultry operation; and a commitment from a poultry company to grow poultry. After plaintiff addressed these and other issues raised by the Lawrence FSA office, the FSA, on June 26, 1998, informed him that he met all the applicant eligibility requirements for the loan program.

During July of 1998, plaintiff proceeded with his plans to build and operate a poultry farm (with some cows). To put these plans in perspective, it is helpful to understand how the domestic poultry industry works. That industry is fully integrated in that ownership and control of essentially all aspects of production – from baby chick to processed broilers and poultry products – are controlled by poultry companies, commonly known as "integrators." Such integrators own or control the breeding flock; hatcheries; chicks; the assignment of baby chicks to growers; feed mills and ingredients; the transportation of chicks, feed, and grown chickens; and processing plants. As integrators expand production, they look for potential growers who meet their needs in terms of location, managerial ability and other factors. Such growers are given a "letter of intent" contract that ordinarily allows the grower to obtain bank loans for the construction of broiler feeding houses and associated equipment. Growers usually do not receive an actual contract until their facilities are finished and determined to meet the integrator's specifications.

On July 9, 1998, Mr. Stovall received a letter of intent from one of these poultry integrators, ConAgra, in which the latter committed to enter into a seven-year broiler feeding agreement with plaintiff upon his construction of two broiler feeding houses that met ConAgra's specifications. By its terms, this commitment was to expire after 120 days.

On July 14, 1998, FSA informed plaintiff that his application was complete. But a week later, on July 21, 1998, it notified him that his application was being reconsidered in light of a federal tax lien for $7,846 that plaintiff had failed to disclose in his earlier applications. Ultimately, FSA elected to proceed with the loan approval, provided plaintiff satisfied the tax lien by the time his loan closed.[4]

---

[3] On April 18, 1998, Ms. Cooksie and Mr. Snyder instructed the Executive Director of the Alabama FSA that certain paragraphs of the Resolution Agreement were not legally enforceable. Among the provisions they opined were unenforceable was that forbidding the FSA from requiring Mr. Stovall to pledge his settlement proceeds. What effect, if any, this opinion had remains to be seen.

[4] On June 4, 1998, plaintiff obtained a bid from Smith Poultry to construct the two poultry houses for $96,000. On July 26, 1998, Smith Poultry submitted a second bid for equipping the houses, offering to do so for $92,400. Meanwhile, on July 6, 1998, plaintiff obtained a second bid, this time from Earthwood of Alabama, to construct and equip two poultry houses for $145,496.

At or around this time, plaintiff contacted the FSA National Office and requested assistance in solving cash flow problems he was experiencing. On August 6, 1998, plaintiff met with representatives from the Alabama FSA and the FSA National Office. Together, they completed a revised farm and home plan for plaintiff to build and operate a poultry and cattle operation. That plan was filed on August 6, 1998.[5] On that day, plaintiff received approval for both a farm ownership loan and an operating loan in the amounts of $199,500 and $165,690, respectively. He was informed of this in a letter sent by the FSA on August 7, 1998. This letter advised Mr. Stovall to refrain from committing with contractors or vendors until loan closing and reminded him of several items that needed to be addressed to facilitate that closing. On November 4, 1998, plaintiff's loan closed and he immediately used part of the proceeds to purchase 159 acres of farmland.[6]

On November 13, 1998, plaintiff contracted with Saylor Construction to construct two poultry houses for $85,340. Although the poultry houses were scheduled to be finished by the end of 1998, the winter weather that year in northern Alabama was unseasonably wet, delaying work on the concrete pads for the houses. Those pads were not finally completed until April 1999, with the work being performed by a subcontractor hired by Saylor. This progress aside, for reasons that are disputed, Saylor did not complete the work on the houses – indeed, no work was performed on the poultry houses between April 1999 and January 2000.

In April 1999, plaintiff applied for additional funds to build the poultry houses. At or around this time, he also purchased some cows for his farm. Several documents reveal that FSA personnel visited his farm on April 16, 1999. In a letter to Mr. Stovall dated April 20, 1999, FSA officials reported that while they had witnessed progress at the farm, they were concerned that the poultry house pads were too close to the road. On October 27, 1999, at plaintiff's request, ConAgra issued a second seven-year commitment letter to replace its now-expired original commitment. ConAgra agreed to supply broiler chickens to either one or both of plaintiff's poultry houses if they were completed to ConAgra's satisfaction within 120 days of the letter. On November 10, 1999, following an additional visit to the farm, FSA officials wrote Mr. Stovall to memorialize discussions they had with him regarding shortfalls in the funds available for him to complete his poultry houses and possible solutions to this and other problems he was experiencing. Despite the concerns raised in this letter, on December 15, 1999, plaintiff accepted a $178,768.09 bid from Carl Pride to complete the poultry houses.[7] While that bid exceeded

---

[5] In preparing this plan, Mr. Stovall pledged $35,000 of his settlement proceeds under receivables. The parties dispute whether he did so voluntarily or was compelled to do so.

[6] Near this time, plaintiff obtained a revised construction bid from Smith Poultry, now quoting a cost of $102,500 to build the poultry houses. The bid explained that the price increase (approximately $10,000) was due to increases in the cost of lumber that had occurred after a hurricane.

[7] Mr. Pride was an experienced builder who had spent the previous year building Mr. Stovall's homestead. He had, however, no experience constructing poultry houses.

plaintiff's available loan funds by $35,528.09, a USDA loan officer arranged for additional financing to cover this shortfall, relying on a disaster assistance program for which plaintiff was eligible. That additional loan, however, the proceeds of which became available on December 15, 1999, exhausted plaintiff's eligibility under the FSA loan programs.

In early 2000 (the parties dispute precisely when), Mr. Pride began to construct the poultry houses. On March 1, 2000, several trusses for the houses blew over in a windstorm. Neither plaintiff nor Mr. Pride had insurance to cover this damage. On May 1, 2000, Mr. Pride informed plaintiff that he had failed to include the cost of insulation in his bid – he later estimated that the insulation would cost between $5,200 and $13,000. On May 30, 2000, Mr. Pride indicated that he could not finish the job on-budget, due to the damaged trusses and insulation cost. It appears that, at this point, either Mr. Pride abandoned performance of the contract or was instructed to do so by Mr. Stovall. Plaintiff eventually accepted a $14,500 bid from Porter & Baker to complete construction of a single poultry house and a $43,479.80 bid from Big Dutchman to equip that house. On August 10, 2000, following a meeting between its representatives and plaintiff, ConAgra issued a third and "final" commitment letter stating that it would commit to enter into an agreement to supply broiler chickens to plaintiff on a "flock-to-flock" basis, provided that plaintiff completed one or both of the poultry houses, to ConAgra's specifications, within 120 days.[8]

Having exhausted both his funds and loan eligibility, plaintiff never built the second poultry house. Nor was he able to operate the first house because of several equipment failures, including one involving a standby generator that plaintiff could not afford to fix. Consequently, plaintiff was unable to satisfy the terms of ConAgra's third commitment letter. He never entered into any further broiler agreements.

In January of 2004, plaintiff brought suit in the United States District Court for the District of Columbia, asserting, *inter alia*, that defendant had breached the settlement agreement by failing to implement various paragraphs of the Resolution Agreement. Plaintiff sought damages of $4,000,000, plus attorneys' fees and costs. Specifically, he sought damages for: (i) lost income from the planned poultry operations; (ii) lost income due to having to reduce the size of his cow/calf operations; and (iii) his inability to recoup the cost of the two incomplete poultry houses. Defendant convinced the district court to transfer the breach of contract portion of plaintiff's case to this court. On April 21, 2005, plaintiff filed an amended complaint in which he alleged that this court had jurisdiction over his contract claims under the Tucker Act, 28 U.S.C. § 1491(a), and the Contract Disputes Act (CDA). On June 16, 2005, defendant filed a motion to dismiss this amended complaint under RCFC 12(b)(1). On August 3, 2005, during briefing of this motion, plaintiff filed a second amended complaint, alleging jurisdiction solely

---

[8] Unlike the first two letters, this commitment letter thus was not for a term of years, but rather anticipated that ConAgra would decide whether to keep working with plaintiff one flock at a time. The earlier commitments thus would have provided plaintiff more financial security than this later offer.

under the Tucker Act and abandoning his CDA claim. On June 2, 2006, this court denied the motion to dismiss. *See Stovall v. United States*, 71 Fed. Cl. 696 (2006).

After a lengthy discovery period, that was punctuated by several disputes, defendant, on August 5, 2009, filed a motion for summary judgment. On October 5, 2009, plaintiff filed a cross-motion. After briefing on those motions was completed, this court conducted oral argument on May 25, 2010.

**II.   DISCUSSION**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Id.* at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. I.N.S.*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *see also Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)). Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)); *see also L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005). Where, as here, a court rules on cross-motions for summary judgment, it must view each motion, separately, through this prism.[9]

For purposes of its motion, defendant stipulates that one or more breaches of the Resolution Agreement occurred here. It maintains, nonetheless, that it is entitled to judgment as

---

[9] *See Chevron U.S.A., Inc. v. Mobil Producing Tex. & N. Mex.*, 281 F.3d 1249, 1252-53 (Fed. Cir. 2002); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010); *Northrop Grumman Computing Systems, Inc. v. United States*, 2010 WL 2365470, at *3 (Fed. Cl. June 9, 2010).

a matter of law because plaintiff cannot prove that he was economically damaged by any such breach. In his cross-motion, plaintiff counters that he, and not defendant, is entitled to judgment as a matter of law. He contends that the facts overwhelmingly demonstrate that the Resolution Agreement was variously breached and that he was damaged thereby. Defendant vigorously contests all these assertions. The court will take up the breach issues first.

### A.      Breach

As in any claim for breach of contract, in order to recover here, plaintiff must establish that: (i) a valid contract existed between him and the government; (ii) the contract gave rise to duties or obligations; (iii) the government breached those duties or obligations; and (iv) the breaches resulted in damages. *See San Carlos Irr. and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Health Ins. Plan of Greater N.Y. v. United States*, 62 Fed. Cl. 33, 43 (2004); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004). The parties agree that the Resolution Agreement is a valid contract which gave rise to duties and obligations on the part of the United States. They disagree, however, as to whether those duties and obligations were breached.

The court will not gild the lily as to this point. The existence of numerous genuine issues of material facts precludes this court from finding, as a matter of law, that one or more breaches of the Resolution Agreement occurred. These questions lurk on several factual planes. Some preliminarily revolve around the interpretation of the agreement and what was meant, for example, by requiring FSA to give Mr. Stovall's loan applications "priority consideration" or construing them "in a light most favorable" to him. Parole evidence is needed to clarify the ambiguities associated with these phrases. *See Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988); *Northrop Grumman*, 2010 WL 2365470, at *3. Other questions exist over whether the facts encountered at the time of performance were such as to trigger particular obligations under the Resolution Agreement – whether, for example, during the relevant periods, the United States had acquired, through foreclosures, "inventory property" it should have offered to plaintiff on a priority basis with favorable terms. Finally, on a third plane, there are disputes as to whether certain forms of allegedly breaching conduct ever occurred – whether, for example, Mr. Stovall was compelled to account for monies received under the Resolution Agreement in his loan applications or did so voluntarily.

Certainly, there is evidence that one or more breaches may have occurred. But, it is inappropriate, at this juncture, for the court to weigh this evidence against the controverting evidence provided by defendant. *See United Med. Supply Co. v. United States*, 63 Fed. Cl. 430, 437 (2005); *Becho, Inc.*, 47 Fed. Cl. at 601. Accordingly, plaintiff's motion on this point must fail.

**B.     Damages**

The parties' disagreements heighten considerably as we come to the subject of damages. For its part, defendant winds up and tries to throw a Sunday punch:  it claims that plaintiff has not shown he is entitled to ***any*** damages.  If true, this point would be decisive, as this court lacks the authority to award nominal damages.  *See Perry v. United States*, 294 U.S. 330, 355 (1935); *Grant v. United States*, 74 U.S. (7 Wall.) 331, 338 (1869); *Severin v. United States*, 99 Ct. Cl. 435, 443 (1943), *cert. denied*, 322 U.S. 733 (1944) ("the futile exercise of suing merely to win a suit was not consented to by the United States when it gave its consent to be sued for its breaches of contract").

Three types of damages can be awarded to compensate for a breach of a contract: expectation, restitutionary, and reliance.  *Southern Cal. Fed. Sav & Loan Ass'n v. United States*, 422 F.3d 1319, 1334 (Fed. Cir. 2005); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 (Fed. Cir. 2004).  "Expectation damages give the non-breaching party the benefit of his bargain by putting him in as good a position as he would have been in had the contract been performed."  *Southern Cal. Fed. Sav. & Loan Ass'n*, 422 F.3d at 1334; *see also Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).  Such damages "are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty."  *Id.*; *see also Fifth Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed. Cir. 2008).  Restitutionary damages restore the non-breaching party to the position he would have been in had there never been a contract to breach.  *Landmark Land Co., Inc. v. United States*, 256 F.3d 1365, 1372 (Fed. Cir. 2001).  Such damages, however, derive from the non-breaching party's performance under the contract and are not recoverable for actions taken voluntarily, beyond the obligations of the contract.  *Id.* at 1375.  Reliance damages are those designed to compensate a plaintiff for foreseeable loss caused by reliance on the contract.  *Id.* at 1378; *see also Southern Cal. Fed. Sav. & Loan Ass'n*, 422 F.3d at 1334.

"Care must be taken lest the calculation of damages become a quixotic quest for delusive precision or worse, an insurmountable barrier to any recovery."  *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 746 (2004).  "The ascertainment of damages is not an exact science," the Federal Circuit has stated, and "where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision."  *Bluebonnet Savings Bank*, 266 F.3d at 1355; *see also* Restatement (Second) of Contracts § 352, cmt. a (1981) (hereinafter "Restatement") ("[d]amages need not be calculable with mathematical accuracy and are often at best approximate").  "'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'"  *Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969) (quoting *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966)); *see also Bluebonnet Savings Bank*, 266 F.3d at 1355.  Accordingly, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."  *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (quoting *Locke v.*

*United States*, 283 F.2d 521, 524 (Ct. Cl. 1960)); *see also Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004). Moreover, "[b]oth the existence of lost profits and their quantum are factual matters that should not be decided on a motion for summary judgment if material facts are in dispute." *Cal Fed. Bank FSB v. United States,* 245 F.3d 1342, 1350 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1326 (Fed. Cir. 2002). The same, of course, is true as to other forms of damages. *See Astoria Fed. Sav. & Loan Ass'n v. United States*, 72 Fed. Cl. 712, 718 (2006) (summary judgment inappropriate as to reliance damages where "issues to be addressed are decidedly factual").

Plaintiff argues that it is entitled to damages as a matter of law. Numerous questions of fact, however, preclude that judgment, none the least of which are those discussed above concerning the existence and extent of the alleged breaches. As noted, defendant's banner claim is that plaintiff has not adequately demonstrated its entitlement to any form of damages. More particularly, it challenges plaintiff's pursuit of lost profits, asserting that the claimed profits were not the proximate result of the alleged breaches, foreseeable or reasonably calculated. It also assails plaintiff's claims to reliance damages. The court will consider these claims *seriatim*.

        **1.**        **Expectation Damages**

Expectation damages give the injured party "the benefits [he] expected to receive had the breach not occurred." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1379, 1380 (Fed. Cir. 2001) (citing Restatement, at § 344(a)). The Federal Circuit has further elucidated – "[t]he benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Id*. (citing Restatement, at § 347); *see also Energy Capital*, 302 F.3d at 1324. To recover lost profits for breach of contract, the plaintiff must establish by a preponderance of the evidence that: "(1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty." *Id*. at 1325; *see also Cal. Fed. Bank*, 245 F.3d at 1349; *Franconia Assocs.*, 61 Fed. Cl. at 746. As noted above, defendant challenges the sufficiency of plaintiff's evidence as to each of these prongs.

Plaintiff must first show, in terms of proximate cause, that defendant's alleged breach produced damage "inevitably and naturally, not possibly or probably." *Ramsey v. United States*, 101 F. Supp. 353, 357 (Ct. Cl. 1951), *cert. denied*, 343 U.S. 977 (1952) (citing *Myerle v. United States*, 33 Ct. Cl. 1, 26-27 (1897)). On this point, the Federal Circuit has observed that lost profits may be recovered "if the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment." *Energy Capital*, 302 F.3d at 1328; *see Cal. Fed. Bank*, 245 F.3d at 1349; *Wells Fargo v. United States*, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996). The causal connection between the breach and the loss of profits must be "definitely established." *La Van v. United States*, 382 F.3d 1340, 1351 (Fed. Cir. 2004); *see*

*also Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005); *Hi-Shear Tech Corp. v. United States*, 356 F.3d 1372, 1379 n.2 (Fed. Cir. 2004); *Energy Capital*, 302 F.3d at 1325. "This is not to say that the breach must be the sole factor or sole cause in the loss of profits," the Federal Circuit has stated, and, accordingly, "[t]he existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Cal. Fed. Bank*, 395 F.3d at 1268.

Defendant seizes upon *Energy Capital*'s statement that lost profits must grow "out of the contract itself" to support a *per se* rule that it claims prevents injured parties from receiving lost profits attributable to contracts or transactions other than the breached contract with the United States. Under this *per se* rule, plaintiff cannot seek the anticipated profits from his aborted farming activities, as they would have derived from contracts with third parties, such as ConAgra. Rather, defendant asserts, plaintiff can obtain profits only to the extent they would have been produced by the performance of the Resolution Agreement. And since no such profits were realizable, this court is told, it follows, *a fortiori*, that plaintiff cannot recover lost profits as a matter of law. This argument flows logically, to be sure, but fails to persuade because it rests on a faulty first premise: defendant's interpretation of *Energy Capital* is too broad, reading into that case something that is not there.

*Energy Capital* is one of several cases on the books holding that a party injured by a breach may recover profits lost on separate contracts with third parties, provided the latter were not "collateral or independent" undertakings. *Energy Capital*, 302 F.3d at 1328; *see also Cal. Fed. Bank*, 245 F.3d at 1349. Quite obviously, this statement cannot be true if, as defendant contends, every transaction with a third party were a "collateral or independent" undertaking.

In fact, within the broader universe of third-party transactions are those that the parties to the contract breached knew, or should have known, were dependent upon the performance of that contract. Lost profits are recoverable as to those transactions, provided the other requirements outlined above (*e.g.*, foreseeability) are met. Defendant confidently invokes *Energy Capital* in support of its contrary *per se* rule only by conveniently ignoring the contradicting holding of that case, *to wit*, that the plaintiff could recover the profits lost as to loans it would have made with third parties had the lien priority agreement in question not been breached. *See Energy Capital*, 302 F.3d at 1328-29. The Federal Circuit found that because the purpose of plaintiff's agreement with defendant was to enable it to make loans to third parties, the resulting loss of profits attributable to plaintiff's inability to make such loans flowed directly from defendant's breach. *Id*. at 1329; *see also Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 472 (2006). When it said, then, that lost profits must "'accrue[] and grow[] out of the contract itself, as the direct and immediate results of its fulfillment,'" *Energy Capital*, 302 F.3d at 1328 (quoting *Wells Fargo*, 88 F.3d at 1023), the Federal Circuit hardly meant that those profits had to arise solely from the performance of the contract breached and could not derive from third-party transactions. Rather, the court merely echoed a longstanding view: that lost profits from transactions with third parties may be awarded where the relationship between the breached contract and those

transactions was such that the damage to the latter was the inevitable and natural consequence of the former.[10]

Other than a couple of out-of-context snippets, there is little to commend defendant's hard-and-fast rule.  It is a fiction, contradicted by the very case upon which it is purportedly drawn – a euphemism for wooden arguments long ago rejected.  It is so wrong, mind you, as to be belied not only by the cases in which lost profits attributable to third-party transactions have been awarded, but even by those in which such awards have been eschewed.  Even the latter, in denying lost profits, do not treat the identity of the transacting parties as determinative.  Rather, they, like cases awarding profit damages, properly focus on how a given outside transaction relates to the purpose of the contract breached.  While the involvement of a third party begs the latter question, it does not answer it.  Indeed, if the decisions in this area prove anything, it is this:  while the patterns that emerge can provide guidance, the intensely factual nature of the causation inquiry in these cases suggests that a court should exercise caution in creating bright-line distinctions in this area, and be even more circumspect before applying them.[11]

---

[10] Proof positive of this may be found in two types of cases:  those that have denied summary judgment while rejecting versions of defendant's *per se* rule, *see, e.g.*, *LaVan*, 382 F.3d at 1349-50 (reversing summary judgment in favor of defendant and holding that plaintiff had created genuine issues of material fact as to its recovery of lost profits on the sale of its stock to third parties); *Cal Fed. Bank*, 245 F.3d at 1350 (reversing summary judgment in favor of defendant and holding that plaintiff had created genuine issues of material facts as to the existence and quantum of lost profits associated with adjustable mortgages it sold to remain in capital compliance following defendant's breach of a contract); *Cal. Oregon Broadcasting, Inc. v. United States*, 74 Fed. Cl. 394, 406-07 (2006) (denying defendant summary judgment because profits from third-party leasing transactions were "not too remote or speculative"); *Castle v. United States*, 48 Fed. Cl. 187, 200-01 (2000), *cert. denied*, 539 U.S. 925 (2003) (rejecting a *per se* argument similar to that raised herein); *Smokey Bear, Inc. v. United States*, 31 Fed. Cl. 805, 809 (1994) (rejecting defendant's argument that plaintiff's lost profits based on potential sales of Smokey Bear products to third parties were unrecoverable as a matter of law); and those that have awarded lost profits on transactions involving third parties, *see, e.g.*, *LaSalle Talman Bank, FSB v. United* States, 317 F.3d 1363 (Fed. Cir. 2003) (affirming award of lost profits based on the servicing of mortgages to third parties); *Neely v. United States*, 285 F.2d 438, 443 (Ct. Cl. 1961) (allowing a claim for lost mining profits derived from third party contracts when the government breached a contract to lease land for mining); *Mann v. United States*, 68 Fed. Cl. 666, 669-70 (2005) ("when the lost profits directly relate to the subject of the contract, they are recoverable, even if they would have required a transaction with a third party"); *Franconia*, 61 Fed. Cl. at 747-48 (awarding profits lost on hypothetical rental transactions with third parties).

[11] *See Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2142 (2008) ("Proximate cause . . . is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'") (quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 272 n.20 (1992) (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983))); 11 Joseph M. Perillo, Corbin on Contracts § 56.24 (rev.

So we must return to the north star of this case – the facts – and they are problematic for defendant. In the case *sub judice*, there is no doubt that the parties to the Resolution Agreement contemplated that plaintiff would thereafter enter into transactions with third parties to acquire and operate a farm – transactions of the sort that plaintiff relies upon in seeking lost profits. *See* 1 Robert L. Dunn, Recovery of Damages for Lost Profits § 1.31 (6th ed. 2005) (hereinafter "Dunn") ("A number of cases have permitted recovery of lost profits damages from a collateral transaction when plaintiff demonstrated actual or constructive contemplation of a collateral transaction of the same general nature as that which in fact took place."). That conclusion springs from the agreement itself and, particularly, the "programmatic" relief provided thereunder, which referred to programs offered by USDA to farmers. Indeed, the agreement specifically included provisions targeted on farm ownership and operating loans – loans that everyone involved undoubtedly knew not only would finance and facilitate transactions between plaintiff and third parties, but would be paid off from the revenues realized from the latter transactions. Accordingly, the transactions that were expected to occur to effectuate plaintiff's goal of becoming a farmer were not collateral and independent of the Resolution Agreement, but rather integral to plaintiff's ability to benefit from that agreement.[12] As such, it is no bar here that

---

ed. 2005) (hereinafter "Corbin") ("Cases allowing and denying the recovery of profits must always be considered with respect to the character of the evidence that was offered on the plaintiff's behalf.").

[12] In trying to disassociate the Resolution Agreement from Mr. Stovall's farming activities, defendant asserts that the sole purpose of that agreement was to settle Mr. Stovall's discrimination complaint. But, this view makes no sense. The discrimination that gave rise to plaintiff's civil rights complaint and, ultimately, the settlement at issue was not some general form of invidious discrimination, but rather racial discrimination targeted at thwarting Mr. Stovall's efforts to establish a successful farm. The programmatic relief offered by that settlement was neither an end in itself nor some largesse from the blue, but rather an attempt to counteract this prior discrimination and aid Mr. Stovall in reaching his original goal: again, to establish a successful farm. All involved knew this – it is not reasonable to contend otherwise. The purpose of the settlement agreement and plaintiff's later farming activities were thus inextricably intertwined. One could readily come to that same conclusion by merely noting the nature of the loan programs referenced in the agreement. All of these have, as their central purpose, the promotion of successful farms. *See* The Agricultural Credit Act of 1987, Pub. L. No. 100-233, 101 Stat. 1568 (1988); H.R. Rep. No. 100-295(I) at 52, 56 (1987) (loan program designed "to help keep farmers on the land" and address problems of "unprofitability"); S. Rep. No. 100-230, at 12-15 (1987) (describing the history and purpose of these loan programs, as modified by the Agricultural Credit Act of 1987). Indeed, as reflected in regulations in effect at the time of the settlement, the *raison d'etre* of these programs was to assist "eligible farmers and ranchers to become owners-operators of family-sized farms or to continue such operations when credit is not available elsewhere," thereby "enabl[ing] family-farm operators to use their land, labor and other resources, and to improve their living and financial conditions so that they can obtain credit elsewhere." 7 C.F.R. § 1943.2 (2001). Defendant, therefore, can no more sensibly

the lost profits that plaintiff seeks are tied to possible transactions with third parties, such as ConAgra. Indeed, while the Resolution Agreement itself is one step removed from being a loan agreement, there is little to distinguish this case from those in which lenders, upon breaching their lending agreements, have been held liable for lost profits on third-party transactions.[13]

This is not to say that plaintiff has established proximate causation. Defendant makes a variety of factual claims regarding the source of plaintiff's economic woes, raising questions, via the evidence in its appendix, as to whether the failure of his farm stemmed not from defendant's alleged breaches of the Resolution Agreement, but either from plaintiff's own failures (or those of his contractors) or from circumstances beyond anyone's control, such as weather. The evidence provided, though not uncontroverted, raises questions as to whether plaintiff made timely and effective use of the funds provided by the FSA in contracting for and supervising the construction of his poultry houses. If proven, these claims could serve to break the chain of causation between the alleged breaches and the lost profits plaintiff seeks. In the court's view, these questions involving proximate causation cannot be resolved via summary judgment, but must instead be the subject of a trial.

---

drive a wedge between the Resolution Agreement and plaintiff's subsequent farming activities than it can between the FSA and its promotion of successful farms.

[13] *See Siegner v. Interstate Prod. Credit Ass'n*, 820 P.2d 20 (Or. Ct. App. 1991) (lender who breached contract to lend money to finance plaintiff's cattle ranch was liable for lost profits on yearling operation); *Morgan v. Young*, 203 S.W.2d 837 (Tex. App. 1947) (farmer entitled to recover net profit on crop he was prevented from planting when lender breached a contract to lend money); *Hunt v. United Bank & Trust Co.*, 291 P. 184 (Cal. 1930) (bank that breached agreement to lend money for irrigation water, seed and labor was liable for lost profits on crop sales); *see also Mohr v. Dix Mut. Cty. Fire Ins. Co.*, 493 N.E.2d 638 (Ill. App. Ct. 1986) (insurance company that failed promptly to pay claim regarding farm equipment was liable for lost profits arising from plaintiff's inability to farm); 1 Dunn, at § 2.53 ("A substantial body of authority now holds that if the borrower cannot or does not obtain new financing and the resulting damages were reasonably foreseeable to the lender, the borrower is entitled to recover . . . lost profits if appropriate."); Debra T. Landis, Annotation, Measure and Elements of Damages for Breach of Contract to Lend Money, 4 AL.R.4th 682, §8 (1981). On brief, defendant contends that "[t]his Court has long held that lost farming profits are not even available when a farmer alleges the breach of [a] loan agreement." This claim is long on bravado and short on citation. The sole case defendant invokes in support thereof, *Dodson Livestock Co. v. United States*, 48 Fed. Cl. 551 (2001), did not involve a loan transaction and only tangentially involved questions involving collateral damages. The essential holding of the case was that defendant did not breach any warranties in selling the farmer sheep infected with paratuberculosis. *Id*. at 562. And even that ruling was later reversed by the Federal Circuit. *Dodson Livestock Co. v. United States*, 30 Fed. Appx. 989 (Fed. Cir. 2002).

Defendant further asserts that plaintiff has provided inadequate evidence that the losses he seeks were foreseeable. As to the foreseeability requirement, the Restatement (Second) of Contracts provides that a "[l]oss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Restatement, at § 351(2); *see also Bluebonnet*, 266 F.3d at 1355; *Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953); *Franconia*, 61 Fed. Cl. at 751. Expounding on this, a leading commentator has stated that, in order to be foreseeable, "the injury must be one of such a kind and amount as a prudent person would have realized to be a probable result of the breach." 11 Corbin, at § 56.7; *see also* Restatement, at § 351, cmt. a ("The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.").[14] In this regard, plaintiff need not show that a particular type of breach was foreseeable, but must prove that both the general magnitude and type of damages were foreseeable. *See Landmark*, 256 F.3d at 1378; *see generally N. Helex Co. v. United States*, 524 F.2d 707, 714 (Ct. Cl. 1975), *cert. denied*, 429 U.S. 866 (1976).

Again, the results here are factually mixed. As discussed above, there is not much debate that it was foreseeable that plaintiff would use the loan proceeds from the loans mentioned in the agreement to purchase land, buildings, and other farming equipment, and that he would be injured if defendant's breach of the agreement prevented him from operating a profitable farm.[15]

---

[14] The fountainhead for the rule that lost profits deriving from a breach of contract must be foreseeable is the historic case of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854); *see* 1 Dunn, at § 1.10. While this rule, as enunciated by Justice Holmes in *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543 (1903), originally considered whether there was a "tacit agreement" between parties regarding the likelihood of receiving damages in the form of lost profits, the modern permutation thereof, exhibited in innumerable cases, is now decidedly objective in scope and employs a reasonable person standard. *See* Restatement, at § 351, cmt. a. Under this standard, "the party who breaches a contract can only be held responsible for such consequences as may be reasonably supposed to be within the contemplation of the parties at the time the contract was made." *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987); *see also Am. Capital Corp. v. United States*, 59 Fed. Cl. 563, 576 (2004); 11 Corbin, at § 56.7.

[15] In discussing forseeability, the Restatement makes the following comment regarding the damages that may flow from a lender who breaches a contract to lend money:

> The limitation of forseeability is often applied in actions for damages for breach of contracts to lend money. Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of breach . . . . In most cases, then, the lender's liability will be limited to the relatively small additional amount

But, factual questions abound regarding the nature and extent of the farming operations that were envisioned – questions that could impact, at the least, the amount of lost profits recoverable here. Some of these involve the foreseeability of plaintiff's entry into particular types of farming – poultry versus cow farming (or both), for example. Plaintiff claims that USDA representatives knew that he was considering a poultry farm at the time the Resolution Agreement was signed, but defendant asserts that the parties envisioned that plaintiff would engage only in cow farming. While it is unclear whether the specific type of farming anticipated by the parties limits the damages recoverable here (some of the cases cited above suggest otherwise), the court again believes that a trial is needed to resolve what the parties knew and when. Other questions exist as to the magnitude of the farming operations that were foreseeable by the parties at the time of the agreement. Limitations on that magnitude conceivably spring from the programmatic limitations on the size of the loans available from the USDA, *e.g.*, how large and what type of farm operation plaintiff could obtain with the amount of loans available. Those limitations – and the parties' expectations based thereupon – could play a pivotal role in determining the foreseeable size of plaintiff's farming operation and the concomitant recoverable losses that can be associated therewith.

A few more words are warranted on this subject. Plaintiff's expert projects that plaintiff's farm would have eventually expanded from two to ten poultry houses. It is unclear, however, where the funding for these eight additional houses would have come from. Certainly, these additional houses could not have been constructed under the Resolution Agreement, even if fully performed, as plaintiff's eligibility under the programs referenced therein was exhausted in building the first two houses. It appears then that plaintiff planned to build these additional houses using some other source of capital, perhaps by reinvesting his farming profits. Every indication, though, is that the lost profits based on this further expansion are too speculative to be recovered. Plaintiff has provided no evidence that the profits derived from his farming activities could have funded the significant capital expenditures necessary to build and make operational the additional houses – and, indeed, the revenue and expense schedules attached to his farm portend no such source of capital. Nor has plaintiff supplied any evidence that his farming revenue would have been adequate to secure further loans. Accordingly, the court finds, as a matter of law, that plaintiff has failed to create genuine issues of material fact as to the additional lost profits attributable to these eight additional houses and that defendant, therefore, is entitled to judgment as a matter of law to this extent. *See Fifth Third Bank*, 518 F.3d at 1379 (allowing

---

> that it would ordinarily cost to get a similar loan from another lender. However, in the less common situation in which the lender has reason to foresee that the borrower will be unable to borrow elsewhere or will be delayed in borrowing elsewhere, the lender may be liable for much heavier damages based on the borrower's inability to take advantage of a specific opportunity . . . , his having to postpone or abandon a profitable project . . . or his forfeiture of security for failure to make prompt payment.

Restatement, at § 351 cmt. e; *see also* 11 Corbin, at § 59.3.

the recovery of lost profits on the hypothetical sale of bank branches to third parties, but refusing to allow the recovery of lost operating profits from the same banks); *First Heights Bank FSB v. United States*, 422 F.3d 1311, 1318 (Fed. Cir. 2005) (bank could not recover lost profits it might have earned by reinvesting its profits on a transaction related to the breach); *Mann*, 68 Fed. Cl. at 669-70 (undertakings too remote to be the basis for lost profits if they involve reinvestment of "the fruits of the contract"). These additional profits thus are not recoverable.

Finally, although it does not make much of a case in this regard, defendant refuses to concede that plaintiff has adequately demonstrated a basis upon which a reasonable estimate of the amount of his lost profits can be made. In reaching this number, absolute certainty, of course, is not required because "'the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.'" *Energy Capital*, 302 F.3d at 1327 (quoting *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1366 (7th Cir. 1996) (quoting *Super Valu Stores, Inc. v. Peterson*, 506 So.2d 317, 330 (Ala. 1987))); *see also Franconia*, 61 Fed. Cl. at 753. Although, a court will not permit a plaintiff to recover damages under this standard based on "'mere speculation or guess,'" *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (quoting *Wood v. Day*, 859 F.2d 1490, 1493 (D.C. Cir. 1988)), the plaintiff need only provide some reasonable basis upon which to estimate damages. *See Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003); *see also Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 561 (1941) ("Certainty as to the amount [of damages] goes no further than to require a basis for a reasoned conclusion.").[16] As to this analysis, the Federal Circuit has made clear that the court "'may act upon probable and inferential as well as direct and positive proof.'" *Energy Capital*, 302 F.3d at 1329 (quoting *Locke*, 283 F.2d at 524); *see also Energy Capital*, 302 F.3d at 1329 (court may rely on "reasonable inferences").

"'Fixing lost profits damages with reasonable certainty requires careful examination of the nature and reliability of the statistical proof.'" *Franconia*, 61 Fed. Cl. at 753 (quoting *Travellers Int'l, A.G. v. Trans World Airlines,* 41 F.3d 1570, 1579 (2d Cir. 1994)). In the case *sub judice,* plaintiff attempted to show that, unhindered by the alleged breaches of the Resolution Agreement, his farming activities would have been profitable. In this regard, his damages expert, Dr. Robert Taylor, an Eminent Scholar and Professor of Agricultural Economics at Auburn University, calculated lost profits by using a discounted cash flow method. That method, of course, is typically used by economists, appraisers and damage experts and, if properly executed with the appropriate factual predicates, could establish the lost profits owed plaintiff with the

---

[16] In other cases involving lost profits, the courts have clarified that there is a "distinction between proof of the fact of damages, which must be established with at least reasonable certainty, and the amount of damages, which may be estimated, provided it is not merely speculative." *Thompson v. Haynes*, 305 F.3d 1369, 1382 (Fed. Cir. 2002) (involving Lanham Act violation); *see also Samaritan Inns*, 114 F.3d at 1235; *Chain Belt*, 115 F. Supp. at 714; *Neely*, 285 F.2d at 443; 1 Dunn, at § 1.8 (citing numerous cases).

certainty required by the law. Numerous cases so hold.[17] But, there are questions regarding the factual predicates underlying plaintiff's calculations. In particular, genuine issues of material fact appear to exist as to: (i) the reliability of the revenue projections used, both in terms of magnitude of the revenue and the period over which it would be received; (ii) the reliability of the cost projections used, both in terms of regular operating costs and periodic capital expenditures; (iii) the appropriateness of the profit margins used; (iv) the basis, if any, for recovering interest on the lost profits; and (v) whether the extraordinarily low discount factor employed (5 percent) adequately represents the risks of producing that income.[18] While plaintiff's expert attempted to corroborate his figures in various ways, relying, for example, on statistics obtained from ConAgra and the Alabama Farm Analysis Association, there are, in the court's view, too many unanswered material factual questions to permit this court to grant plaintiff, let alone defendant, judgment as a matter of law. Similar questions underlie Dr. Taylor's projections as to the lost profits associated with plaintiff's reduced cattle herd.

While plaintiff has produced sufficient evidence to proceed to trial, none of the foregoing discussion should leave him sanguine that he will have an easy time there. The legal requirements for proving lost profits are daunting, as the many cases rejecting such claims attest. Moreover, defendant has identified what may prove to be significant weaknesses in some of plaintiff's factual claims. Even so, the existence of material questions of fact as to the recovery of those damages means that plaintiff is entitled to the opportunity to make his case and, correspondingly, that neither plaintiff nor defendant is entitled to judgment, as a matter of law, on this issue.

### 2. Reliance

Plaintiff also seeks various forms of damages that can best be characterized as reliance damages. These damages take two forms. The first involve expenses incurred by plaintiff in constructing and equipping his poultry houses that are now nonoperational and in disrepair. Relatedly, plaintiff appears to seek any damages that would arise if defendant sought to enforce plaintiff's loan obligations – repayment obligations that, in plaintiff's view, he is unable to meet because of defendant's breaches of the Resolution Agreement.

Reliance damages are used to put the non-breaching party in "'as good a position as [it] would have been in had the contract not been made.'" *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1364 (Fed. Cir. 2005) (quoting Restatement, at § 344(b)); *see also Am. Capital*

---

[17] *See Palmer*, 311 U.S. at 557-58; *Energy Capital*, 302 F.3d at 1328-34; *Ace-Fed. Reporters*, 226 F.3d at 1333; *see also Sure-Trip, Inc. v. Westinghouse Eng'g & Instr. Serv. Div.*, 47 F.3d 526, 531 (2d Cir. 1995); *Blackman v. Hustler Magazine, Inc.*, 800 F.2d 1160, 1163 (D.C. Cir. 1986); *Franconia*, 61 Fed. Cl. at 754.

[18] These issues, thought not extensively discussed in the parties' briefs, were highlighted at the oral argument.

*Corp. v. F.D.I.C.*, 472 F.3d 859, 867 (Fed. Cir. 2006); *Glendale Fed. Bank, FSB v. United States*, 239 F.3d at 1382. According to the Restatement, such damages are available where the injured party "cannot provide his profit with reasonable certainty" or "in the case of a losing contract, . . . under which he would have had a loss rather than a profit." Restatement, at § 349 cmt. a. While reliance damages often consist of the costs of performing the contract that is breached, they may also constitute the costs for preparing "a collateral transaction that a party plans to carry out when the contract in question is performed," sometimes called "incidental" or "collateral" reliance damages. *Id.*; *see also Am. Capital Corp*, 472 F.3d at 867 n.4; E. Allen Farnsworth, Farnsworth on Contracts § 12.1, at 151 (2d ed. 1998) (hereinafter "Farnsworth"); 11 Corbin, at § 57.5.[19] That said, such damages may not be speculative, but rather must be based on "the real costs incurred for capital and services that [the injured party] would not have incurred but for the contract and its subsequent breach." *Glendale*, 378 F.3d 1311-12.

In order to recover reliance damages, the "plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation." *Landmark*, 256 F.3d at 1378; *see also Am. Capital Corp.*, 472 F.3d at 867. As in the case of expectation damages, a loss is foreseeable and, therefore, recoverable "'as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.'" *Landmark*, 256 F.3d at 1378 (citing Restatement, at § 351(2)); *see also Am. Capital Corp.*, 472 F.3d at 867-68; 11 Corbin, at § 57.7 (noting that net losses from collateral transactions "may be included in the damages awarded, if at the time the contract was made the breaching party had reason to foresee that such expenditures would be made and that the breach would prevent their reimbursement"). The burden of establishing that plaintiff would have suffered all or part of these losses even without the alleged breach falls on defendant. *See Am. Capital Corp.*, 472 F.3d at 868-69; *Westfed*, 407 F.3d at 1369-70 (citing Restatement, at § 349); 3 Farnsworth, at § 12.16.

Plaintiff argues that the various transactions he entered to establish his farm were foreseeable by the parties, even though not explicitly referenced in the Resolution Agreement. He asserts that, as a result of defendant's alleged breach of that agreement, he was left with two nonoperational poultry houses and a sizable debt owed to the USDA. Plaintiff's expert included a figure of $200,000 in his report to account for these damages. There are, however, several potential problems with this number. For one thing, as noted above, the law generally views reliance damages as an alternative to receiving damages for lost profits. The former calculates damages as if the transaction had not occurred; the latter as if it had been fully performed. The

---

[19] The Restatement supplies the following illustration: "A contracts to sell his retail store to B. After B has spent $100,000 for inventory, A repudiates the contract and B sells the inventory for $60,000. If neither party proves with reasonable certainty what profit or loss B would have made if the contract had been performed, B can recover as damages the $40,000 loss that he sustained on the sale of the inventory." Restatement, at § 349, cmt. a, ill. 4; *see also* L.L. Fuller & William R. Perdue, Jr., "The Reliance Interest in Contract Damages," 46 Yale L.J. 52, 78-84 (1936) (hereinafter "Fuller & Perdue").

prospect of an injured party collecting under both theories risks leaving him "in a better position that he would have occupied had the contract been fully performed." Fuller & Perdue, at 79. Hence, to the extent the report of plaintiff's expert includes both types of damages in his calculations, it may be defective. *See* Restatement, at §349 (noting that a party has a right to damages based on his reliance interest "as an alternative to" expectation damages); *see also Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 499 (3d Cir. 1997); *Grumman Data Sys. Corp. v. United States*, 28 Fed. Cl. 803, 810 n.11 (1993) ("As a general rule of contract law, an aggrieved party cannot recover both reliance and expectation damages.").[20] Such concerns are heightened by the lack of clarity surrounding Dr. Taylor's $200,000 figure and how it was derived. While that figure apparently is a rough estimate of plaintiff's investment in the poultry houses, Dr. Taylor admits that it "can be refined with detailed data on the loan, interest charges, penalties and other expenses incurred by Mr. Stovall." Those refinements may well be critical as the decisional law indicates, *inter alia*, that incidental reliance damages cannot exceed the injured party's actual losses. *See Glendale Fed. Bank*, 239 F.3d at 1383; 3 Farnsworth, at § 12.16; *see also DPJ Co. Ltd. P'ship v. FDIC*, 30 F.3d 247, 250 (1st Cir. 1994) ("[R]eliance damages . . . aim to restore to the claimant what he or she spent before the opportunity was withdrawn."). Indeed, it is possible that plaintiff's current loss calculation includes expenditures made with the proceeds from the USDA loans – obligations that he has not, as yet, been required to repay.

Accordingly, while the court believes plaintiff has supplied enough information to defeat defendant's motion on this count, there remain questions of fact that preclude this court from granting plaintiff summary judgment on this issue.

### III.    CONCLUSION

Based on the foregoing, the court **DENIES**, **IN PART**, and **GRANTS**, **IN PART**, defendant's motion for summary judgment and **DENIES** plaintiff's motion for summary judgment. On or before September 10, 2010, the parties shall file a joint status report proposing trial dates and a suitable location for trial. The court expects that prior to filing this report, the parties will give renewed emphasis to the settlement of this matter, with due consideration to the findings and issues raised in this opinion. The court stands ready to assist these efforts.

**IT IS SO ORDERED**.

                                                   s/ Francis M. Allegra
                                                   Francis M. Allegra
                                                   Judge

---

[20] Professor Farnsworth, on the other hand, indicates that "[t]here is no objection in theory to combining recovery measured by the reliance interest with recovery for such lost profits as are proved with sufficient certainty. The problem in practice is to avoid excessive recovery through overlapping items." 3 Farnsworth, at § 12.16. This passage suggests that, at the least, plaintiff must demonstrate that there is no double-counting in his pursuit of both expectation and reliance damages.